Brandon S. Reif (SBN 214706)
Marc S. Ehrlich (SBN 198112)
Ohia A. Amadi (SBN 268876)
**REIF LAW GROUP, P.C.**
10250 Constellation Blvd., Suite 100
Los Angeles, CA 90067
Tel: 310.494.6500
Email: Docket@reiflawgroup.com; BReif@reiflawgroup.com;
          MEhrlich@reiflawgroup.com; OAmadi@reiflawgroup.com

Attorneys for Plaintiffs (Co-counsel information on next page)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KOLETTE A. PAGE and CLETUS M. PAGE, individually and on behalf of their individual retirement accounts,<br><br>Plaintiffs,<br><br>v.<br><br>MINNESOTA LIFE INSURANCE COMPANY, a Minnesota corporation; SHURWEST HOLDING COMPANY, INC., an Arizona corporation; SHURWEST, LLC, an Arizona limited liability company; HAPPY STATE BANK & TRUST COMPANY dba GOLDSTAR TRUST COMPANY, a Texas business entity (corporate status unknown); FUTURE INCOME PAYMENTS, LLC, a Delaware limited liability company; CMAM, INC. dba HERITAGE FINANCIAL SERVICES, a California corporation; ALBERT ANDREW MANFRE, an individual; JEANETTE MANFRE, an individual; MATTHEW LEE BIESER, an individual; and DOES 1-10, inclusive,<br><br>Defendants. | Case No.:<br><br>**PLAINTIFFS' COMPLAINT FOR:**<br>1. **Violation of the Securities Act**<br>2. **Breach of Fiduciary Duty**<br>3. **Aiding and Abetting Breach of Fiduciary Duty**<br>4. **Financial Elder Abuse**<br>5. **Violation of California Securities Laws**<br>6. **Violation of the California Consumer Legal Remedies Act**<br>7. **Violation of Unfair Competition Law B&PC § 17200, et seq.**<br>8. **Common Law Fraud**<br>9. **Constructive Fraud**<br>10.**Negligent Misrepresentation**<br>11.**Negligence**<br>12.**Intentional Infliction of Emotional Distress**<br><br>**DEMAND FOR JURY TRIAL** |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jon C. Furgison (SBN 205761)
**FURGISON LAW GROUP, P.C.**
444 Longfellow Avenue
Hermosa Beach, CA 90254
Tel: 310.356.6890
Email: jon@furgisonlawgroup.com

Attorneys for Plaintiffs

Plaintiffs Kolette A. Page ("Kolette") and Cletus M. Page ("Cletus") (collectively, "Plaintiffs") allege the following against Minnesota Life Insurance Company ("Minnesota Life"), Shurwest Holding Company, Inc. and Shurwest, LLC ("Shurwest"), Happy State Bank & Trust Company dba Goldstar Trust Company ("GoldStar"), Future Income Payments, LLC ("FIP"), CMAM, Inc. dba Heritage Financial Services ("Heritage"), Albert Andrew Manfre ("Albert"), Jeanette Manfre ("Jeanette") and Matthew Lee Bieser ("Bieser") (collectively, "Defendants"):

## I.   SUMMARY OF CLAIMS

1.    Defendants conspired to defraud Plaintiffs, an elderly and vulnerable retired couple, out of their irreplaceable retirement and life savings exceeding $1,300,000.

2.    Defendants engaged in an unlawful securities and insurance scheme targeting vulnerable, elderly California residents in several actionable acts:

3.    First, Defendants, individually and collectively, induced Plaintiffs through fraud and deception to liquidate their conservatively invested life savings estimated at over $1,300,000 and to transfer all the proceeds to GoldStar.

4.    Second, after the proceeds were transferred to GoldStar, Defendants recommended that Plaintiffs purchase concentrated positions of FIP securities and Minnesota Life permanent life insurance policies with all their retirement proceeds.

5.    Third, Defendants failed to inform and warn Plaintiffs that Defendants' recommended taxable distributions from their GoldStar IRAs to purchase Minnesota Life incurred significant ordinary income taxes of nearly $60,000.  Defendants also failed to inform and warn Plaintiffs that Defendants' recommended concentrated investments into two illiquid assets, such as FIP and Minnesota Life, carried significant risk, were costly, and not in their best interests. Defendants further failed to inform and warn Plaintiffs that the annual premiums on the insurance was unaffordable to them and that they ran a high risk of policy lapse.

6.     Fourth, Defendants never informed or warned Plaintiffs that FIP and Heritage had a history of preying on senior citizens, disabled veterans and retirees living on fixed pension or income streams.  Defendants also failed to inform Plaintiffs that, around the time Defendants were recommending FIP to Plaintiffs, FIP was being investigated by regulators in New York, California, Massachusetts, Iowa, Washington, North Carolina, and the Consumer Financial Protection Bureau due to predatory lending practices.

7.     Defendants individual and collective acts establish statutory strict liability claims as well as intentional torts and negligence.

8.     The strict liability claims are of significant import since they do not require proof of causation or intent and the statutory remedy is, *inter alia*, rescission of all the transactions:

   a. FIP was an unlicensed, unregistered and non-exempt securities offering.

   b. Minnesota Life, Shurwest, GoldStar, Heritage, Albert, Jeanette and Bieser did not possess the necessary state or federal securities licenses and/or the FINRA licenses to make securities recommendations.

   c. Shurwest and GoldStar were not "qualified" to do business in the State of California.

9.     Minnesota Life, Heritage, GoldStar, and FIP, as principals, were responsible for the wrongful conduct of their agents, Albert, Jeanette and Bieser.

10.     Minnesota Life, GoldStar, Heritage and FIP, as principals, affirmatively misrepresented Bieser and Albert as being duly registered, licensed or certificated to engage in securities transactions and provide investment advice to Plaintiffs.  The principal defendants failed to conduct or ignored federally-mandated due diligence which would have uncovered their agents' misconduct.

## II.    PARTIES

11.    Plaintiffs Kolette and Cletus Page are a married couple residing in the State of California in Covina, California.  At all relevant times, they were retired and living on a fixed income stream.  Cletus is seventy-four (74) years old. Kolette is fifty-eight (58) years old.

12.    Defendant Minnesota Life is a Minnesota insurance corporation headquartered in St. Paul, Minnesota.  It authorized Defendants Albert, Jeanette and Bieser as its duly appointed agents.

13.    Defendants Shurwest Holding Company, Inc. and Shurwest, LLC (Shurwest) are Arizona businesses that conduct regular, ongoing activities in the State of California.  Ronald L. Shurts is the President of Shurwest Holding Company, Inc. and the Manager of Shurwest, LLC.  Shurwest markets and sells life insurance, annuities and securities to consumers.  The Shurwest businesses are not registered with the State of California as "qualified" to do business in the State. Shurwest unlawfully engaged in business with California residents.  Further, Shurwest Holding Company, Inc.'s corporate status is "Pending Inactive" by the Arizona Secretary of State pending an administrative dissolution for failure to timely file annual reports.

14.    Defendant GoldStar Trust Company is a "trust branch" and division of Happy State Bank & Trust Company (GoldStar) and promotes itself (via website) as "backed by the financial strength and confidence of" Happy State Bank & Trust Company. On information and belief, Happy State Bank & Trust Company is a business entity registered with the Texas Secretary of State.  GoldStar holds itself out to public consumers as a self-directed IRA custodian, trustee and escrow/payment agent.  It is not "qualified" to do business in the State of California.  It unlawfully engaged in business with California residents.

15.    Defendant FIP is a Delaware limited liability company, registered to do business in California, with an office located in Irvine, California. On

information and belief, FIP specializes in issuing loans to pensioners in return for their pension payments and then bundles the loans and issues unlicensed, non-exempt securities to investors backed by the pension payments. FIP is not registered with the SEC, FINRA or the California Department of Business Oversight ("DBO") and is not exempt from securities registration. It unlawfully engaged in securities transactions with residents of the State of California.

