James A. Anton (144999)
Law Office of James A. Anton
7700 Irvine Center Drive, Suite 800
Irvine, CA 92618
949-753-2818
Email: *james@jamesantonlaw.com*

Attorney for Defendants, Jeannette Manfre, Albert Manfre and
CMAM, Inc. dba Heritage Financial Services

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | |
|---|---|
| KOLETTE A. PAGE AND CLETUS M. PAGE <br><br> PlaintiffS, <br><br> v. <br><br> MINNESOTA LIFE INSURANCE COMPANY, SHURWEST HOLDING COMPANY, INC., SHURWEST, LLC; HAPPY STATE BANK & TRUST COMPANY DBA GOLDSTAR TRUST COMPANY; FUTURE INCOME PAYMENTS, LLC; CMAM, INC. DBA HERITAGE FINANCIAL SERVICES; ALBERT ANDREW MANFRE; JEANNETTE MANFRE; MATTHEW LEE BIESER, AND DOES 1 – 10, <br><br> Defendants. | Case No. 8:18-cv-01208 AG (KESx) <br> (Assign: Hon. Judge Andrew J. Guilford) <br><br> **EXHIBITS IN SUPPORT OF MOTION FOR MORE DEFINITE STATEMENT OR IN THE ALTERNATIVE MOTION TO DISMISS COMPLAINT AGAINST DEFENDANTS (Fed. R. Civ. P. 12(e) and 12(b)(6)** <br><br> **Hearing Date: December 17, 2018** <br> **Hearing Time: 10:00 am** <br> **Courtroom: 10D** <br><br> **[REQUEST FOR JURY TRIAL]** |

    Defendants, CMAM, Inc. dba Heritage Financial Services and Albert Manfre and Jeannette Manfre (hereinafter collectively "Defendants") provide the attached Exhibits 1 & 2 in support of it's motion.

DATED: __9-24__, 2018

LAW OFFICE OF JAMES A. ANTON

_____
James A. Anton, Attorney for Defendants, Jeannette Manfre,
Albert Manfre and CMAM Inc. dba Heritage Financial Services

1

**EXHIBIT 1**

FIP LLC Purchase Agreement  //  p. 2

approved the cash flows comprising the Purchased Asset (the "**Closing**") FIP will sell, transfer and convey all right, title and interest in and to the Purchased Asset to Purchaser in return for the Purchase Price.

2. **Establishment of Payment Account; Remittance of Purchased Asset**. Upon the Closing and until the end of the Term, FIP will direct the Seller to forward all payments comprising the Purchased Asset to an account established by FIP (the "**Payment Account**"), and will direct such payments from the Payment Account to the Purchaser.

3. **Funding of Escrow Account**. In connection with and simultaneous to the execution and submission of the Purchase Request, Purchaser, at the direction of the IRA Owner, shall cause funds in the full amount of the Purchase Price to be wired to the Escrow Account identified above. The Purchase Price will be released from the Escrow Account by Escrow Agent as set forth in the terms of this Agreement.

4. **Survivor Beneficiary**. If the Seller of cash flows comprising the Purchased Asset designates a survivor beneficiary upon the Seller's death, then FIP may require such survivor beneficiary to agree to be bound by the terms of the underlying sale agreement between FIP and the Seller (the "**Underlying Sale Agreement**"), and to forward all such payments comprising the Purchased Asset as per the terms of such Underlying Sale Agreement.

5. **Representations and Warranties of FIP**. As of the date of the Closing, FIP hereby makes the following representations, warranties and acknowledgements to and for the benefit of Purchaser and IRA Owner.

    5.1. *Organization and Good Standing*. FIP is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Nevada and has organization power and authority to own its properties and to conduct its business as such properties shall then be owned and such business is then conducted.

    5.2. *Power and Authority*. FIP has full power, authority and right to execute and deliver this Agreement, and has full power and authority to perform its obligations hereunder, and has taken all necessary action to authorize and has duly authorized the execution, delivery and performance of this Agreement and the performance of such obligations.

    5.3. *Binding Obligation*. This Agreement constitutes the legal, valid and binding obligations of FIP enforceable against FIP in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights generally or by general principles of equity.