16. Defendant CMAM, Inc. dba Heritage Financial Services (Heritage) is a California corporation located in Lake Forest, California. It also does business as HFIS Insurance Services. On information and belief, Defendant Albert Manfre is the President and owner of Heritage. Heritage's predecessor, which was in the same line of business, located at the same address, and also owned by Albert Manfre, was called Albert Andrew, Inc. and did business as Security Financial Group. Heritage is licensed to sell Life and Accident Insurance by the California Department of Insurance ("DOI") as CMAM, Inc. dba HFIS Insurance Services with CA Ins. Lic. No. 0G98543. It is not registered with the SEC, FINRA or the DBO and is not authorized to offer or sell securities.

17. Albert Andrew Manfre (Albert) is an individual residing, on information and belief, in San Juan Capistrano, California, and is the President of Heritage and its now dissolved predecessor Albert Andrew, Inc. He is also an appointed agent of Minnesota Life. Albert is licensed to sell life and accident insurance by the DOI with CA Ins. Lic. No. 0786630. On information and belief, he is married to defendant Jeanette.

18. Defendant Jeanette Manfre (Jeanette) is an individual residing, on information and belief, in San Juan Capistrano, California, and is employed by Heritage. Plaintiffs are informed and believe that she is the CEO of Heritage. She is also an appointed agent of Defendant Minnesota Life. Jeanette is licensed to sell life and accident insurance by the DOI with CA Ins. Lic. No. 0H24714. Plaintiffs are informed and believe that she is married to Albert.

19.     Defendant Bieser is an individual residing in California with a last known address in Costa Mesa, California.  Bieser is licensed to sell life and accident insurance by the DOI with CA Ins. Lic. No. 0680265. Bieser is deceptively identified as an "account representative" on the Plaintiffs' IRAs under the custodianship of GoldStar.  Bieser is also deceptively identified as an "advisor" in annual reports provided to Plaintiffs by Minnesota Life.  Bieser does not now hold, and has never held, securities licenses with the SEC, DBO or FINRA and is not authorized to effectuate or recommend securities transactions for customers. Heritage, Albert, Jeanette, and Bieser are, collectively referred to as the "Heritage Defendants."

20.     Plaintiffs are unaware of the true names and capacities, whether individual, corporate, agent, representative, or otherwise, of the Defendants named herein as DOES 1 through 10 and therefore sue such Defendants by such fictitious names pursuant to Local Rule 19-1. Plaintiffs are informed and believe, and thereon allege, that each of the Defendant DOES is in some manner responsible for the acts and occurrences alleged herein; and that each DOE Defendant is therefore liable to Plaintiffs as alleged herein. Plaintiffs will seek leave of Court pursuant to Federal Rule of Civil Procedure 15 to amend this complaint to set forth the true names and capacities of these fictitiously named Defendants when they are ascertained.

21.     Plaintiffs allege, on information and belief, that, at all material times herein mentioned, each Defendant was the agent, principal, servant, representative, employer, employee, joint venturer, co-conspirator, partner, parent, subsidiary, affiliate and/or alter ego of each and every other Defendant and, in doing the things hereinafter alleged, was acting within the course and/or scope of such authority as the agent, principal, servant, representative, employer, employee, joint venturer, co-conspirator, partner (of any kind), parent, subsidiary, affiliate, and/or alter ego with the authority and consent of the remaining co-Defendants except where otherwise specifically described.

22.     Plaintiffs are informed and believe, and on that basis, allege that Defendants conspired to and did commit and/or aided and abetted in committing the inequitable, tortious and/or unlawful acts herein alleged in furtherance of their conspiracy to accomplish their unlawful purposes. Defendants, and each of them, caused injury to Plaintiffs.

### III.    JURISDICTION AND VENUE

23.     Jurisdiction and venue are proper in this Court based on federal question jurisdiction pursuant to 28 U.S.C. § 1331.

24.     Venue is appropriate in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred and a substantial part of property that is the subject of the action is situated in this District in that the relationships and conduct at issue in this case were entered into with and affected Plaintiff-residents of this District.

25.     Further, pursuant to, *inter alia*, Cal. Corp. Code § 25550, Defendants are subject to jurisdiction in this venue due to their lack of licensing, registration, and/or certification as alleged in more detail below.

26.     This Court has supplemental jurisdiction over the state law claims for relief under 28 USC §1367.

### IV.    OPERATIVE FACTS

27.     In or about September 2016, Plaintiffs sought to revise trust documents that had previously been prepared for them by Security Financial, a predecessor to Heritage also owned by Albert.

28.     When Plaintiffs contacted Security Financial, they were informed of the name change and told that Heritage would be able to take care of their trust modifications. The employee who previously assisted Plaintiffs was no longer with the company, so Heritage assigned Bieser to assist them.

29.     California *Ins. Code* § 785.4 provides that "[it] shall be unlawful for any insurance agent who is not licensed as an attorney to deliver to a person who is

65 years of age or older, a living trust or other legal document, other than an insurance contract or other insurance product document, if a purpose of the delivery is to sell an insurance product."

30.     Heritage, Albert, Jeanette, Shurwest and Bieser are not licensed attorneys and violated Section 785.4 by preparing and delivering Plaintiffs' trust revisions.   Defendants Minnesota Life knew or should have known of the Section 785.4 violations by its appointed agents and affiliates.

31.     Heritage, Albert, Jeanette, Shurwest, Minnesota Life and Bieser used the trust revisions to gain access to Plaintiffs' securities portfolio exceeding one million dollars in their IRAs managed by Lincoln Financial Group ("Lincoln Financial").  Plaintiffs Kolette and Cletus accrued their savings over decades of service—Kolette, 35 years with Avery Dennison and Cletus, 45 years with the L.A. Times. These Defendants, through Bieser, then began a campaign to induce Plaintiffs to take custody of their assets through GoldStar to induce them to buy large permanent life insurance policies from his principal Minnesota Life and to invest in the FIP securities offering—in violation of *Ins. Code* § 785.4 and other laws as alleged in this complaint.

32.     From September 2016 to December 2016, Bieser visited Plaintiffs' home several times to review their investment portfolio and to make investment, securities and insurance recommendations on behalf of the Defendants.  Sometimes Bieser visited them alone, and sometimes his pregnant wife or infant child joined him. But each time, Bieser pressured Plaintiffs to buy the insurance policies, to transfer their IRAs with Lincoln Financial to Defendants' management and to purchase FIP.  Bieser took all these steps to create a false sense of trust so he and the other Defendants could deceive and defraud Plaintiffs.

33.     Plaintiffs were vulnerable retirees, who ultimately surrendered to Defendants' aggressive and deceptive sales tactics.

34.     Plaintiffs depended on the money in their IRAs to cover their immediate living expenses in retirement. Bieser, on behalf of Defendants, assured Plaintiffs that FIP was a safe and conservative investment guaranteed to make money and that Plaintiffs would receive a guaranteed return of at least 7% on their investment with complete return of their principal within five years.

35.     Bieser, on behalf of Defendants, also promised that between the life insurance and FIP investment, Kolette and Cletus would make thousands of dollars a month and benefit from the life insurance policy worth millions of dollars should one of them die.  Bieser, on behalf of Defendants, was so convincing in his fraudulent sales tactics that in or about December 2016, Plaintiffs followed Defendants' recommendation to invest their entire life savings in their recommended portfolio of Minnesota Life insurance and FIP.

36.     On or about December 16, 2016, Defendants, through Bieser, presented Kolette and Cletus with writings to purchase the FIP securities and the Minnesota Life insurance.  Kolette and Cletus dutifully followed Defendants' instructions and signed the writings in reliance on Defendants' promises of investment returns.