6. **Representations and Warranties of Purchaser and IRA Owner**.

    6.1. *Competency and Consent*. Purchaser and IRA Owner are competent to enter into this Agreement and has voluntarily entered into this Agreement as an act of free will and with full capacity to understand the terms and conditions contained herein.

    6.2. *Binding Obligation*. This Agreement constitutes the legal, valid and binding obligations of Purchaser and IRA Owner enforceable against Purchaser and IRA Owner in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights generally or by general principles of equity.

    6.3. *Risks of Purchased Asset*. FIP has put mechanisms in place which it believes will protect the Purchaser's right to receive the payments comprising the Purchased Asset on behalf of the IRA Owner; however, IRA Owner understands and acknowledges that there are multiple risks associated with the purchase of the Purchased Asset. These risks include, but are not limited to those listed below. By initialing next to each risk listed below, the IRA Owner acknowledges and agrees that he or she has read, fully understands and accepts the risks of purchasing the Purchased Asset.

FIP LLC Purchase Agreement // p. 4

6.3.6  INITIALS  *No Governmental Backing.* The payments comprising the Purchased Asset are not deposits and are not insured by the Federal Deposit Insurance Corporation or any other governmental or non-governmental agency.

6.3.7  INITIALS  *Illiquid Asset.* There is currently no recognized secondary market for the Purchased Asset, and it is extremely unlikely that one will develop; thus, if Purchaser is directed by the IRA Owner to sell the Purchased Asset prior to the end of the Term, it will likely be difficult or impossible to do so. In order to receive all payments comprising the Purchased Asset, the Purchaser, as directed by the IRA Owner, will be required to hold the Purchased Asset until the expiration of the Term.

6.3.8  INITIALS  *Prohibitions in Law.* U.S. federal law currently prohibits the assignment or alienation of pension payments for both military and non-military pensions. However, FIP believes the law in the area of what constitutes an "assignment or alienation" is unsettled. For example, some courts have held the sale of cash flows from military pensions, where the purchased cash flows are deposited into an account controlled by the purchaser, are prohibited by federal law, while others have held such transactions are not prohibited. FIP does not have the purchased cash flows deposited into an account it controls, nor assigned directly to an escrow account, but instead has the purchased payment amount forwarded to a purchaser after the seller has taken receipt of the funds. FIP is not aware of any case which has held that the sale of a pension payment is prohibited by federal law after receipt of the funds by the seller, or any case which has held that the sale of a non-military pension is prohibited by federal law. Under its contract, FIP believes the sale of the Purchased Asset does not constitute a prohibited assignment or alienation. This may, however, change and the federal or state governments may pass and implement laws specifically prohibiting the sale of military and non-military pensions in transactions such as those contemplated in this Agreement, even where the purchased cash flows are not deposited in an account controlled by the purchaser. In the event laws prohibiting such transactions were passed, it is unknown whether the Purchaser, on behalf of the IRA Owner, would receive all of the payments comprising the Purchased Asset, and FIP may not be able to recover any of the purchase price paid to the Seller resulting in the IRA Owner suffering a significant loss on the Purchase Price of the Purchased Asset.

6.3.9  INITIALS  *No Guarantees of Payment.* While FIP has taken certain steps (described in Section 7 below) to mitigate some of the risks set forth in this Section 6.3, FIP MAKES NO GUARANTEE PURCHASER WILL RECEIVE ALL PAYMENTS COMPRISING THE PURCHASED ASSET, OR THAT IRA OWNER WILL RECEIVE BACK THE PURCHASE PRICE OR ANY AMOUNT IN EXCESS THEREOF. The mechanisms put in place by FIP to mitigate some of the risks of purchasing the Purchased Asset may not cover the payments comprising the Purchased Asset indefinitely.