37.     Following Defendants' recommendations, Plaintiffs liquidated their IRAs with Lincoln Financial and rolled over the proceeds to GoldStar, all at Defendants' directive.  Also, at Defendants' directive, Plaintiffs took taxable distributions from their IRAs to pay the premiums on the Minnesota Life permanent life insurance policies.  None of the Defendants informed and warned Plaintiffs about the adverse tax and financial consequences of these acts.

38.     At the time, Kolette's IRA with Lincoln (Account No. xxxx-6801) ("Lincoln IRA") was worth $516,907.94.  Her retirement savings were invested in low cost, conservative mutual funds.  At Defendants' directive, she liquidated all her investments and rolled over the cash proceeds to GoldStar.  At Defendants' directive, Kolette opened a Minnesota Life "Omega Builder Indexed Universal

Life" insurance policy (policy no. xxx6081W) with a death benefit of $2 million and a premium of $113,539 due annually. GoldStar transferred a distribution of $55,000 from Kolette's GoldStar IRA to Minnesota Life to cover the initial partial premium on her Minnesota Life insurance policy. Shurwest set-up and supervised the transfer of Kolette's GoldStar IRA distribution and the investment purchases recommended by Defendants. Kolette later learned that she was taxed on this distribution, but Defendants did not explain the risks versus rewards before the tax consequence was incurred.

39.  Defendants, collectively, used the remainder of Kolette's life savings, roughly $460,000, to purchase FIP securities for Kolette's GoldStar IRA.

40.  Cletus's Lincoln IRA (Account No. xxxx-5806) was worth $798,000.55 just prior to liquidation. His retirement savings was invested in low cost, conservative mutual funds.  At Defendants' directive, he liquidated all his investments and rolled over the cash proceeds to GoldStar. Also, at Defendants' directive, Cletus opened a Minnesota Life "Omega Builder Indexed Universal Life" insurance policy (policy no. xxx9788W) with a death benefit of $1.8 million and a premium of $185,705 due annually. GoldStar transferred a distribution of $96,000 from Cletus's GoldStar IRA to Minnesota Life to cover the initial partial premium on the Minnesota Life insurance policy. Shurwest setup and supervised the transfer of Cletus's GoldStar IRA distribution and the investment purchases recommended by Defendants. Cletus later learned that he was taxed on the distribution to fund the premium.  Defendants did not explain the risks versus rewards before the tax consequence was incurred. Defendants, through Bieser, deceived Plaintiffs that the transactions would be tax free.

41.  Defendants collectively used the remainder of Cletus's life savings, roughly $700,000, to purchase FIP securities for Cletus's GoldStar IRA.

42.  According to the FIP Purchase Agreement, Kolette would receive monthly principal and interest payments of $9,011.01 for five years from January

2017 until her initial principal investment of $460,000 was paid plus 7% interest. Cletus would receive monthly principal and interest payments of $13,712 for five years from January 2017 until his initial principal investment of $700,000 was paid plus 7% interest. However, Plaintiffs only received one check from GoldStar, made out to Plaintiffs jointly, for roughly $22,000 (after tax) in May 2018.

43.     The monthly payments from FIP would be deposited with GoldStar and then transferred to Minnesota Life to help pay the nearly $300,000 in annual premiums for Plaintiffs' Minnesota Life insurance policies.

44.     Defendants, and each of them, are liable for their participation in FIP's unlawful securities offering.

45.     Shurwest, Minnesota Life, and each of the Heritage Defendants were licensed to sell life insurance, not securities, such as the FIP securities they recommended and induced Plaintiffs to purchase. Defendants' conduct gives rise to statutory strict liability. None of Defendants were registered as required with the SEC, FINRA or the State of California as broker-dealers, brokers, associated persons, investment advisers or registered investment advisory firms.  Yet, Defendants, including GoldStar, held themselves out to Plaintiffs as being properly registered, skilled and authorized to engage in securities transactions.

46.     Defendants marketed and recommended FIP's securities without an offering memorandum prior to Plaintiffs making their investment, and they did not certify Plaintiffs' accreditation status or other necessary steps.

47.     Plaintiffs are informed and believe, and thereon allege that Melanie Schulz-Miller, Shurwest's National Life Director at the time, participated in and supervised the wrongdoing alleged herein on behalf of Shurwest.

48.     Albert, Jeanette and Bieser were Minnesota Life appointed agents and given authority to transact business on its behalf. In account reports distributed by Minnesota Life to Plaintiffs, Minnesota Life referred to Bieser as Plaintiffs'

"advisor" which furthered the fraud and deceit that Bieser was a registered investment advisor or other skilled and licensed investment advisor.

49.     Minnesota Life is an insurance company selling permanent life insurance. It is subject to the federal Bank Secrecy Act ("BSA") and its implementing regulations (Anti-Money Laundering ("AML") rules).

50.     Pursuant to AML rules codified at 31 C.F.R. § 1025.320(a)(2)(iii), Minnesota Life has a duty to report any transaction that "is conducted or attempted by, at, or through an insurance company, and involves or aggregates at least $5,000 in funds or other assets, and the insurance company knows, suspects, or has reason to suspect that the transaction (or a pattern of transactions of which the transaction is a part):… Has no business or apparent lawful purpose or is not the sort in which the particular customer would normally be expected to engage, and the insurance company knows of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction[.]"

51.     If Minnesota Life had performed its statutorily required duties, it would have uncovered facts showing that the permanent life insurance policies recommended to Plaintiffs were improper.

52.     Minnesota Life should have determined that, per 31 C.F.R. § 1025.320(a)(2)(iii), the transactions "ha[d] no business or apparent lawful purpose or [were] not the sort in which the particular customer would normally be expected to engage." Plaintiffs were retirees living on a limited fixed income who needed their retirement savings for immediate use. Plaintiffs' initial partial premium payment for the two Minnesota Life policies was approximately $150,000—well in

excess of the $5,000 threshold from AML rules and more than 100% of Plaintiffs' 2017 fixed income[1].

53.     Further, the two Minnesota Life policies called for a combined annual premium of nearly $300,000—more than 200% of Plaintiffs' 2017 fixed income[2]. An investigation by Minnesota Life would have uncovered the fact that the only reason Plaintiffs believed they could "afford" the insurance policies was Defendants' fraudulent representation that concentrating the remaining 90% of their life savings[3] in a single, unregistered security (i.e., FIP) would provide them with sufficient distributions to cover the policy premiums. Minnesota Life should have determined that such a concentrated investment was an unacceptable risk for elderly, retirees such as Plaintiffs.

54.     As such, either Minnesota Life knew of and approved its agents' actions, or it ratified its agents' actions by negligently, fraudulently or recklessly performing its duties.

55.     On information and belief, GoldStar and Shurwest were not registered to do business in the State of California. As such, their business activities with California resident consumers, the Plaintiffs, was unlawful.  These businesses never disclosed or warned Plaintiffs that they were not qualified to transact business with Plaintiffs in California.

56.     Plaintiffs dutifully entered into the transactions recommended by Defendants and through March of 2018, FIP apparently made some payments to Plaintiffs GoldStar IRAs.

---

[1] Plaintiffs' 2017 fixed income excludes taxable distributions from Plaintiffs' GoldStar IRAs used to pay the Minnesota Life initial partial premiums.
[2] See fn. 1.
[3] The other 10% of their life savings went to pay Minnesota Life's initial partial premiums. In May 2018, Plaintiffs transferred roughly $20,000 cash, the remaining cash in their GoldStar IRAs, to separate IRA accounts they opened for that purpose.

57.     However, according to FIP, after making the March 2018 payment, FIP ceased making any payments to investors, including Plaintiffs.