6.3.10  INITIALS  *Characterization of Sale Transactions as Loans.* FIP has undertaken good faith efforts to structure the purchase of the cash flows comprising the Purchased Asset from the Seller as a sale, rather than a loan, transaction. Notwithstanding these efforts, FIP has received requests for information and/or subpoenas from state regulators seeking documents and information in order to permit such regulators to make their own determination of whether these transactions are loans or sales transactions. In the event that these transactions are determined to be loans, rather than purchases, by the pertinent regulator and if FIP cannot obtain an appropriate lenders license in the pertinent jurisdiction, it is possible that state regulators may require FIP to cease collecting the cash flows comprising the Purchased Asset with the result that

purchasers of cash flows in the impacted jurisdictions will not receive all payments comprising the Purchased Asset.

6.4. *Sophistication of IRA Owner*. The IRA Owner is sufficiently sophisticated, knowledgeable and experienced in financial and business matters as to be capable of determining and evaluating the merits and risks of purchasing the Purchased Asset and to be capable of protecting the Purchaser's and IRA Owner's interests in connection with such purchase.

6.5. *Suitability*. The IRA Owner has determined, based on his or her own independent review and such professional advice as her or she has deemed appropriate under the circumstances, that the acquisition of the Purchased Asset by the Purchaser at the IRA Owner's direction: (i) is fully consistent with his or her financial needs, objectives and condition, and (ii) is fit, proper and suitable, notwithstanding the risks inherent in purchasing the Purchased Asset, and has directed the Purchaser to enter into this Agreement and purchase the Purchased Asset.

6.6. *Payment of Taxes*. During the term of this Agreement, IRA Owner shall timely pay all federal and state income taxes, and any and all other taxes which IRA Owner is required to pay, both in connection the Purchased Asset and otherwise, and under no circumstances will FIP have any responsibility for such taxes.

6.7. *Further Assurances; Cooperation*. Purchaser and IRA Owner agree to execute and deliver any and all other documents that may be required for FIP to secure the Purchaser's rights to the Purchased Asset. Purchaser and IRA Owner further agree to take any and all other actions as may be necessary or appropriate to fully give effect to the intentions of the parties under this Agreement.

7. **Purchaser Protections**. FIP has established certain mechanisms and processes intended to reduce, but not eliminate, the risk of disruption of the payments comprising the Purchased Asset. Purchaser and IRA Owner understand and accept that because the cash flows comprising the Purchased Asset must be forwarded by the Original Owner each month, FIP cannot and does not guarantee that disruptions in such payments will not occur. The funds available in the shortfall and reserve account are meant to protect the purchaser/IRA Owner as it relates to two primary risks: 1) the risk that the Seller dies before end of the term; and 2) failure by the Seller to make the payments required by the Underlying Sale Agreement (except, as noted in Section 6.3.3 above, for instances in which the failure to make the payments is a result of the entity obligated to make such payments to the Seller failing to do so) and 3) the event that these transactions are determined to be loans, rather than purchases.

7.1. *Establishment of Shortfall Account and Reserve Account*. In order to mitigate some of the risks set forth in Section 6 and Section 7 of this Agreement, FIP has established two accounts for the benefits of Purchasers: 1) an account containing a limited amount of funds to cover immediate shortfalls in the event an Seller fails to forward a payment as promised (the "**Shortfall Account**"); and 2) a reserve account (the "**Reserve Account**") into which FIP will deposit a portion of the profits it derives from its business, the proceeds of which will be available to reimburse FIP or, under certain circumstances, the Purchaser, in the event an Seller fails to forward the payments comprising the Purchased Asset as promised (except as set out in Section 6.3.3). In the event that the Seller breaches the obligation under the Underlying Sale Agreement to make the required payments, or the payments comprising the Purchased Asset are otherwise interrupted, assuming the Shortfall Account has a positive balance and that the failure is not a result of the circumstances described in Section 6.3.3, FIP will cover temporarily any interruption in payments to the Purchaser by making such payments for a limited period of time out of the Shortfall Account. As set forth in Section 7.2, if FIP determines it is necessary, it will find a replacement cash flow for the Purchaser and FIP will seek reimbursement for the related expense from the Reserve Account. FIP has no obligation to add any additional funds to the Shortfall Account or the Reserve Account in order to cover losses suffered by the Purchaser. **FIP DOES NOT GUARANTEE THAT FUNDS WILL BE AVAILABLE IN EITHER THE SHORTFALL ACCOUNT OR THE RESERVE ACCOUNT TO CONTINUE PAYMENTS TO THE PURCHASER FOR ANY SPECIFIC PERIOD OF TIME.**

**EXHIBIT 2**

approved the cash flows comprising the Purchased Asset (the "**Closing**") FIP will sell, transfer and convey all right, title and interest in and to the Purchased Asset to Purchaser in return for the Purchase Price.