58.     On or about April 10, 2018, FIP sent some investors and other interested parties, not including Plaintiffs, a letter with re line "FIP Restructure" stating that "Due to [FIP's] business and legal expenses, FIP plans are [sic] to restructure its operation and to drastically cut its overhead."

59.     Around the same time that FIP claimed it was "restructuring" it circulated an undated letter stating that: "There will be NO restructuring or collections by FIP in ANY state**."** (Emphasis removed.) Further, "FIP's final and ONLY remaining task is to provide Buyers the information they need on the assets they purchased."

60.     In its April 10, 2018 letter, FIP also implicated GoldStar as liable for FIP's demise stating that:

> FIP has recently endured and continues to endure, intense Regulatory pressure and legal expense. FIP has suffered from events like Goldstar Trust, cutting their services without warning.

> The CFPB announcement that FIP is the target of an ongoing investigation has caused substantial damage to FIP's business.  This announcement has caused harm and posed a threat even though (1) the Bureau insists that it has made no determination of whether FIP's business practices comply with the laws and rules the CFPB enforces, and (2) the Ninth Circuit has stayed on enforcement of the CID.

> The primary harm to FIP has damaged its business relationships with the people and entities that FIP relies on to conduct its business.  FIP depends on various service providers (Like our Sellers payment processor and our bank) to hold and transfer money, facilitate the purchase and sale of income streams, (Like Goldstar Trust) and otherwise keep partner with FIP to implement its business model.

61.     On or about April 17, 2018, GoldStar issued a contradictory letter to Plaintiffs asserting that:

a. it has "no business relationship" with FIP despite purchasing and maintaining custody of security interests issued by FIP;

b. it is not a business partner with FIP; and

c. it had not entered into any contracts with FIP.

62.    In its April 17 letter, GoldStar also admitted that it "has not conducted any due diligence regarding the legality or appropriateness of FIP, LLC's business model." So before placing more than $1 million of Plaintiffs' life savings into FIP, GoldStar admitted it performed no due diligence on FIP.  Restated, it did not investigate whether FIP was securities-licensed or exempt from registration or whether it was licensed to do business or whether it was a qualified or nonqualified offering.  Goldstar's malfeasance is actionable.

63.    Around the same time in April 2018, Plaintiffs were panicked that taxes on GoldStar IRA distributions used to pay premiums on Plaintiffs' Minnesota Life policies were due. Plaintiffs rushed to take out a $25,000 loan on Kolette's Minnesota Life insurance policy to pay for 2017 taxes on IRA distributions. Plaintiffs were also forced to take a loan on Cletus's Minnesota Life insurance policy for $33,598 to pay for 2017 taxes on IRA distributions that GoldStar transferred to Minnesota Life.  Plaintiffs were unaware in 2017 that they had incurred nearly $60,000 in taxes because none of the Defendants ever told Plaintiffs that money transferred from their GoldStar IRAs to Minnesota Life would be taxed. Minnesota Life did not investigate, as suspicious or as unsuitable transactions, the fact that their customers took loans within one year of purchasing millions of dollars in insurance.

64.    In January 2018, Plaintiffs were required to take another taxable distribution from their GoldStar IRA to pay $272,000 in Minnesota Life insurance premiums. This distribution will result in a likely tax liability for Plaintiffs of nearly $100,000.

65.     This action is not the first time that Heritage or its agents have been accused of taking advantage of vulnerable, elderly clients. In January 2018, the California Commissioner of Insurance filed an Accusation and Petition to Remove Heritage agent Mark Malatesta, aka Mark Shulzitski for "exploit[ing] elderly consumers, all over the age of 75, for his own financial gain," while he was employed with Heritage from 2010 to 2016. The Commissioner sought to revoke Malatesta's licenses and licensing rights pursuant to Insurance Code section 1748.5(b).

66.     Defendants GoldStar, Shurwest, the Heritage Defendants, and Minnesota Life were Plaintiffs' fiduciaries.  Also, Defendant Minnesota Life owed Plaintiffs fiduciary duties as principal to monitor and supervise its agents Albert, Jeanette and Bieser, and they all owed Plaintiffs the same fiduciary duties or at least a duty of reasonable care. Additionally, the insurer, insurance broker, and insurance agent Defendants owed Cletus, as a potential insured over the age of 65, duties of honesty, good faith, and fair dealing pursuant to Cal. *Ins. Code* § 785.

67.     Defendants knew or should have known that investing Plaintiffs' life savings in concentrated, speculative investments violates the law and is actionable. Defendants knew or should have known that FIP was at risk of financial ruin due to ongoing legal and regulatory issues, but none of the Defendants informed and warned the Plaintiffs of these risks.  Many of these legal issues arose prior to or soon after GoldStar, Shurwest, the Heritage Defendants, and Minnesota Life convinced Plaintiffs to make their life altering investment in FIP:

a.  In March 2016, the Massachusetts Attorney General announced that FIP agreed to provide more than $2 million in debt relief to resolve allegations that it made predatory and illegal loans to Massachusetts consumers. FIP was also barred from making these loans in Massachusetts in the future.

b. On November 23, 2016, the federal Consumer Financial Protection Bureau served FIP with a Civil Investigative Demand, demanding information related to the company's income stream-advance transactions.

c. In February 2017, a month after Plaintiffs' FIP investment, the City of Los Angeles filed suit against FIP, alleging that the company charges usurious, hidden interest rates as high as ninety-six percent, prohibits early termination of the loans (thereby ensuring that consumers cannot avoid the high interest rates), and employs abusive collection practices.

d. And in May 2017, FIP was the subject of investigations by state regulators in New York, California, Massachusetts, Iowa, Washington, and North Carolina.

68. Defendants fraudulently concealed these facts from Plaintiffs to continue profiting from them. Plaintiffs had no knowledge or suspicion of any of these issues until approximately April 2018 when FIP's President announced FIP had ceased the majority of its operations and would make no further payments to investors as a result of the ongoing regulatory actions and litigation FIP faced.

69. Plaintiffs are informed and believe that all the Defendants engaged in a conspiracy and/or joint venture to defraud them and other vulnerable retirees like them. Defendants combined their property, skill, and knowledge to that purpose. Each Defendant had a role to play in the conspiracy and/or joint venture and each Defendant profited from its role.

70. Defendant Shurwest promoted and supervised investments in the now defunct FIP. As part of Defendants' conspiracy, Shurwest and the Heritage Defendants identified and targeted retirees with substantial IRA assets. Shurwest and the Heritage Defendants convinced their victims to transfer their IRAs to GoldStar and invest millions of dollars in FIP promising high returns, substantial

cash distributions, and no risk. GoldStar profited by charging custodial fees on the IRAs and admittedly failed to perform any due diligence on FIP before committing millions in retirement funds to FIP.

71.    Shurwest and the Heritage Defendants convinced retirees like Plaintiffs that the distributions from FIP would pay for large permanent life insurance policies with Minnesota Life. Shurwest and the Heritage Defendants profited from commissions they made from selling the life insurance policies. And Minnesota Life profited from lucrative premiums on the policies—so lucrative in fact that Minnesota Life either intentionally or negligently failed to perform due diligence that would have uncovered Defendants' fraudulent scheme.

72.    Since FIP ceased operating, Defendants Albert and Bieser have made statements to Plaintiffs implicating themselves and the other Defendants in this conspiracy and/or joint venture to defraud Plaintiffs and others like them. Plaintiffs took contemporaneous notes of Albert and Bieser's statements. Following are transcriptions of Plaintiffs' notes (corrected for typos).