2. **Establishment of Payment Account; Remittance of Purchased Asset**. Upon the Closing and until the end of the Term, FIP will direct the Seller to forward all payments comprising the Purchased Asset to an account established by FIP (the "**Payment Account**"), and will direct such payments from the Payment Account to the Purchaser.

3. **Funding of Escrow Account**. In connection with and simultaneous to the execution and submission of the Purchase Request, Purchaser, at the direction of the IRA Owner, shall cause funds in the full amount of the Purchase Price to be wired to the Escrow Account identified above. The Purchase Price will be released from the Escrow Account by Escrow Agent as set forth in the terms of this Agreement.

4. **Survivor Beneficiary**. If the Seller of cash flows comprising the Purchased Asset designates a survivor beneficiary upon the Seller's death, then FIP may require such survivor beneficiary to agree to be bound by the terms of the underlying sale agreement between FIP and the Seller (the "**Underlying Sale Agreement**"), and to forward all such payments comprising the Purchased Asset as per the terms of such Underlying Sale Agreement.

5. **Representations and Warranties of FIP**. As of the date of the Closing, FIP hereby makes the following representations, warranties and acknowledgements to and for the benefit of Purchaser and IRA Owner.

    5.1. *Organization and Good Standing*. FIP is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Nevada and has organization power and authority to own its properties and to conduct its business as such properties shall then be owned and such business is then conducted.

    5.2. *Power and Authority*. FIP has full power, authority and right to execute and deliver this Agreement, and has full power and authority to perform its obligations hereunder, and has taken all necessary action to authorize and has duly authorized the execution, delivery and performance of this Agreement and the performance of such obligations.

    5.3. *Binding Obligation*. This Agreement constitutes the legal, valid and binding obligations of FIP enforceable against FIP in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights generally or by general principles of equity.

6. **Representations and Warranties of Purchaser and IRA Owner**.

    6.1. *Competency and Consent*. Purchaser and IRA Owner are competent to enter into this Agreement and has voluntarily entered into this Agreement as an act of free will and with full capacity to understand the terms and conditions contained herein.

    6.2. *Binding Obligation*. This Agreement constitutes the legal, valid and binding obligations of Purchaser and IRA Owner enforceable against Purchaser and IRA Owner in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights generally or by general principles of equity.

    6.3. *Risks of Purchased Asset*. FIP has put mechanisms in place which it believes will protect the Purchaser's right to receive the payments comprising the Purchased Asset on behalf of the IRA Owner; however, IRA Owner understands and acknowledges that there are multiple risks associated with the purchase of the Purchased Asset. These risks include, but are not limited to those listed below. By initialing next to each risk listed below, the IRA Owner acknowledges and agrees that he or she has read, fully understands and accepts the risks of purchasing the Purchased Asset.

FIP LLC Purchase Agreement // p. 3

6.3.1 *Risk of Seller Breach*. Receipt by Purchaser of the payments comprising the Purchased Asset is dependent upon the Seller adhering to the terms of the Underlying Sale Agreement. If the Seller breaches the terms of the Underlying Sale Agreement and fails to make payments as scheduled, and there are insufficient funds in the Reserve Account (as defined in Section 7.1) to cover such payments and FIP is unable to procure a Replacement Purchased Asset (as defined in Section 7.2), Purchaser may lose some or all of the Purchase Price, and may not receive all of the payments comprising the Purchased Asset.

6.3.2 *Risk of Seller Bankruptcy*. If the Seller declares bankruptcy, and the bankruptcy court does not treat the sale of the Purchased Asset as a true sale, but rather as a loan or an unsecured obligation, and there are insufficient funds in the Reserve Account (as defined in Section 7.1) to cover such payments and FIP is unable to procure a Replacement Purchased Asset (as defined in Section 7.2), Purchaser may lose some or all of the Purchase Price, and may not receive all of the payments comprising the Purchased Asset.