73.    During a June 1, 2018 call with Plaintiffs, Albert stated that, "Three people to sue are Shurwest, Goldstar and FIP." He further stated that "all qualified money like ours went through Goldstar," and that "even though Goldstar sent a letter saying they are not responsible they are completely responsible." He further stated that "We [Heritage, Jeanette, and Albert] are going to get your money back one way or another.  You are not going to lose your money.  We will get your money and then some." Finally, he stated that "If I have to sue Shurwest and spend 1/2 to 1 million dollars, I will.  Numerous advisors like me are out there in the same boat.  There is over $25 million in this product [FIP] because of Shurwest advising it."

74.    During a June 22, 2018 call with Plaintiffs, Albert stated that "We are not liking what FIP is doing.  We have decided we are going to go after Shurwest because what they did is unethical." Further, he said he would give Plaintiffs

"something from the attorney to sign because he will represent all of my clients when we sue Shurwest." He further stated that "my attorney thinks that we will only get back 30 to 40% of your money from FIP so we will sue Shurwest to get the difference or the whole thing plus attorney fees," and that "Shurwest has committed insurance fraud" but that he "cannot get into the whole thing now but will provide you with more information next Friday.  Shurwest did something with the insurance company [Minnesota Life] and the Sr. manager [Melanie Schulze-Miller at Shurwest] was hiding something." He stated that he "talked to the CEO of Shurwest and he said he fired [Schulze-Miller] and he did not know what she was doing" and that Albert told Shurwest's CEO that "you are going to make my clients whole with the $5 million they have out now or much more later if we have to." Finally, he said "I cannot believe that the CEO of Shurwest would let someone do this."

75.     During a June 25, 2018 call with Cletus, Bieser stated that "Shurwest committed insurance fraud.  We are 100% behind you guys and will make you whole even if it has to come out of our own pockets.  We will make this right.  We know that this is your retirement money and Heritage has never lost their clients' money in 23 years."

76.     Bieser further stated that the FIP program was "sold to [Heritage, Albert, Jeanette, and Bieser by Shurwest] as 'completely safe.'" Bieser said that Plaintiffs should "keep in mind Shurwest is a $200 million dollar company so why wouldn't they settle this $5 million dollar loss and not jeopardize their $200 million dollar business?"

77.     Bieser further stated that "Al [Albert] has been looking into what Mel [Melanie Schulze-Miller from Shurwest] was doing and she was doing more on the side that we did not realize." Bieser reiterated that "this program [the FIP offering] was never presented to you as a risk nor was it presented to me that way either.  I told Al that and now he understands it was not presented as a risky program to you." Bieser further stated that he has "two clients that this is all of their retirement

money so I will make it right if I have to pay you out of my own pocket." Finally, he said he "know[s] how stressful this is to you and it is to me too. I had a heart attack at 49 and my doctor said to avoid stress and this is very stressful to everyone."

78.    On July 2, 2018, Bieser called Plaintiffs claiming that he had a "new development." He said "Shurwest is the fourth largest wholesaler of insurance and because of what FIP did, they are very concerned with what this means to their relationship with MN Life. Shurwest does $200 million a year in policies with MN Life."

79.    Bieser further stated that "[Ron Shurts, CEO and President of Shurwest] is coming out to meet with Al Manfre in two weeks to get this squared away. Ron himself will pay everyone because he does not want to compromise his relationship with MN Life. This has changed everything. He has to resolve this. He is not going to let this jeopardize his relationship with MN Life. Why let $5m mess up the $100m income from MN Life.…Ron from Shurwest is coming out to get this resolved. He wants to get everyone taken care of because he does not want this to go to court. If it does, it lets out a whole can of worms that they do not want. It may be that we get 50% from FIP and Ron and Al make up the rest. I am hoping to get very specific answers within the next 2 weeks. We cannot go on like this, it just can't. I think Ron will just do this."

80.    The Heritage Defendants, on behalf of themselves and the other Defendants, have been pressuring Plaintiffs and other clients in 1Q18 and 2Q18 to retain their selected lawyer to pursue FIP and Shurwest. Their acts show ongoing breach of fiduciary duties, misrepresentations and fraudulent concealment of material facts. They promised Plaintiffs that their lawyer, if retained, will be able to get back their money without Plaintiffs having to do anything or paying any of the legal fees.

81.    The Heritage Defendants, on behalf of themselves and the other Defendants, are trying to distract from and conceal their liability to Plaintiffs by shifting blame to Shurwest and/or other culpable parties.  All these ongoing false and misleading acts, evidence breaches of fiduciary duty and fraudulent concealment by Defendants, individually and collectively, and prove their misconduct.

## V.    CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## (VIOLATION OF THE FEDERAL SECURITIES ACT BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS AND DOES 1 AND 2)

82.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

83.    Sections 5, 11, and 12 of the federal Securities Act of 1933 provide registration and other requirements relating to the securities offered to Plaintiffs.

84.    On information and belief, the FIP securities that Defendants offered or sold to Plaintiffs were not registered in compliance with the Securities Act.

85.    Further Defendants were not properly registered, licensed, or certificated to engage in the securities transactions as alleged in this complaint, nor were they exempt.

86.    Defendants also failed to disclose required information to Plaintiffs as alleged herein, including but not limited to, failing to provide Plaintiffs with a prospectus or operating memorandum for their investments.

87.    This cause of action is a statutory strict liability cause of action which does not require proof of causation or intent.

88.    Plaintiffs are entitled to rescission of all transactions and/or damages and prejudgment interest and attorneys' fees and costs.

## SECOND CLAIM FOR RELIEF

### (BREACH OF FIDUCIARY DUTY BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS AND DOES 3 TO 5)

89. Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

90. A fiduciary or confidential relationship existed between Plaintiffs and each Defendant.

91. Defendants Minnesota Life, the Heritage Defendants, Shurwest, and GoldStar owed fiduciary duties by holding themselves out as brokers and financial advisers, investment advisers and skilled financial and licensed professionals with authority to effect transactions in securities and investments, such as IRA rollovers, the FIP securities and the insurance policies pled in this action.

92. Further, GoldStar, FIP and Minnesota Life owed Plaintiffs fiduciary duties as a common law agent entrusted with Plaintiffs' life savings. FIP owed Plaintiffs fiduciary duties based on Plaintiffs granting FIP power of attorney pursuant to the purchase agreement between FIP and Plaintiffs. Defendant GoldStar owed Plaintiffs fiduciary duties as securities custodian of Plaintiffs' life savings and by effecting the FIP securities purchases for the benefit of Plaintiffs pursuant to the purchase agreement between FIP and each Plaintiff.

93. Plaintiffs were retired, advanced in age, living on a fixed income and had limited financial and investment acumen. Plaintiffs were vulnerable to Defendants' predation and they relied on Defendants' representations of financial and investment expertise and recommendations. Plaintiffs followed Defendants' recommendation and advice to invest in FIP and purchase Minnesota Life insurance.

94. Defendants betrayed the trust that Plaintiffs reposed in them and breached their fiduciary duties by: (1) engaging in all acts discussed herein including the registration/licensing violations; (2) putting Defendants' interests

ahead of Plaintiffs' interests and taking actions and making recommendations for their own gain at Plaintiffs' expense; (3) concealing material facts from Plaintiffs and by misleading them and deceiving them in all the acts discussed herein.

95.   Defendants' breaches of fiduciary duty proximately caused Plaintiffs' harm.

96.   Defendants engaged in their actions and omissions intentionally with malice, oppression, or fraud pursuant to California Civil Code §3294.  Further, the individual employees of the corporate entity Defendants who committed these wrongful acts and omissions were either officers, directors, or managing agents of such Defendants or such Defendants authorized their employees misconduct or subsequently adopted or approved their wrongful conduct such that such Defendants are liable for punitive damages based on their employees' conduct.

97.   Further, per California Civil Code § 3372, Defendants were persons "engaged in the business of advising others for compensation as to the advisability of purchasing, holding or selling property for investment and who represent[ed]" themselves to be experts but failed to perform with "the due care and skill reasonably to be expected of a person who is such an expert."