6.3.3 *Risk of Pension Obligor Failure/Insolvency*. The payments comprising the Purchased Asset are derived from pension obligations owed to individuals, typically from companies with which these individuals were previously employed. If the company pension plan obligated to make the payments comprising the Purchased Asset, becomes insolvent, declares bankruptcy or otherwise reneges on the obligation to make the payments comprising the Purchased Asset to the Seller prior to the time that the Purchaser has received all payment comprising the Purchased Asset, then Purchaser will lose some or all of the Purchase Price, and will not receive all of the payments comprising the Purchased Asset. **THE RISK SET FORTH IN THIS SECTION 6.3.3 IS NOT MITIGATED BY OR PROTECTED AGAINST BY THE PROTECTIONS SET FORTH IN SECTION 7 HEREIN.**

6.3.4 *Risk of Temporary Shortfall Account and Reserve Account Depletion*. As described in Section 7.1, in order to mitigate some of the risk that a Seller fails to forward a payment as agreed FIP will establish a Shortfall Account and a Reserve Account. Neither the Shortfall Account nor the Reserve Account are established for the sole or specific benefit of the Purchaser, and each will only contain or have access to a limited amount of funds. FIP will have no obligation to contribute any additional funds to increase the sum held in the Shortfall Account or the Reserve Account. In the event that other sellers of cash flows to FIP, subsequently re-sold by FIP to other purchasers, fail to forward payments as agreed it is possible that the Shortfall Account and the Reserve Account will be depleted covering obligations to other purchasers and that no funds will remain to cover any payments to the Purchaser. **THE EXISTENCE OF THE SHORTFALL ACCOUNT AND THE RESERVE ACCOUNT DOES NOT GUARANTEE PURCHASER WILL RECEIVE ALL PAYMENTS COMPRISING THE PURCHASED ASSETS.**

6.3.5 *Risk of Survivor Beneficiary Breach*. In instances where the Seller has named a survivor beneficiary for the cash flows received by such Seller in the event of the Seller's death, FIP has required such survivor beneficiary to sign an agreement pledging to honor the terms of the sale of the cash flow by the Seller to FIP. It is possible, however, that such beneficiary will breach the terms of the agreement with FIP, and if FIP is unable to procure a Replacement Purchased Asset (as defined in Section 7.2), Purchaser may lose some or all of the Purchase Price, and may not receive all of the payments comprising the Purchased Asset.

FIP LLC

FIP LLC Purchase Agreement // p. 4

6.3.6   *No Governmental Backing*. The payments comprising the Purchased Asset are not deposits and are not insured by the Federal Deposit Insurance Corporation or any other governmental or non-governmental agency.

6.3.7   *Illiquid Asset*. There is currently no recognized secondary market for the Purchased Asset, and it is extremely unlikely that one will develop; thus, if Purchaser is directed by the IRA Owner to sell the Purchased Asset prior to the end of the Term, it will likely be difficult or impossible to do so. In order to receive all payments comprising the Purchased Asset, the Purchaser, as directed by the IRA Owner, will be required to hold the Purchased Asset until the expiration of the Term.

6.3.8   *Prohibitions in Law*. U.S. federal law currently prohibits the assignment or alienation of pension payments for both military and non-military pensions. However, FIP believes the law in the area of what constitutes an "assignment or alienation" is unsettled. For example, some courts have held the sale of cash flows from military pensions, where the purchased cash flows are deposited into an account controlled by the purchaser, are prohibited by federal law, while others have held such transactions are not prohibited. FIP does not have the purchased cash flows deposited into an account it controls, nor assigned directly to an escrow account, but instead has the purchased payment amount forwarded to a purchaser after the seller has taken receipt of the funds. FIP is not aware of any case which has held that the sale of a pension payment is prohibited by federal law after receipt of the funds by the seller, or any case which has held that the sale of a non-military pension is prohibited by federal law. Under its contract, FIP believes the sale of the Purchased Asset does not constitute a prohibited assignment or alienation. This may, however, change and the federal or state governments may pass and implement laws specifically prohibiting the sale of military and non-military pensions in transactions such as those contemplated in this Agreement, even where the purchased cash flows are not deposited in an account controlled by the purchaser. In the event laws prohibiting such transactions were passed, it is unknown whether the Purchaser, on behalf of the IRA Owner, would receive all of the payments comprising the Purchased Asset, and FIP may not be able to recover any of the purchase price paid to the Seller resulting in the IRA Owner suffering a significant loss on the Purchase Price of the Purchased Asset.