## THIRD CLAIM FOR RELIEF

### (AIDING AND ABETTING BREACH OF FIDUCIARY DUTY BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS AND DOES 6 AND 7)

98.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

99.   If any Defendant was not in a fiduciary or confidential relationship with Plaintiffs, Plaintiffs allege they aided and abetted the breaches of fiduciary duties committed by the other Defendants as alleged in the complaint: they had actual knowledge of the other Defendants' breaches of fiduciary duties and provided substantial assistance or encouragement to their breaches.

100.   Minnesota Life disclosed Bieser as investment "advisor" in annual policy disclosure reviews and Goldstar disclosed Bieser as an "account representative."  Minnesota Life, Goldstar, and the other Defendants reinforced the other Defendants' fraud, deceit, breaches and negligence as set forth in this complaint.

101.   As a proximate result of Defendants' conduct, Plaintiffs have been damaged in an amount to be determined at trial.

102.   Defendants engaged in their actions and omissions intentionally with malice, oppression, or fraud pursuant to California Civil Code §3294 and are liable for punitive damages.

103.   Per California Civil Code § 3372, Defendants were persons "engaged in the business of advising others for compensation as to the advisability of purchasing, holding or selling property for investment and who represent[ed]" themselves to be experts but failed to perform with "the due care and skill reasonably to be expected of a person who is such an expert."

## FOURTH CLAIM FOR RELIEF

### (FINANCIAL ELDER ABUSE BY PLAINTIFF CLETUS AGAINST ALL DEFENDANTS AND DOES 1 TO 10)

104.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

105.   Plaintiff Cletus properly asserts his rights under California's financial elder abuse statute because he was a California resident and 65 years or older during all relevant times.

106.   Defendants, and each of them, are liable to Cletus because they violated California's financial elder abuse statute which makes anyone liable who: (i) takes, secretes, appropriates, obtains or retains, any interest in any real or personal property, for a wrongful use, or with intent to defraud or both; or (ii)

assists in doing any of the above described acts; or (iii) does any of the above described acts through undue influence.

107.   A conclusive presumption of financial abuse exists under Cal. *Welf. & Inst. Code* § 15610.30(b) because Defendants, and each of them, knew or should have known that their malfeasance was likely to be harmful to Cletus, a senior citizen.

108.   Cletus was approximately seventy-two (72) to seventy-four (74) years old during the time period relevant to this complaint.  Defendants and their co-conspirators and aiders and abetters exerted duress, fraud, coercion and undue influence over Cletus at the time of these wrongful takings alleged in this complaint.

109.   Cletus seeks attorneys' fees and costs of suit under Cal. *Welf. & Inst. Code* §§ 15657.5(a).  Cletus seeks pain and suffering damages under Cal. *Civ. Code* § 3333.2 and Cal. *Welf. & Inst. Code* §15657.5(b)(1).

110.   Cletus seeks punitive and exemplary damages and trebled damages under Cal. *Civ. Code* §§ 3345 and 3294.

## FIFTH CLAIM FOR RELIEF
### (VIOLATION OF THE CALIFORNIA CORPORATIONS CODE BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS AND DOES 1 AND 2)

111.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

112.   California securities laws provide rules and qualifications for effecting any transaction in, or inducing the purchase or sale of, any securities in the State of California.  Plaintiff alleges, on information and belief, that Defendants violated these statutory rules.

113.   Cal. *Corp. Code* §§ 25110 to 25130 provides that "[i]t is unlawful for any person to offer or sell…" securities in the State of California without meeting

specific state requirements or having an exemption.  Cal. *Corp. Code* §25210 provides that broker-dealers must first apply for and secure a certificate before effecting any transaction in, or inducing the purchase or sale of, any security in the State of California.

114.   Cal. *Corp. Code* §25211 provides that persons must not effect any transaction in, or induce or attempt to induce the purchase or sale of, any security in the State of California unless the broker-dealer and agent are licensed and registered.

115.   Cal. *Corp. Code* § 25401 provides that "[i]t is unlawful for any person to offer or sell a security in this state, or to buy or offer to buy a security in this state, by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading."

116.   Cal. *Corp. Code* § 25501 provides in pertinent part that "[a]ny person who violates Section 25401 shall be liable to the person who purchases a security from him or sells a security to him, who may sue either for rescission or for damages (if the plaintiff or the defendant, as the case may be, no longer owns the security)[.]"

117.   Cal. *Corp. Code* § 25501.5 provides that "[a] person who purchases a security from or sells a security to a broker-dealer that is required to be licensed and has not, at the time of the sale or purchase, applied for and secured from the commissioner a certificate under Part 3 (commencing with Section 25200), that is in effect at the time of the sale or purchase authorizing that broker-dealer to act in that capacity, may bring an action for rescission of the sale or purchase or, if the plaintiff or the defendant no longer owns the security, for damages."

118.   Here, none of the Defendants were registered, licensed and certificated brokers with the SEC, FINRA or the State of California or exempt from such

registration, licensure, or certification. Nor were they registered, licensed and certificated as investment advisors or exempt from such.

119.   Further, GoldStar and Shurwest were not qualified to conduct business in California because they never registered with the DBO.

120.   Defendants concealed from Plaintiff that they were not registered, licensed and certificated to act in their capacities as brokers and/or investment advisers or to operate at all within the State of California.

121.   For these reasons and other statutory registration and licensing issues alleged in this complaint, the agreements and transactions between Defendants and Plaintiffs are void.

122.   This claim for relief is a statutory strict liability claim which does not require proof of causation or intent.

123.   Plaintiffs are entitled to rescission of all transactions plus prejudgment interest, among other remedies set forth in the prayer.

124.   Plaintiffs are also entitled to treble damages under California *Code of Civ. P.* §1029.8 and reasonable attorneys' fees under any statute or law providing such entitlement, including California *Corp. Code* §25501.5(b).

## <u>SIXTH CLAIM FOR RELIEF</u>

### (VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT ("CLRA") BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS AND DOES 1 TO 10) (*INJUNCTIVE RELIEF ONLY*)

125.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

126.   Cal. *Civ. Code* § 1770(a) states that "the following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer are unlawful: …(2) Misrepresenting the source, sponsorship, approval, or certification of goods or services. (3) Misrepresenting the affiliation,

connection, or association with, or certification by, another…(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have….(18) Misrepresenting the authority of a salesperson, representative, or agent to negotiate the final terms of a transaction with a consumer…. (26) Advertising, offering for sale, or selling a financial product that is illegal under state or federal law, including any cash payment for the assignment to a third party of the consumer's right to receive future pension or veteran's benefits.

127.   Defendants all misrepresented their registration, licensing, and or certification to effect the transactions at issue in this case and/or to provide investment advice to Plaintiffs. Defendants concealed the fact that the FIP securities were not properly registered or exempt from registration. Defendants also concealed from Plaintiffs regulatory actions and litigation against FIP which ultimately led to FIP's demise. As principal, Minnesota Life is responsible for the wrongdoing of its agents Albert, Jeanette, and Bieser.

128.   Shurwest and GoldStar misrepresented their qualification to conduct business in California. Shurwest and GoldStar held themselves out as being authorized by the State of California to conduct business with Plaintiffs, California residents. However, they were not so authorized.

129.   FIP advertised, offered for sale, and sold cash payment for the assignment to a third party of consumers' right to receive future pension or veteran's benefits in violation of the CLRA.

130.   Pursuant to Cal. *Civ. Code* §1780(a) "[a]ny consumer who suffers any damage as a result of the use or employment by any person of a method, act, or practice declared to be unlawful by Section 1770 may bring an action against that person to recover or obtain any of the following: (1) Actual damages, but in no case shall the total award of damages in a class action be less than one thousand dollars

($1,000). (2) An order enjoining the methods, acts, or practices. (3) Restitution of property. (4) Punitive damages. (5) Any other relief that the court deems proper."