6.3.9   *No Guarantees of Payment*. While FIP has taken certain steps (described in Section 7 below) to mitigate some of the risks set forth in this Section 6.3, **FIP MAKES NO GUARANTEE PURCHASER WILL RECEIVE ALL PAYMENTS COMPRISING THE PURCHASED ASSET, OR THAT IRA OWNER WILL RECEIVE BACK THE PURCHASE PRICE OR ANY AMOUNT IN EXCESS THEREOF.** The mechanisms put in place by FIP to mitigate some of the risks of purchasing the Purchased Asset may not cover the payments comprising the Purchased Asset indefinitely.

6.3.10   *Characterization of Sale Transactions as Loans*. FIP has undertaken good faith efforts to structure the purchase of the cash flows comprising the Purchased Asset from the Seller as a sale, rather than a loan, transaction. Notwithstanding these efforts, FIP has received requests for information and/or subpoenas from state regulators seeking documents and information in order to permit such regulators to make their own determination of whether these transactions are loans or sales transactions. In the event that these transactions are determined to be loans, rather than purchases, by the pertinent regulator and if FIP cannot obtain an appropriate lenders license in the pertinent jurisdiction, it is possible that state regulators may require FIP to cease collecting the cash flows comprising the Purchased Asset with the result that

purchasers of cash flows in the impacted jurisdictions will not receive all payments comprising the Purchased Asset.

6.4. *Sophistication of IRA Owner*. The IRA Owner is sufficiently sophisticated, knowledgeable and experienced in financial and business matters as to be capable of determining and evaluating the merits and risks of purchasing the Purchased Asset and to be capable of protecting the Purchaser's and IRA Owner's interests in connection with such purchase.

6.5. *Suitability*. The IRA Owner has determined, based on his or her own independent review and such professional advice as her or she has deemed appropriate under the circumstances, that the acquisition of the Purchased Asset by the Purchaser at the IRA Owner's direction: (i) is fully consistent with his or her financial needs, objectives and condition, and (ii) is fit, proper and suitable, notwithstanding the risks inherent in purchasing the Purchased Asset, and has directed the Purchaser to enter into this Agreement and purchase the Purchased Asset.

6.6. *Payment of Taxes*. During the term of this Agreement, IRA Owner shall timely pay all federal and state income taxes, and any and all other taxes which IRA Owner is required to pay, both in connection the Purchased Asset and otherwise, and under no circumstances will FIP have any responsibility for such taxes.

6.7. *Further Assurances; Cooperation*. Purchaser and IRA Owner agree to execute and deliver any and all other documents that may be required for FIP to secure the Purchaser's rights to the Purchased Asset. Purchaser and IRA Owner further agree to take any and all other actions as may be necessary or appropriate to fully give effect to the intentions of the parties under this Agreement.

7. **Purchaser Protections**. FIP has established certain mechanisms and processes intended to reduce, but not eliminate, the risk of disruption of the payments comprising the Purchased Asset. Purchaser and IRA Owner understand and accept that because the cash flows comprising the Purchased Asset must be forwarded by the Original Owner each month, FIP cannot and does not guarantee that disruptions in such payments will not occur. The funds available in the shortfall and reserve account are meant to protect the purchaser/IRA Owner as it relates to two primary risks: 1) the risk that the Seller dies before end of the term; and 2) failure by the Seller to make the payments required by the Underlying Sale Agreement (except, as noted in Section 6.3.3 above, for instances in which the failure to make the payments is a result of the entity obligated to make such payments to the Seller failing to do so) and 3) the event that these transactions are determined to be loans, rather than purchases.