131.   Pursuant to Cal. *Civ. Code* § 1780(b)(1) "[a]ny consumer who is a senior citizen or a disabled person, as defined in subdivisions (f) and (g) of Section 1761, as part of an action under subdivision (a), may seek and be awarded, in addition to the remedies specified therein, up to five thousand dollars ($5,000) where the trier of fact does all of the following: (A) Finds that the consumer has suffered substantial physical, emotional, or economic damage resulting from the defendant's conduct. (B) Makes an affirmative finding in regard to one or more of the factors set forth in subdivision (b) of Section 3345. (C) Finds that an additional award is appropriate."

132.   At this time, Plaintiffs seek only injunctive relief. Attached to this complaint as Exhibit A is Plaintiffs' demand letter to Defendants pursuant to the CLRA. If the 30-day period for Defendants to cure their unlawful conduct expires without any Defendant curing such unlawful conduct, Plaintiffs will seek damages and other remedies including trebled damages, attorneys' fees, prejudgment interest, and costs against all Defendants.

## SEVENTH CLAIM FOR RELIEF

### (UNFAIR BUSINESS PRACTICES IN VIOLATION OF BUS. AND PROF. CODE SECTION 17200 BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS AND DOES 1 TO 10)

133.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

134.   Defendants failed to fulfill their statutory and common law duties as alleged in this complaint. Among other things, Defendants held themselves out as qualified to purchase for Plaintiffs, and advise Plaintiffs on, FIP securities, but failed to register as such prior to purchasing securities for Plaintiffs and advising them on the purchase of securities. Shurwest and GoldStar failed to obtain

authorization from the State of California to do business with Plaintiffs. And Defendants misled Plaintiffs on the advisability of purchasing FIP securities and the Minnesota Life insurance policies.

135.   By reason of this and other fraudulent, deceptive, unfair, and wrongful conduct alleged herein, Defendants have violated *California Business and Professions Code* section 17200 et seq.

136.   Pursuant to *Bus. & Prof. Code* section 17200, et seq., Plaintiffs are entitled to restitution of all amounts paid to Defendants and to injunctive relief against Defendants' wrongful conduct alleged in this complaint.

## EIGHTH CLAIM FOR RELIEF

### (COMMON LAW FRAUD BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS AND DOES 1 TO 10)

137.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

138.   As alleged above, Defendants committed fraudulent acts against Plaintiffs both by affirmative misrepresentations and by intentional concealment.

139.   Defendants concealed from Plaintiffs their lack of registration, certification and licensure as set forth herein. Minnesota Life, the Heritage Defendants, and Shurwest held themselves out as investment advisers and brokers. However, none of them were registered, licensed, or certificated to act as such and they never disclosed this to Plaintiffs.

140.   Minnesota Life committed affirmative misrepresentations by identifying Bieser as an "advisor" when in fact he was not registered, licensed, or certificated as a financial/investment advisor or as a broker. It is also liable for the fraud of its agents Albert, Jeanette, and Bieser.

141.   GoldStar and Shurwest concealed from Plaintiffs the fact that they were not qualified to transact business with them as California residents.

142.   Defendants concealed the fact that the FIP securities were not properly registered or exempt from registration. Defendants also concealed from Plaintiffs regulatory actions and litigation against FIP which ultimately led to FIP's demise.

143.   Defendants knew or reasonably should have known that their conduct was fraudulent. Defendants also intended to defraud Plaintiffs.

144.   Defendants owed fiduciary or similar duties to Plaintiffs such that Plaintiffs were justified in relying on Defendants' misstatements and concealment. The nature of the relationship between Plaintiffs and Defendants in which Plaintiffs reposed trust and confidence in Defendants, justified their reliance on Defendants.

145.   Defendants' fraudulent concealment and misrepresentation proximately caused Plaintiffs' harm.

146.   As alleged above, Defendants engaged in their actions and omissions intentionally with malice, oppression, or fraud pursuant to California Civil Code §3294.  Further, the individuals who committed these wrongful acts and omissions were either officers, directors, or managing agents of the entity Defendants or the entity Defendants authorized their employees' misconduct or subsequently adopted or approved their wrongful conduct such that the entity Defendants are liable for punitive damages based on their employees'/agents' conduct.

### NINTH CLAIM FOR RELIEF

### (CONSTRUCTIVE FRAUD BY ALL PLAINTIFFS
### AGAINST ALL DEFENDANTS AND DOES 3 TO 7)

147.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

148.   Defendants occupied a fiduciary or similar position of trust with respect to Plaintiffs, for, among other things, holding themselves out to be brokers and/or investment advisers.

149.   As alleged above Defendants committed multiple fraudulent acts against Plaintiffs both by affirmative misrepresentations and by intentional concealment.

150.   Defendants concealed from Plaintiffs their lack of registration, certification and licensure as set forth herein. Minnesota Life, GoldStar, the Heritage Defendants, and Shurwest held themselves out as investment advisers and brokers. However, none of them were registered, licensed, or certificated to act as such and they never disclosed this to Plaintiffs.

151.   Minnesota Life and GoldStar committed affirmative misrepresentations by identifying Bieser as an "advisor" and an "account representative," respectively, when in fact he was not registered, licensed, or certificated as a financial/investment advisor or as a broker. Minnesota Life is also liable for the fraud of its agents Albert, Jeanette, and Bieser.

152.   GoldStar and Shurwest concealed from Plaintiffs the fact that they were not qualified to transact business with them as California residents.

153.   Defendants concealed the fact that the FIP securities were not properly registered or exempt from registration. Defendants also concealed from Plaintiffs regulatory actions and litigation against FIP which ultimately led to FIP's demise.

154.   Defendants knew or reasonably should have known that their conduct was fraudulent.

155.   Defendants' fraudulent concealment and misrepresentation proximately caused Plaintiffs' harm.

156.   Defendants engaged in their actions and omissions intentionally with malice, oppression, or fraud pursuant to California Civil Code §3294 and are liable for punitive damages.

### TENTH CLAIM FOR RELIEF

### (NEGLIGENT MISREPRESENTATION BY ALL PLAINTIFFS
### AGAINST ALL DEFENDANTS AND DOES 1 TO 10)

157.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

158.   As alleged above, Defendants made affirmative misrepresentations to, and intentionally concealed material information from, Plaintiffs.

159.   Defendants concealed from Plaintiffs their lack of registration, certification and licensure as set forth herein. Minnesota Life, GoldStar, the Heritage Defendants, and Shurwest held themselves out as investment advisers and brokers. However, none of them were registered, licensed, or certificated to act as such and they never disclosed this to Plaintiffs.

160.   Minnesota Life committed affirmative misrepresentations by identifying Bieser as an "advisor" when in fact he was not registered, licensed, or certificated as a financial/investment advisor or as a broker. It is also liable for the fraud of its agents Albert, Jeanette, and Bieser.

161.   GoldStar and Shurwest concealed from Plaintiffs the fact that they were not qualified to transact business with them as California residents.

162.   Defendants also concealed the fact that the FIP securities were not properly registered or exempt from registration. Defendants also concealed from Plaintiffs regulatory actions and litigation against FIP which ultimately led to FIP's demise.

163.   Defendants knew or reasonably should have known that their conduct was fraudulent.

164.   Although Defendants may have honestly believed that their representations were true or that they had no duty to disclose information that they failed to disclose to Plaintiffs, Defendants had no reasonable grounds for their belief at the time of their misrepresentation or omission.

165.   Defendants intended for Plaintiffs to rely on their misrepresentations and omissions.

166.   As fiduciaries, Plaintiffs were justified in relying on Defendants' misstatements and concealment.  The nature of the relationship between Plaintiffs and Defendants in which Plaintiffs reposed trust and confidence in Defendants, justified their reliance on Defendants.