7.1. *Establishment of Shortfall Account and Reserve Account*. In order to mitigate some of the risks set forth in Section 6 and Section 7 of this Agreement, FIP has established two accounts for the benefits of Purchasers: 1) an account containing a limited amount of funds to cover immediate shortfalls in the event an Seller fails to forward a payment as promised (the "**Shortfall Account**"); and 2) a reserve account (the "**Reserve Account**") into which FIP will deposit a portion of the profits it derives from its business, the proceeds of which will be available to reimburse FIP or, under certain circumstances, the Purchaser, in the event an Seller fails to forward the payments comprising the Purchased Asset as promised (except as set out in Section 6.3.3). In the event that the Seller breaches the obligation under the Underlying Sale Agreement to make the required payments, or the payments comprising the Purchased Asset are otherwise interrupted, assuming the Shortfall Account has a positive balance and that the failure is not a result of the circumstances described in Section 6.3.3, FIP will cover temporarily any interruption in payments to the Purchaser by making such payments for a limited period of time out of the Shortfall Account. As set forth in Section 7.2, if FIP determines it is necessary, it will find a replacement cash flow for the Purchaser and FIP will seek reimbursement for the related expense from the Reserve Account. FIP has no obligation to add any additional funds to the Shortfall Account or the Reserve Account in order to cover losses suffered by the Purchaser. **FIP DOES NOT GUARANTEE THAT FUNDS WILL BE AVAILABLE IN EITHER THE SHORTFALL ACCOUNT OR THE RESERVE ACCOUNT TO CONTINUE PAYMENTS TO THE PURCHASER FOR ANY SPECIFIC PERIOD OF TIME.**

# PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF ORANGE, UNITED STATES OF AMERICA

I am employed in the county of Orange, State of California. I am over the age of 18 and not a party to the within action; my business address is 7700 Irvine Center Drive, Suite 800, Irvine, CA 92618.

On Sept. 24, 2018, I served the foregoing document described as **EXHIBITS IN SUPPORT OF MOTION FOR MORE DEFINITE STATEMENT OR IN THE ALTERNATIVE MOTION TO DISMISS COMPLAINT AGAINST DEFENDANTS (Fed. R. Civ. P. 12(e) and 12(b)(6** on the interested parties in this action by placing a true copy thereof enclosed in sealed envelopes addressed as follows:

Brandon Reif, Reif Law Group, 10250 Constellation Blvd., Suite 100, Los Angeles, CA 90067 (310) 494-6500 (BReif@reiflawgroup.com) (*Plaintiff's*)

Kathy Huang, Alston & Bird, 333 South Hope Street, 16th Floor, Los Angeles, CA 90071 (213) 576-1000 (Kathy.huang@alston.com) (*Minnesota Life Ins. Co.*)

Joseph Aliberti, Law Office Joseph Aliberti, 4340 Von Karman Ave., Suite 110, Newport Beach, CA 92660 (949) 734-0550 (jma@alibertilaw.com) (*Mathew Beiser*)

Joe Akrotirianakis, King & Spalding, 633 West Fifth Street, Suite 1700, Los Angeles, CA 90071 (213) 443-4355 (JAkro@KSLAW.com)  (Shurwest Holding Company, Inc. & Shurwest, LLC)

Faisal Zubairi, Dorsey & Shitnes, 600 Anton Blvd., Suite 2000, Costa Mesa, CA 92626-7655 (714-800-1461) (zubairi.faisal@dorsey.com) (Happy State Bank & Goldstar Trust Company)

\_\_\_ **VIA MAIL:**  As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Orange County, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

\_\_\_ **BY PERSONAL SERVICE:**  I delivered such envelope by hand to the office of the above addressee(s) during normal business hours.

\_\_\_ **BY OVERNIGHT COURIER:** I caused the above-referenced document(s) to be delivered to an overnight courier service for delivery to the addressee(s) shown.

\_/\_ **VIA ELECTRONIC MAIL:** The document was served electronically to the respective e-mail address(es) of the party(ies) as stated above and/or on the mailing list.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed Sept. 24, 2018, at Orange County, California.

_____

James A. Anton