167.   Defendants' omissions and misrepresentations proximately caused Plaintiffs' harm.

168.   Defendants engaged in their actions and omissions intentionally with malice, oppression, or fraud pursuant to California Civil Code §3294 and are liable for punitive damages.

### ELEVENTH CLAIM FOR RELIEF

### (NEGLIGENCE BY ALL PLAINTIFFS

### AGAINST ALL DEFENDANTS AND DOES 1 TO 10)

169.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

170.   Per California *Civil Code* § 3372, Defendants were persons "engaged in the business of advising others for compensation as to the advisability of purchasing, holding or selling property for investment and who represent[ed]" and as such had a duty to perform with "the due care and skill reasonably to be expected of a person who is such an expert."

171.   Defendants breached these duties as alleged in this complaint.

172.   Defendants' breaches proximately caused Plaintiffs' harm.

173.   As a result of Defendants' negligence, Plaintiffs suffered serious emotional distress.

174.   Defendants' negligence was a substantial factor in causing Plaintiffs' serious emotional distress.

## TWELFTH CLAIM FOR RELIEF

## (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS AND DOES 1 TO 10)

175. Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

176. Defendants' conduct as alleged in this complaint was outrageous.

177. Either Defendants intended to cause Plaintiffs emotional distress or Defendants acted with reckless disregard of the probability that Plaintiffs would suffer emotional distress as a result of Defendants' conduct.

178. Plaintiffs suffered severe emotional distress.

179. Defendants' conduct was a substantial factor in causing Plaintiffs' severe emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

1. Statutory damages, including rescission of Plaintiffs' transactions;

2. Compensatory damages in an amount according to proof, but not less than $1,300,000;

3. Special damages in an amount according to proof;

4. General damages in an amount according to proof;

5. An accounting of all of Plaintiffs' transactions;

6. Restitution and unjust enrichment in an amount according to proof;

7. Treble damages under any statute or law providing such entitlement, including Cal. *Code of Civ. Proc.* § 1029.8 and Cal. *Civ. Code* § 3345;

8. Attorneys' fees and costs of suit under any agreement, statute, or law providing such entitlement, including Cal. *Corp. Code* § 25501.5(b), Cal. *Wel. & Inst. Code* § 15657.5(a), Cal. *Code of Civ. Proc.* § 1029.8;

9. For pre-judgment interest on all damages at the maximum legal rate;

10. For punitive and exemplary damages under Cal. *Civ. Code* §§ 3294 and 3345;

11. For an injunction prohibiting Defendants from continuing to violate Cal. *Bus. & Prof. Code* §§17200, *et seq.* and the CLRA, Cal. *Civ. Code* § 1750 et seq.; and equitable remedies including but not limited to rescission, restitution, civil penalties; and

12. For such other further relief as the court may deem just and proper.

## JURY DEMAND

Plaintiffs demand trial by jury as to all issues so triable in this action.

**REIF LAW GROUP, P.C.**

Dated:  July 6, 2018      By: _____

Brandon S. Reif
Marc S. Ehrlich
Ohia A. Amadi

Jon C. Furgison
FURGISON LAW GROUP, P.C.

*Attorneys for Plaintiffs*

EXHIBIT "A"

036



**REIF LAW GROUP** P.C.

TRIAL ATTORNEYS • SECURITIES & BUSINESS DISPUTES

July 6, 2018

<u>**VIA PERSONAL DELIVERY**</u>
**TO EACH AND ALL DEFENDANTS**

     RE: *Page, et al. v. Minnesota Life Insurance Company, et al*., C.D. Cal.
        <u>Notice of Violation of Consumer Legal Remedies Act</u>

To whom it may concern:

     **PLEASE TAKE NOTICE** that this letter constitutes notice under the California Consumer Legal Remedies Act, (hereinafter referred to as "CLRA") California *Civil Code* section 1750, et seq. Pursuant to Civil Code section 1782, Plaintiffs Kolette and Cletus Page, individually and on behalf of their IRAs, (collectively, "Plaintiffs") hereby notify Defendants Minnesota Life Insurance Company ("Minnesota Life"), Shurwest Holding Company, Inc. and Shurwest, LLC ("Shurwest"), Happy State Bank & Trust Company dba Goldstar Trust Company ("GoldStar"), Future Income Payments, LLC ("FIP"), CMAM, Inc. dba Heritage Financial Services ("Heritage"), Albert Andrew Manfre ("Albert"), Jeanette Manfre ("Jeanette") and Matthew Lee Bieser ("Bieser") (collectively, "Defendants") of violations of the CLRA and of demand that you remedy such violation within thirty (30) calendar days from your receipt of this letter.

     As stated in Plaintiffs' complaint, filed July 6, 2018 in the District Court for the Central District of California, to which this letter is attached as Exhibit A, and which complaint is incorporated herein by reference as if stated in full, Defendants unfair methods of competition or unfair or deceptive acts or practices in violation of the CLRA section 1770 include, but are not limited to:

(1) Misrepresenting the source, sponsorship, approval, or certification of goods or services;

(2) Misrepresenting the affiliation, connection, or association with, or certification by, another;

(3) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have;

(4) Misrepresenting the authority of a salesperson, representative, or agent to negotiate the final terms of a transaction with a consumer; and

(5) Advertising, offering for sale, or selling a financial product that is illegal under state or federal law, including any cash payment for the assignment to a third party of the consumer's right to receive future pension or veteran's benefits.

More specifically, Defendants committed, among other wrongful acts alleged in the complaint, the following wrongful acts:

(1) Defendants all misrepresented their registration, licensing, and or certification to effect the transactions at issue in this case and/or to provide investment advice to Plaintiffs.

(2) Defendants concealed the fact that the FIP securities were not properly registered or exempt from registration.

(3) Defendants concealed from Plaintiffs regulatory actions and litigation against FIP which ultimately led to FIP's demise.

(4) Shurwest and GoldStar misrepresented their qualification to conduct business in California. Shurwest and GoldStar held themselves out as being authorized by the State of California to conduct business with Plaintiffs, California residents. However, they were not so authorized.

(5) FIP advertised, offered for sale, and sold cash payment for the assignment to a third party of consumers' right to receive future pension or veteran's benefits in violation of the CLRA.

Based upon the above, Plaintiffs hereby demand that you rescind the transactions at issue, pay Plaintiffs for all damage caused by your unlawful conduct—not less than $1.3 million, pay Plaintiffs any penalties, fines, or other statutory amounts for which Defendants are liable as a result of their unlawful conduct, and pay Plaintiffs' attorneys' fees and costs.

Please be advised that your failure to comply with this request within thirty (30) calendar days may subject you to the following remedies, which are available for a violation of the Consumer Legal Remedies Act:

(1) The actual damages suffered;

(2) An order enjoining Defendants for the alleged unlawful methods, acts or practices;

(3) Restitution;

(4) Punitive damages;

(5) Any other relief which the court deems proper; and

(6) Court costs and attorneys' fees.

In addition, California Civil Code Section 1780(b) provides in part that: "Any consumer who is a senior citizen or a disabled person, as defined in subdivisions (f) and (g) of Section 1761, as part of an action under subdivision (a), may seek and be awarded, up to five thousand dollars ($5,000)...." Cletus was 65 or older and thus a senior citizen pursuant to Section 1780(b) and is eligible for an additional $5,000.

This letter will also constitute FURTHER NOTICE that the actions as set forth above also constitute violations of California's *Business and Professions Code Sections* 17200, et seq.

Very truly yours,

Brandon S. Reif
for REIF LAW GROUP, P.C.
on Behalf of Plaintiffs Kolette and Cletus Page,
individually and on behalf of their IRAs