Brandon S. Reif (SBN 214706)
Marc S. Ehrlich (SBN 198112)
Ohia A. Amadi (SBN 268876)
**REIF LAW GROUP, P.C.**
10250 Constellation Blvd., Suite 100
Los Angeles, CA 90067
Tel: 310.494.6500
Email: Docket@reiflawgroup.com; BReif@reiflawgroup.com;
          MEhrlich@reiflawgroup.com; OAmadi@reiflawgroup.com

Attorneys for Plaintiffs (Co-counsel information on next page)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KOLETTE A. PAGE and CLETUS M. PAGE, individually and on behalf of their individual retirement accounts,<br><br>Plaintiffs,<br><br>v.<br><br>MINNESOTA LIFE INSURANCE COMPANY, a Minnesota corporation; SHURWEST HOLDING COMPANY, INC., an Arizona corporation; SHURWEST, LLC, an Arizona limited liability company; HAPPY STATE BANK & TRUST COMPANY dba GOLDSTAR TRUST COMPANY, a Texas business entity (corporate status unknown); FUTURE INCOME PAYMENTS, LLC, a Delaware limited liability company; CMAM, INC. dba HERITAGE FINANCIAL SERVICES, a California corporation; ALBERT ANDREW MANFRE, an individual; JEANETTE MANFRE, an individual; MATTHEW LEE BIESER, an individual; and DOES 1-10, inclusive,<br><br>Defendants. | Case No. 8:18-cv-01208-AG-KES<br>[Hon. Andrew J. Guilford]<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT HAPPY STATE BANK DBA GOLDSTAR TRUST COMPANY'S MTD TO DISMISS**<br><br>Action Filed:  July 9, 2018<br>Trial Date:     January 28, 2020 |

-1-

Jon C. Furgison (SBN 205761)
**FURGISON LAW GROUP, P.C.**
444 Longfellow Avenue
Hermosa Beach, CA 90254
Tel: 310.356.6890
Email: jon@furgisonlawgroup.com

Attorneys for Plaintiffs

PLAINTIFFS' OPPOSITION TO DEFENDANT HAPPY STATE BANK DBA GOLDSTAR TRUST
COMPANY'S MTD TO DISMISS

## I.   SUMMARY OF ARGUMENT

Defendants Happy State Bank dba Goldstar Trust Company ("GoldStar") directly and through its agents, Matthew Bieser ("Bieser") and Albert and Jeanette Manfre (the "Manfres"), its authorized insurance agents, CMAM, Inc. dba Heritage Financial Services ("Heritage"), its authorized insurance agency, and Shurwest's employees Melanie Schulze-Miller and Bridget Davis, engaged in the unlawful financial elder abuse chicanery set forth in the Complaint.

As stated below, Plaintiffs adequately alleged all causes of action against GoldStar and thus GoldStar's Motion to Dismiss should be denied.

## II.   STATEMENT OF FACTS

In 2007, Plaintiffs retained Security Financial Group to prepare a trust for them. Security Financial is a predecessor company to defendant Heritage. *K. Page and C. Page Decls.*, ¶ 3. In or about September of 2016, they again contacted Security Financial about making revisions to their trust. *Id*. However, Security Financial was apparently out-of-business so they were connected to Heritage instead. *Id*.

Heritage explained to Plaintiffs that Security Financial was now Heritage, but still had the capability to do the trust revisions. *Id., ¶ 4.* Heritage assigned Bieser to help them with the revisions. *Id*. Plaintiffs had never met Bieser prior to his assignment as their financial advisor. *Id*. He personally came to Plaintiffs' home several times in order to get information for the trust revision. *Id*.

Part of the information Bieser collected from Plaintiffs included the amount of money in their individual retirement account ("IRA"). *Id., ¶ 5.* At the time, Lincoln Financial Group ("Lincoln") managed their IRAs. Plaintiffs had roughly $1,500,000 in their IRAs invested exclusively in what they believed were conservative mutual funds. *Id*.

Once Bieser saw the value of their IRAs, he began trying to convince them to invest in a program requiring them to liquidate the investments in their Lincoln IRA and transfer the entire amount of proceeds to an affiliated IRA custodian Bieser

1   recommended: Defendant Goldstar Trust Company ("Goldstar"). GoldStar would

2   then take custody of their IRAs and purchase securities in FIP. *Id.,* ¶ 6. The proceeds

3   from FIP would be used to fund large permanent life insurance policies from MN

4   Life. Bieser told Plaintiffs that he was a licensed agent of MN Life. *Id.,* ¶ 6.

5          Plaintiffs were initially reluctant to buy into the program Bieser recommended

6   because they had no experience with the recommended strategy described as the

7   Structured Settlement program. Bieser personally visited Plaintiffs many times at

8   their home to convince them to proceed with the investment strategy in the Structured

9   Settlement program. Bieser made Plaintiffs feel like they were his friends. Sometimes

10  he would bring his pregnant wife with him. And, after his wife gave birth, he came

11  with both his wife and their newborn, who Plaintiffs even bought a gift for. *K. Page*

12  *Decl.,* ¶ 7.  Bieser even accompanied Mr. Page to the movies on one occasion. *C.*

13  *Page Decl.,* ¶ 7. Bieser's behavior was deceptively designed to entice an elderly

14  susceptible couple like Plaintiffs.

15         Bieser convinced Plaintiffs that investing in the Structured Settlement program

16  would earn them significantly more than their IRAs were earning at the time. *K. Page*

17  *and C. Page Decls.,* ¶ 8. Bieser guaranteed them that it was a risk-free program and

18  that they would earn at least 7% annually on their investment in FIP—which was

19  several percentage points higher than their IRAs were then earning. *Id*. He told them

20  that the program was such a good deal that he was personally invested in the program

21  and had also convinced relatives to invest. *Id*.

22         Bieser also explained to Plaintiffs that if they invested the proceeds from FIP

23  in permanent life insurance policies with MN Life, they would be able to afford a

24  policy with a death benefit of roughly $2 million. *Id.,* ¶ 9. The policy would also

25  increase in value over time and eventually become another source of income. *Id.,* ¶

26  9.

27         Bieser told them that he had been introduced to the Structured Settlement

28  program by Shurwest. *Id.,* ¶ 10. He told Plaintiffs that his contact at Shurwest was

PLAINTIFFS' OPPOSITION TO DEFENDANT HAPPY STATE BANK DBA GOLDSTAR TRUST
COMPANY'S MTD TO DISMISS

Melanie Schulze-Miller and that Shurwest recommended the Structured Settlement program to him. *Id*. This affiliation was made to build trust and confidence in the recommended program.

Ms. Schulze-Miller and Shurwest were mostly in the back-office operation but Bieser assured them that Shurwest vetted and endorsed the Structured Settlement program and Shurwest's endorsement further guaranteed the program as risk-free and safe. *Id.,* ¶ 11.

Plaintiffs did have a conference call once with Ms. Schulze-Miller and Bieser on the call. *Id.,* ¶ 12. Bieser needed guidance on how to structure the transfer of money from our GoldStar IRA accounts to MN Life to cover Plaintiffs' policy premiums. *Id.,* ¶ 12.

Bieser also informed Plaintiffs of another Shurwest employee who was assisting in the processing of their insurance policy applications named Bridget Davis. *Id.,* ¶ 13. Shurwest was fully aware that Plaintiffs were California residents. *See, e.g.*, *Amadi Decl*., ¶ 2 and Ex. 1.

Plaintiffs depended on the money in their IRAs to cover their immediate living expenses in retirement. Bieser assured them that FIP was a safe and conservative investment guaranteed to make at least 7% on Plaintiffs' investment with complete return of their principal within five years. *K. Page and C. Page Decls.,* ¶ 14. Bieser also promised them that between the life insurance and FIP investment, they would make thousands of dollars a month and benefit from the life insurance policy worth millions of dollars if either of them died. *Id.,* ¶ 14.

From September 2016 to about November 2016, Shurwest received and transmitted to MN Life Plaintiffs' medical records and test results from medical exams they had to undergo in order to qualify for a MN Life insurance policy. *Id.,* ¶ 15.

Plaintiffs also submitted extensive applications to MN Life for the insurance policies. *Id.,* ¶ 16. In the application, Plaintiffs disclosed details of their financial

assets including their IRAs. Plaintiffs provided detail on the limited fixed income pension payments they received also. *Id.* There was a question in the application that asked how Plaintiffs would fund their policy premiums. Bieser—who was at Plaintiffs' home while they completed the applications—told them to indicate that they would fund the premium from their savings. *Id.* This was correct, however their savings included over $1,500,000 dollars in their IRAs. *Id.* As was Bieser's usual procedure, he brought the paperwork to Plaintiffs' house. *Id.* He then sat by them while they completed the paperwork. *Id.* After they completed the paperwork, he took the applications with him. Plaintiffs never received a copy of the paperwork from Bieser. *Id.*

On or about December 16, 2016, sometime after Plaintiffs learned that MN Life had approved them for the policies, Bieser brought paperwork to their home that was required to transfer their IRAs to GoldStar and to purchase FIP securities. *Id.,* ¶ 18. They had never received or reviewed any of the documents prior to Bieser bringing them to their home. *Id.* Bieser brought multiple agreements, written in technical language. *Id.* So there were many terms Plaintiffs either did not have time to review or understand. However, after 4 months of personal visits from Bieser, Plaintiffs trusted that he had their best interests at heart. *Id.* So Plaintiffs diligently followed Bieser's instructions and signed where he indicated. *Id.,* ¶¶ 18, 19 and Ex. 1 (FIP Purchase Agmt. ("FPA"))

Bieser did not leave a copy of the FPA with them. *Id.,* ¶ 19. They received a copy from Mr. Manfre a year-and-a-half later, in or about April 2018, after FIP announced it was ceasing operations and would no longer make any payments to Plaintiffs or other investors. *Id.* At that time, Plaintiffs went to meet Mr. Manfre in-person at Heritage's office. Mr. Manfre provided them with a copy of the subscription agreement along with other account documents. *Id.,* ¶ 19.

Bieser also brought GoldStar forms for Plaintiffs to fill out in order to transfer their Lincoln IRAs to GoldStar. *Id.,* ¶ 20. They had never previously heard of

GoldStar and did not freely choose GoldStar as their IRA custodian. Bieser told me that all the FIP investors used GoldStar so they did not have a choice. *Id.,* ¶ 20.

Neither Bieser, who sold the Structured Settlement program for Shurwest and the other defendants, Shurwest's employee and the architect of the program Ms. Schulze-Miller, nor any other Defendant ever told them that FIP was under investigation by numerous state and federal regulators for issuing predatory loans to retirees, veterans and other pensioners or how much risk Plaintiffs were taking by investing their entire IRAs in the Structured Settlement program. *Id.,* ¶ 21.

In or about January 2017, the time came for Plaintiffs to fund their initial partial premiums for the MN Life insurance policies. *Id.,* ¶ 22. The combined payments for Plaintiffs exceeded their combined annual income. *Id.,* ¶ 22. In order to fund the policy premiums, GoldStar sold some of their FIP securities and distributed money from their IRAs to their bank which they then wired to MN Life. Plaintiffs were unexpectedly taxed on the distributions. *Id.,* ¶ 22. Bieser never told them that the distribution from GoldStar to fund the insurance policies would be a taxable event. *Id.,* ¶ 22.

As a result, they had to take loans on the MN Life policy to help pay for the additional taxes from the distribution that they had to pay in April 2018. *Id.,* ¶ 23.

Bieser depended on Ms. Schulze-Miller and Shurwest to determine how exactly Plaintiffs were to get money from their GoldStar IRAs to MN Life. *Id.,* ¶ 24. So on or about January 17, 2017, while Bieser was at Plaintiffs' house, he called Ms. Schulze-Miller so they could have a conference call. *Id.,* ¶ 24. Bieser put Ms. Schulze-Miller on speaker and Plaintiffs listened as she explained that she would arrange for a transfer from their GoldStar IRA to their bank in California and then they would need to wire the money to MN Life. *Id.,* ¶ 24. This is in fact what I did. *Id.,* ¶ 24.

Defendants' Structured Settlement program began unraveling in or about February 2018. *Id., ¶ 25.* It appeared to Plaintiffs that they were not receiving the amount of distributions that they were supposed to from FIP. *Id., ¶ 25.*

Plaintiffs called Bieser to talk about the shortfall and for Bieser to find out what was holding up their payments. *Id., ¶ 26.* After two months of increasingly panicked calls from Plaintiffs, Plaintiffs finally received a collective payment in April 2018 for $22,000. *Id., ¶ 26.* However, shortly after that Plaintiffs received a letter from FIP stating that it was ceasing operations due to regulatory actions against it and from GoldStar failing to "keep partner" with FIP. *Id., ¶ 26.*

Since that time, Plaintiffs have received confirmation both from conversations with Bieser and with Mr. Manfre and from documents produced so far in this case, that Shurwest was the hub connecting GoldStar, Heritage, FIP and Minnesota Life in the Structured Settlement program. *Id., ¶ 27.*

Ms. Schulze-Miller regularly communicated by phone and/or email with FIP and GoldStar directly on behalf of Plaintiffs. *Id., ¶ 28.* She provided the opportunity to sell FIP interests to Matthew and Heritage. *Id., ¶ 28.* She also provided logistical and other advice to facilitate the program. *Id., ¶ 28.* And Shurwest was the intermediary between Heritage and MN Life. *Id., ¶ 28.* While Plaintiffs primarily interacted with Matthew and Heritage and received documents from them, they submitted the documents Plaintiffs gave back to them to Shurwest and Shurwest then transmitted the documents to MN Life. *Id., ¶ 28.*

Shurwest also directed Matthew and Heritage regarding the information they needed to obtain from Plaintiffs and transmitted instructions from MN Life to Matthew and Heritage. *Id., ¶ 29.*

There were also numerous other retirees such as Plaintiffs who lost their retirement funds through Defendants' Structured Payment program. *Id., ¶ 30.* There were at least 12 other individuals with Heritage alone, all of whom reside in California. *K. Page Decl., ¶ 30 and Ex. 2.*

PLAINTIFFS' OPPOSITION TO DEFENDANT HAPPY STATE BANK DBA GOLDSTAR TRUST COMPANY'S MTD TO DISMISS

As a direct result of the additional stress from seeing the bulk of Plaintiffs' savings disappear, Mrs. Page has suffered severe physical symptoms. *K. Page Decl., ¶ 31*. She has had to deal with chronic insomnia that gets so bad sometimes she requires prescription medication to sleep. *Id*. The stress has exacerbated high blood pressure and high cholesterol conditions she suffers from. *Id*. And she has had to increase the dosage of prescription medications she takes for these ailments. *Id*. Mr. Page's high cholesterol condition has been exacerbated and he too has had to increase his prescription dosage for the condition. *C. Page Decl.*, ¶ 31.

## III. LEGAL ARGUMENT

### A. The Court Has Personal Jurisdiction Over GoldStar

Goldstar's Rule 12(b)(6) motion is sanctionably frivolous. FIP agreed to jurisdiction in this forum in written agreements signed by, among others, GoldStar and Plaintiffs. Further, Plaintiffs' claims arise directly from GoldStar's contacts with the California forum such that the exercise of personal jurisdiction over GoldStar is consistent with due process. For these reasons, as detailed below, this court should deny GoldStar's MTD based on Rule 12(b)(6).

#### 1. Legal Standard for MTD to Dismiss Based On Lack of Personal Jurisdiction

Specific personal jurisdiction exists over a non-resident defendant where as here, GoldStar purposely directed its activities to and purposefully availed itself of the California forum and Plaintiffs' claims arise from the GoldStar's contacts with the California. *See Menken v. Emm*, 503 F.3d 1050, 1056-57 (9th Cir. 2007). Plaintiffs' uncontroverted allegations must be taken as true and all disputed facts resolved in Plaintiffs' favor. *Menken*, 503 F.3d at 1056 (citations omitted). "[A] single forum state contact can support jurisdiction if Plaintiffs' claims arise from that contact." *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 742 (9th Cir. 2013), aff'd sub nom. *Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591 (2015).

Once Plaintiffs made a prima facie showing of jurisdiction, GoldStar had the burden to "present a *compelling* case" that the such jurisdiction would be unreasonable. *Menken v. Emm*, 503 F.3d 1050, 1056-57 (9th Cir. 2007) (emphasis added). The "compelling case" contemplated by courts is an exacting standard, not easily met. The court's exercise of jurisdiction must "make litigation so gravely difficult and inconvenient that a party unfairly is at a severe disadvantage in comparison to his opponent." *Burger King Corp.,* 471 U.S. at 478. Even where certain considerations could make exercise of jurisdiction unreasonable, courts should look first to other means to accommodate those considerations "short of finding jurisdiction unconstitutional." *Id.* at 477. Indeed, the U.S. Supreme Court has long held that "*most* such considerations *usually* may be accommodated" without finding jurisdiction unconstitutional. *Id.* (emphasis added).

As discussed in detail below, Plaintiffs have met their burden. GoldStar has consented to jurisdiction in this forum, has forum contacts justifying jurisdiction, and cannot show jurisdiction would be unreasonable.

## 2. GoldStar Consented to Jurisdiction in California

In the FPA, GoldStar as "Purchaser" agreed that "Purchaser…hereby consent and agree that the state or federal courts located in California shall have non-exclusive jurisdiction to hear and determine any claims or disputes pertaining to this Agreement and/or any related agreement, to any matter arising out of, or related to, this Agreement and/or any related agreements[.]" (K. Page Decl., Ex. [ ], FPA, ¶ 10.6).

Further, "Purchaser [GoldStar]…waive[d] any objection that it may have based upon lack of personal jurisdiction, improper venue or forum non convenience and hereby consents to the granting of such legal or equitable relief as is deemed appropriate by such court." *Id.*

As such, in writing, GoldStar has consented to the jurisdiction of this Court and waived any right to contest it.

PLAINTIFFS' OPPOSITION TO DEFENDANT HAPPY STATE BANK DBA GOLDSTAR TRUST COMPANY'S MTD TO DISMISS

3.   **Plaintiffs' Claims Arise from GoldStar's Contacts with California and Personal Jurisdiction of GoldStar is Reasonable**

GoldStar purposefully directed its conduct to the California-resident Plaintiffs, and purposefully availed itself of the California forum.

In the Ninth Circuit, the "purposeful availment" or "purposeful direction" test for specific jurisdiction is satisfied when (1) an intentional act is (2) both aimed at, and has an effect in, the forum state, and (3) causes harm, "the brunt of which is suffered – and which the defendant knows is likely to be suffered – in the forum state." *Core-Vent Corp. v. Nobel Industries AB*, 11 F.3d 1482, 1486 (9th Cir. 1993) (citing *Calder v. Jones*, 465 U.S. 783, 783-784 (1984)).

The first prong of the specific jurisdiction analysis "may be satisfied by purposeful availment of the privilege of doing business in the forum; by purposeful direction of activities at the forum; or by some combination thereof." *Menken*, 503 F.3d at 1057 (quoting Yahoo! Inc., 433 F.3d at 1206).

As discussed above, GoldStar committed intentional acts expressly aimed at California-resident Plaintiffs, causing harm that GoldStar knew would be suffered by Plaintiffs and its other California victims in California. *See Menken*, 503 F.3d at 1050. GoldStar has more than sufficient California contacts arising from the specific transactions at issue in this case, based on the following conduct:

GoldStar began its illegal scheme with its co-defendants to induce Plaintiffs to transfer their California-based assets into the custody of GoldStar by arranging to "introduce" itself to Plaintiffs through Bieser. Bieser was used by GoldStar and its co-defendants to befriend Plaintiffs over a period of time to gain their trust and confidence.

GoldStar agreed to protection of the laws of California and the California judicial forum in the FPA. *K. Page and C. Page Decls.*, ¶ 19, Ex. 1

GoldStar sent Plaintiffs IRA distribution checks to Plaintiffs' in California and electronically transferred funds to Plaintiffs' California bank. Id., ¶ 26.

Bieser introduced Plaintiffs to GoldStar by presenting their contracts to the Plaintiffs in California.

GoldStar's purchase of the FIP securities on Plaintiffs' behalf occurred in California. Under California law. "An offer to buy or a purchase of a security is made in [California] when an offer to buy is made in [California], or an offer to sell is accepted in [California][.]" *Cal. Corp. Code* § 25008(a). "An offer…to buy is made in [California] when the offer…is directed by the offeror to [California] and received at the place to which it is directed." Cal. Corp. Code § 25008(b). Finally, "A security is delivered to the purchaser in [California] when the certificate or other evidence of the security is directed to the purchaser in [California] and received at the place to which it is directed." *Id*.

GoldStar admittedly was not qualified to do business in California (*see, e.g.*, MTD, p. 22:2-3) but did so with the Plaintiffs and at least a dozen other elderly California-residents. *K. Page Decl.*, ¶ 30 and Ex. 2.

GoldStar contracted with Plaintiffs to service their accounts in California for the life of their investment—i.e. for five (5) years – including, among other duties, collecting and accounting for distributions from FIP on a monthly basis, preparing the required annual reports, preparing and distributing annual tax forms, and sending relevant notices to Plaintiffs in California. *K. Page Decl*. and , ¶ 30 and Ex. 2.

GoldStar's contacts with the state of California are plentiful. Thus, GoldStar's characterization of its interactions with Plaintiffs as a "one-time transaction" is not only false, but also rises to the level of a sanctionable misrepresentation.

Moreover, the cases cited by GoldStar to support its opposing position are inapposite and unavailing. For example, in *Morill* (p. 8), the defendants' only contacts with the forum state were created during the course of representing a client in other litigation and not for any substantive purpose-- plainly not the situation in

the within case. Similarly, in *Shisler*, the defendant's contacts with the forum state were found lacking because the parties engaged in a true one-shot deal (the purchase of a car), and the defendant had no other contacts with the forum other than the sale of the car to the resident—quite unlike the instant case, in which the parties entered into a contractual relationship for a five year period that imposed ongoing activities and obligations upon GoldStar throughout the contractual term.

Further, despite the assertions in its MTD that Plaintiffs "reached out" to GoldStar in Texas and "directed their conduct toward GoldStar," (MTD, p. 6:1 ) GoldStar has failed to proffer a scintilla of admissible evidence to support its vague generalizations.  GoldStar's only "evidence" is the generalized, factually-bereft declaration of a Senior Vice President, John Johnson, who does not even purport to have any specific connection to, or  even claim to have worked on, Plaintiffs' account. His sole source of knowledge is the fact that he is a GoldStar officer. He does not attest to have any personal knowledge of facts pertinent to this case.  Mr. Johnson's declaration is apparently offered by GoldStar to support the identical unsupported statements in its MTD.

Importantly, a defendant need not accomplish any physical act within California to engage in "forum related activities." Instead, where a defendant's activities are likely to cause injury to a plaintiff in California, such activities constitute "forum-related activities." *See CE Distrib., LLC v. New Sensor Corp*., 380 F.3d 1107, 1111–12 (9th Cir. 2004); *Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd*., 328 F.3d 1122 (9th Cir. 2003) (tortious conduct occurring entirely in London were sufficiently "related" to California by injuring plaintiff in California).

### a) Plaintiffs' Claims Arise From GoldStar's California Contacts

Plaintiffs' claims arise out of GoldStar's forum-related activities thus conferring jurisdiction over GoldStar. *Panavision Int'l, L.P.*, 141 F.3d at 1322; *Craigslist Inc.*, 694 F.Supp. 2d at 1053.  As discussed above, nothing about the

-11-

parties' interactions in this case suggest that any state but California, has an interest in this case.

Further, "[a]n offer…to buy is made in this state when the offer…is directed by the offeror to this state and received at the place to which it is directed." *Cal. Corp. Code* § 25008(b). Finally, "A security is delivered to the purchaser in this state when the certificate or other evidence of the security is directed to the purchaser in this state and received at the place to which it is directed." *Id*.

Because GoldStar accepted offers to buy the FIP securities on behalf of Plaintiffs, its purchases were made in California. Further, when Plaintiffs received evidence of securities purchased in their accounts in California, by law, the securities were delivered to them in California. (DEC)

And, but for the unlawful conduct of GoldStar and its co-defendants, the California-residing Plaintiffs would not have suffered the extensive harm resulting from Structured Settlement program. Accordingly, the third and final prong of the test for specific jurisdiction has also been satisfied. *See Menken*, 503 F.3d at 1059.

### 4.   In the Alternative, The Court Should Allow Plaintiffs to Complete Jurisdictional Discovery

Plaintiffs have made a *prima facie* showing that personal jurisdiction can be established based on the pleadings and declarations filed concurrently with this Opposition. However, if this Court believes that Plaintiffs have not established personal jurisdiction over GoldStar, the Court should permit discovery into personal jurisdiction related issues to allow Plaintiffs the opportunity to assert such personal jurisdiction. "A court may permit discovery to aid in determining whether it has in personam jurisdiction." *Data Disc, Inc. v. Sys. Tech. Assocs.*, 557 F.2d 1280, 1285 n. 1 (9th Cir. 1977).  Granting jurisdictional discovery is particularly appropriate when a corporate defendant contends that it is not doing business within the forum. *See Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n.*, 107 F.3d 1026,

1042 (3d Cir. 1997); *Metcalfe v. Renaissance Marine, Inc*. 566 F.3d 324, 336 (3d Cir. 2009).

Here, discovery would yield unredacted copies of Plaintiffs' GoldStar Agreements which would show their California address (GoldStar has conveniently redacted all Plaintiffs' address information because it would show that Plaintiffs live in California). There are likely records of communications between GoldStar and Bieser, the Manfres, and Heritage—all of whom are located in California. There are also likely records of GoldStar's communications and long-term agreements with other California residents regarding the Structured Settlement program. If FPAs for other California-resident customers are similar to Plaintiffs' there should also also be records of at least a dozen other instances where GoldStar consented to the California forum and California law. GoldStar should also have records of transmitting funds to Plaintiffs' and other customers' bank accounts in California.

> **B.   GoldStar's Rule 12(b)(3) and Forum Non Conveniens Arguments Fail Because it Agreed to a California Federal Court Forum and California Choice-of-Law**

As GoldStar admits in its brief "Where the "parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation." *Atlantic Marine Const. Co., Inc. v. U.S.Dist. Court for Western Dist. Of Texas, et al.* ("*Atlantic Marine*"), 571 U.S. 49, 64 (2013)." (MTD., p. 10).

The crux of GoldStar's 12(b)(3) venue argument is the GoldStar Agreements' Forum Clauses. Inexplicably, GoldStar has failed to bring to the Court's attention to the FPA signed by the GoldStar, Plaintiffs, Heritage, and FIP LLC, for the purchase of FIP securities by GoldStar for the benefit of Plaintiffs.  This subsequent agreement contains a robust choice of law and venue provision mandating California choice of law. Further GoldStar as "Purchaser" agreed that "Purchaser…hereby consent and agree that the state or federal courts located in California shall have non-exclusive

jurisdiction to hear and determine any claims or disputes pertaining to this Agreement and/or any related agreement, to any matter arising out of, or related to, this Agreement and/or any related agreements[.]" (K. Page Decl., Ex. [ ], FPA, ¶ 10.6).

Further, "Purchaser [GoldStar]…waive[d] any objection that it may have based upon lack of personal jurisdiction, improper venue or forum non convenience and hereby consents to the granting of such legal or equitable relief as is deemed appropriate by such court." *Id*.

As such, GoldStar has "waive[d] the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation." *Atl. Marine*, 571 U.S. 49, 64 (2013)

The FPA contains a merger clause stating it supercedes any prior agreement. In particular, paragraph 10.6 of the FIP Agreement provides: "*Entire Agreement.* This Agreement and the exhibits hereto constitute the entire and final agreement between the parties with respect to the subject matter hereof. No party is entering into this Agreement in reliance on, and this Agreement shall not be contradicted **or** supplemented by, any prior or contemporaneous condition, discussion, promise, statement, understanding, or undertaking, commitment or other agreement or document." (K. Page Decl., Ex. 1, FPA, ¶ 10.3).

GoldStar entered into the FPA after the GoldStar Agreements were executed. GoldStar's representative executed the FIP Agreement on January 3, 2017, just over a week following its execution of the GoldStar Agreement on December 23, 2016. Paragraph 10.6 is far broader than the mediation/arbitration provision of the GoldStar Agreements given that it encompasses not only issues arising out of the FIP Agreement but also to "any related agreement" and "to any matter arising out of, or related to, this Agreement and/or any related agreement." (Emphasis added.)  The GoldStar Agreement clearly falls within the purview of Paragraph 10.6 because the FIP Securities were purchased by GoldStar for Plaintiffs' IRAs, pursuant to its role as Plaintiffs' agent under the GoldStar Agreements.

1    A similar agreement exists for Mr. Page. (*See C. Page Decl*., Ex. 1 (FPA

2    Agreement).

3    When the enforcement of different forum selection clauses would result in

4    piecemeal litigation of the plaintiff's claims, courts will not enforce both of them.

5    *Primary Color Sys. Corp. v. Agfa Corp*., No. SACV1700761JVSDFMX, 2017 WL

6    8220729, at *6 (C.D. Cal. July 13, 2017) (declining to enforce "both forum-selection

7    clauses" because "[p]iecemeal litigation…would result in a waste of judicial and

8    party resources."); *B & O Mfg., Inc. v. Home Depot U.S.A., Inc.*, No. C 07-02864

9    JSW, 2007 WL 3232276, at *3 (N.D. Cal. Nov. 1, 2007) (enforcement of two forum

10    selection clause "would be 'unreasonable under the circumstances.'" (*quoting M/S*

11    *Bremen v. Zapata Off-Shore Co*., 407 U.S. 1, 10 (1972)).

12    Similarly, mediation/arbitration/forum selection clauses such as the ones

13    contained in the GoldStar Agreements will not be enforced in California if there

14    exists even a possibility of conflicting rulings on a common issue of law or fact. *Cal.*

15    *Code Civ. Proc*. §1281.2(c).

16    In view of the merger clause and the fact that GoldStar freely signed the FPA

17    after it had entered into GoldStar Agreements, together with the broad scope of the

18    FPA's paragraph 10.6 , GoldStar is now bound by its express consent to jurisdiction

19    in California.  For the same reason, the application of California law is proper in this

20    case. *See also* Cal. Civ. Code § 1856(a).  Accordingly, both GoldStar's 12(b)(2)

21    jurisdictional argument and its 12(b)(3) venue arguments are groundless in view of

22    the FPA.  GoldStar's MTD based on these grounds should therefore be denied.

23    A further reason for refusing to enforce the GoldStar Agreement's  GoldStar's

24    forum selection and venue clauses is unconscionability.

25    Unconscionability is a defense to the enforcement of contracts. (Civ. Code, § 1670.5.)

26    Courts have also specifically held that unconscionability is a defense against

27    agreements to arbitrate. (*See, e.g.*, Szetela, 97 Cal.App.4th at p. 1099.)

28    Unconscionability requires a showing of both procedural and substantive

unconscionability, "balanced on a sliding scale." *Tompkins*, 2014 WL 2903752, at *13 (citation omitted).

### C. Plaintiffs Have Adequately Alleged GoldStar's Liability as Co-Conspirator and that Bieser Was Its Agent

GoldStar  wrongly asserts that the Complaint does not adequately allege an agency relationship between GoldStar and its co-defendants. [(MTD, __)] GoldStar ignores the doctrine of civil conspiracy, which ties the Defendants' conduct together in this action. Civil conspiracy affixes liability to all persons who have agreed to a common design to commit a wrong. *See, e.g.*, *Choate v. County of Orange*, 86 Cal.App.4th 312, 333 (2000) (internal citation omitted.)

In ruling on the sufficiency of Plaintiffs' allegations, the Court should consider that "[c]onspiracies are typically proved by circumstantial evidence. '[S]ince [the Defendants'] participation, cooperation or unity of action is difficult to prove by direct evidence, it can be inferred from the nature of the act done, the relation of the parties, the interests of the alleged conspirators, and other circumstances.' " (*Rickley*, 212 Cal.App.4th at p. 1166, internal citation omitted.) After the plan for joint action is shown, 'a defendant may be held liable who in fact committed no overt act and gained no benefit therefrom.' " *Wetherton v. Growers Farm Labor Assn*. (1969) 275 Cal.App.2d 168, 176, internal citations omitted, disapproved on another ground in *Applied Equipment Corp*., supra, 7 Cal.4th at 521, fn. 10.

In this case, Plaintiffs have alleged sufficient facts to support a conspiracy claim between GoldStar and its co-defendants.  Among other facts, the Complaint alleges the following:

Defendants, including GoldStar, used Bieser to "beg[i]n a campaign to induce Plaintiffs to take custody of their assets through GoldStar." (Compl., ¶31);

GoldStar falsely identified Bieser "account representative," when in fact he was not registered, licensed, or certificated as a financial/investment advisor or as a

broker. (Compl., ¶151). In so doing, GoldStar cloaked Bieser in authority he did not have.

Bieser visited Plaintiffs home and ingratiated himself to them in an effort "to create a false sense of trust so he and the other defendants [including GoldStar] could deceive and defraud plaintiffs" (Compl., ¶32);

Bieser, on behalf of GoldStar and the other defendants, used fraudulent sales tactics to convince Plaintiffs to liquidate their IRAs with Lincoln Financial and roll over the proceeds to GoldStar (Compl., ¶¶ 35-37);

Defendants, including GoldStar, held themselves out to Plaintiffs as being properly registered, skilled and authorized to engage in securities transactions (¶45);

GoldStar was not registered to do business in California but  "never disclosed or warned Plaintiffs that [it was] not qualified to transact business with Plaintiffs in California" (Compl., ¶ 55).

because otherwise there would have been no reason for Bieser's insistence that Plaintiffs place their funds with GoldStar. (see also DEC describing his insistence). The Complaint further alleges that Plaintiffs learned of Defendants' conspiracy after the scheme began to unravel.

FIP implicated GoldStar in the conspiracy and as responsible for FIP's demise stating that ". . .FIP has suffered from events like GoldStar Trust, cutting their services without warning. . . . FIP depends on various service providers … . [to]transfer money, facilitate the purchase and sale of income streams (Like GoldStar Trust) and otherwise keep partner with FIP to implement its business model" (Compl., ¶ 60);

GoldStar denied having a "business relationship" with FIP, claiming "it had not entered into any contracts with FIP," (Compl., ¶ 61),   a position directly contradicted by the FPA that FIP, GoldStar and Plaintiffs entered into in or about December 2016 (K. Page and C. Page Decls., Ex. [ ] (FPA));

"Shurwest and the Heritage Defendants convinced their victims to transfer their IRAs to GoldStar and invest millions of dollars in FIP . . . GoldStar profited by charging custodial fees on the IRA . . ." (Compl., ¶70);

that, after FIP ceased operations, in June 2018, Defendant Albert implicated GoldStar in Defendants' conspiracy, "stat[ing] that, 'Three people to sue are Shurwest, GoldStar and FIP," and "that 'all qualified money like ours went through GoldStar,' and that 'even though GoldStar sent a letter saying they are not responsible they are completely responsible.'" (¶¶72, 73)

These allegations raise the inference that GoldStar was a participant in the scheme and was working in conjunction with Bieser, FIP, and the other Defendants to commit the wrongful acts alleged in the Complaint. As such, Plaintiffs have adequately pled GoldStar's liability for the other Defendants' misconduct.

### D.   Plaintiffs Have Adequately Pled That GoldStar Owes Them Fiduciary Duties

Even in relationships where traditionally no fiduciary relationship exists, courts have found a fiduciary relationship where the relationship between the parties goes beyond the traditional relationship. *See, e.g.*, *Negrete v. Fid. & Guar. Life Ins. Co.*, 444 F. Supp. 2d 998, 1004 (C.D. Cal. 2006) ("[P]laintiffs allegations are sufficient to state claim for common law breach of fiduciary duty against defendant, in that the relationship alleged is not simply that of an insurer-insured, but rather one which may entail a fiduciary duty.").

*Negrete* is instructive. In that case, the plaintiff sued an insurance company defendant in a situation analogous to this case. Plaintiff alleged a "systematic unfair, fraudulent and unlawful sales practices in connection with [Defendant's] solicitation, offering and sale of deferred annuity products to senior citizens (65 years of age or older) in California ." *Id.* at 1000. Plaintiff insured brought claims for, inter alia, elder abuse and breach of fiduciary duty. In a Rule 12(b)(6) motion to dismiss, the defendant insurer based its defense on the argument that "under California law an

insurer owes no fiduciary duty to its insureds." *Id*. at 1003. The court disagreed holding sufficient plaintiff's single allegation that the insurer's "purported positions as financial advisors, estate planning specialists, and because of their superior knowledge and ability to manipulate and control senior citizens' finances and legal status, the [managing general agents] and the [national marketing organizations], owned, operated and/or controlled by defendant who marketed and sold F & G annuities to senior citizens assumed fiduciary duties." *Id*.

Similarly, GoldStar asserts it has no fiduciary obligations because custodians of self-directed IRAs owe no fiduciary duties to IRA owners. (MTD, pp. 18-19). However, as alleged and explained in detail in this Opposition, GoldStar's role went far beyond that of a traditional self-directed IRA custodian. As in *Negrete*, GoldStar, through its agents and co-conspirators Bieser and the other Defendants, targeted elderly people and retirees. Among other things, Plaintiffs have adequately alleged that GoldStar, through its agent and co-conspirator Bieser, worked for months to gain Plaintiffs' confidence and held himself out as qualified to advise Plaintiffs regarding the purchase of FIP securities, even though he was not so qualified. *See* Section III.C above.

Further, GoldStar ignores the express language of the FPA and GoldStar Agreements conferring fiduciary duties on GoldStar. Under the FPA, GoldStar expressly acted "FBO," i.e., for the benefit of Plaintiffs. *See, e.g.*, *K. Page Decl*., Ex. 1, p. 1. Further, in the GoldStar Agreements, GoldStar expressly represented that it would act as Plaintiffs' "agent." *See, e.g.*, Johnson Decl., Ex. A, ¶ 8.03 ("By performing services under this agreement we [GoldStar] are acting as your [Plaintiffs'] agent."). However, although GoldStar expressly appointed itself as Plaintiffs' agent, it also disingenuously inserted exculpatory language into the same paragraph to relieve itself of the fiduciary duties it owed to Plaintiffs as their agent. Id. ("You [Plaintiffs] acknowledge and agree that nothing in this agreement will be construed as conferring fiduciary status upon us [GoldStar]." California courts

disfavor exculpatory clauses such as this when the party seeking to avoid its fiduciary duties proceeds to act in bad faith, as was the case here. *See*, e.g., *Neubauer v. Goldfarb*, 108 Cal. App. 4th 47, 56-57 (2003).

Accordingly, GoldStar's purported waiver is ineffective and GoldStar was therefore required to act in accordance with the fiduciary duties owed to Plaintiffs.

### E.   Plaintiffs Have Alleged Fraud Against GoldStar with Sufficient Particularity

F.R.C.P. Rule 9(b)'s particularity standard for pleading fraud is relaxed because this is a case of corporate fraud so the relevant facts here are in GoldStar's knowledge. *See Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989) ("[R]ule [9(b)] may be relaxed as to matters within the opposing party's knowledge. For example, in cases of corporate fraud, plaintiffs will not have personal knowledge of all of the underlying facts.");

Further, for fraudulent omission, Plaintiffs do not need to plead time and place of the omission. *See also Cirulli v. Hyundai Motor Company*, 2009 WL 5788762, at *4 (C.D. Cal. 2009) (Guilford, J.) ("[W]hen an allegation rests on a claim of fraudulent omission, the Rule 9(b) standard is relaxed because a plaintiff cannot plead either the specific time of [an] omission or the place, as he is not alleging an act, but a failure to act.") (internal quotes omitted).

Plaintiffs have sufficiently pled fraud committed by GoldStar and its Co-Conspirator Defendants prior to Plaintiffs' execution of the Structured Payment program agreements in December 2016. Plaintiffs have alleged that the relevant time period was September to December 2016 (the "when"). *See, e.g.*, Compl., ¶¶ 27, 32, 36.

Plaintiffs alleged that GoldStar (the "who"), fraudulently identified Bieser as an Account Representative (the "what"), on their IRAs (the "where") thereby implying he was qualified to advise Plaintiffs in the purchase of securities. (Compl., ¶ 19). This Plaintiff also identified Heritage as a broker dealer in its "Account

Representative and Factoring Company Form" ("Rep. Form") (the "where"), again implying Heritage was qualified to advise on the security transactions at issue. *See*, Mtn., *Decl. of John Johnson*, Ex. C, ("The company or organization under which your designated Account Representative operates will be referred to herein as "broker dealer.") However, GoldStar's representations were false because neither Bieser or Heritage was qualified to market or sell the securities at issue here (the "how").

Plaintiffs further alleged that GoldStar (the "who") held itself out as being qualified to do business in California (the "what"), but was not so qualified. (See, e.g., Compl. ¶¶ 55, 128). GoldStar held itself out as being able to do business with California-resident Plaintiffs by actually doing business and entering into agreements with them. (*See, e.g.*, Compl., ¶¶ 37-43 ).

Plaintiffs further alleged that GoldStar, through its agent and co-conspirator Bieser (the "who"), falsely claimed that Plaintiffs' investment of more than 90% of their IRA assets in FIP was a safe and sound investment (the "what"). (*See, e.g.*, Compl., ¶¶ 34, 53). This was fraudulent because in fact FIP was subject to numerous undisclosed regulatory investigations and such a high concentration in a retirement account is essentially per se unsuitable (the "how"). (*See, e.g.*, Compl., ¶¶ 53).

For the *fraudulent omissions*, Plaintiffs need only allege the "who", "what", and "how" of the fraudulent omissions. In this case Plaintiffs have pled that Goldstar (the "who") failed to disclose (the "what"):

- FIP's regulatory issues Compl., ¶ 142. These issues subsequently led to cessation of FIP's operations;
- the FIP securities lack of proper registration or exemption from registration (Compl., ¶ 142);
- That GoldStar was not qualified to sell the FIP securities nor qualified to do business with California-resident Plaintiffs (Compl., ¶ 55); and

- the tax implications of Plaintiffs' transactions *See, e.g.*, Compl., ¶¶ 38, 40. Plaintiffs were ultimately taxed on distributions from their GoldStar IRAs. *Id.*

As stated in Section III.C above, Plaintiffs have adequately alleged GoldStar's own affirmative misrepresentations and its role in a conspiracy to defraud Plaintiffs with the other Defendants. As such, Plaintiffs have also adequately pled GoldStar's direct liability and liability for the other Defendants' fraudulent conduct.

## F. Plaintiffs Have Stated A Claim for All Causes of Action

### 1. Legal Standard

In deciding a MTD under Federal Rule of Civil Procedure ("FRCP") 12(b)(6), a court accepts as true all allegations of material fact in the complaint and reads the complaint in the light most favorable to the nonmoving party. *Marceau v. Blackfeet Hous. Auth.*, 540 F.3d 916, 919 (9th Cir. 2008); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

### 2. Plaintiffs State a Claim for Violations of the Securities Act and California Securities Laws

GoldStar rests its entire argument concerning Plaintiffs' federal and state securities fraud claims on the assertion that "an IRA is not a 'security' and GoldStar did not offer a security to Plaintiffs for sale." (MTD, p. 17:11-12). GoldStar then proceeds to provide a lecture on the definition of a "security." But nowhere in their Complaint did Plaintiffs allege that an IRA is a security.

GoldStar is completely silent as to Plaintiffs' conspiracy, agency, fiduciary duty, and aiding and abetting allegations against it. Its silence is a judicial admission. *See Walker v. Dorn*, 240 Cal.App.2d 118, 120 (1966) (failure to deny an allegation is a judicial admission); *Troche v. Daley*, 217 Cal.App.3d 406, 409 (1990) (citing Dorn). As discussed above, these allegations have been sufficiently pled, and therefore GoldStar is as equally culpable for the wrongdoing of its co-defendants, whom, among other things, sold FIP securities to Plaintiff. Thus, as a co-conspirator

and aider and abettor of its co-defendants, GoldStar bears equal responsibility with them for the violations of sections 5, 11, and 12 of the Federal Securities Act of 1933 and violations of California Corporations Code section 25110 to 25130, as specifically alleged in the Complaint.

### 3. Plaintiffs State a Claim for Breach of Fiduciary Duty and Aiding and Abetting Such Breach, Constructive Fraud, and Negligence

GoldStar wrongly asserts that Plaintiffs have failed to allege any extra-contractual duties GoldStar owes to Plaintiffs. See, e.g., MTD, pp. 18-21. As discussed in detail in Section III.D above, the Complaint alleges a fiduciary relationship between GoldStar and Plaintiffs and thus GoldStar owed them fiduciary duties.

In the MTD GoldStar simply falls back on the same argument it rehashes throughout its MTD—i.e., that it is a self-directed IRA custodian and therefore insulated from liability for the wrongful acts alleged in the Complaint.  (MTD, pp. 18-20).  GoldStar is mistaken.

As discussed in section III.C. above, since the Complaint alleges that GoldStar's acts went far beyond those required of a self-directed IRA custodian, the limitations imposed on an IRA custodian for performing its ordinary custodial duties are inapplicable.

Further, the requisite knowledge and intent can be inferred from Plaintiffs allegations. *Wyatt v. Union Mortgage Co.,* 24 Cal.3d 773, 785 (1979) ("[T]he requisite concurrence and knowledge 'may be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances. Tacit consent as well as express approval will suffice to hold a person liable as a coconspirator.") (internal citations and quotations omitted).

**4.   Plaintiffs State A Claim for Violation of the CLRA, UCL, and Elder Abuse Act**

As detailed above, Mr. Page has sufficiently alleged that GoldStar and the other defendants committed financial elder abuse by conspiring to wrongly obtain and actually wrongfully obtaining the funds in his IRA. Further, as alleged above Plaintiffs violated the CLRA and UCL.

*Negrete* is instructive here. *Negrete* specifically addressed a defendant insurer's claim that it did not "take, secrete, appropriate or retain" the plaintiff's funds as understood by the Elder Abuse statute. *Negrete*, 444 F. Supp. 2d at 1002. The court held that plaintiff's allegations where sufficient because he alleged—similar to this case—that defendant insurer resorted to fraudulent and deceptive practices aimed at seniors to increase its sales to seniors for its own financial gain. *Id*. The *Negrete* plaintiff further alleged that the defendant insurer used information it had on its existing senior citizen customers, such as the cash value in their in their already existing insurance policies and annuities to target those with "substantial accumulated cash values." *Id*.

Plaintiffs here have alleged similar but more egregious conduct by GoldStar and the other defendants. Here, Plaintiffs alleged that Defendants targeted Plaintiffs due to the value of their IRAs which exceed $1 million dollars—information Heritage gained by preparing a trust revision for Plaintiffs. (Compl., ¶ 31). Bieser on behalf of defendants then spent four months insinuating himself into Plaintiffs' confidence and using fraud and deceit to convince Plaintiffs to invest in the Structured Settlement program. (*See, e.g*., Compl., ¶¶ 32-37).

**5.   Plaintiffs State A Claim for Fraud and Negligent Misrepresentation**

As discussed at length in section___, above, Plaintiffs have sufficiently alleged their fraud claims against GoldStar, even under the heightened Rule 9(b) standard. However, Plaintiffs' allegations are also to be scrutinized under a more relaxed

standard than that of Rule 9(b) for two separate reasons: first, Plaintiffs have adequately alleged that a fiduciary relationship existed between GoldStar and Plaintiffs, which means that Plaintiffs' fraud allegations are subject to a more relaxed pleading rule than that of Rule 9(b); and, second, many of the specifics of Defendant's fraudulent scheme are necessarily within Defendants' knowledge and control, which in turn means that less specificity and particularity is required of Plaintiffs' allegations. (___). In either case, as discussed above, Plaintiffs' frauds claim have been sufficiently alleged.

Thus, Plaintiffs have made detailed allegations concerning the elements of their fraud-based claims and given GoldStar a clear understanding of the "who, what, where, when, and how" of their fraud claims. Even if Plaintiff's Complaint does not connect every single dot, it does "show how, when, where, to whom, and by what means the representations were tendered." (*Lazar v. Superior Court*, supra, 12 Cal.4th 631, 645.) It thus has the particularity required to provide fair notice to the defense and assurance to the court that the complaint has a prima facie foundation of merit." *Id*. The foregoing allegations are therefore sufficient to apprise GoldStar of the claims against it.

Further, the above-mentioned allegations, as well as those set forth in section are also adequate to show causation. Plaintiffs have demonstrated cause and effect: Defendants' misrepresentations induced Plaintiffs to transfer their IRA's into GoldStar accounts and purchase the MN Life policies and FIP securities "when [they] otherwise would not have done so," and they suffered "damage by virtue of [among other things] the wrongfully induced decision to buy the [FIP securities]." (Greenfield v. Fritz- QU: AFF'd On Review??) For pleading purposes this is sufficient. Commonwealth Mortgage Assurance Co. v. Superior Court, 211 Cal.App.3d 508, 518 (1989); Woodson v. Winchester (1911) 16 Cal.App. 472, 476-477, 117 P. 565.) [Need California cases]

Tellingly, GoldStar does not contend that the factual allegations are insufficient or that it does not understand the claims against it.  Rather, as discussed below (section ___) GoldStar apparently believes that cloaking itself in the role of "Self-Directed IRA Custodian" will insulate it from liability for its knowing and intentional participation in the illicit scheme perpetrated by all defendants on Plaintiffs.  Unfortunately for GoldStar, the allegations sufficiently reflect that GoldStar did not act as a mere custodian but as a co-conspirator with the other Defendants, this is not the case. (see sections___, below) below))(CITES HERE? CASEY V. US BANK, ETC)   As a result, it shares in the liability of its co-defendants. (CASEY)

In addition, because the Complaint adequately alleges that Plaintiffs were fraudulently induced, by misrepresentations and omissions, to enter into the GoldStar Agreements, not only are the agreements unenforceable but the Forum Clauses at the heart of GoldStar's arguments, are also null and void. *Brown v. Wells Fargo Bank N.A.*, 168 Cal.App.4th 938, 958 ("If the entire contract is void ab initio because of fraud, the parties have not agreed to arbitrate any controversy

### 6. Plaintiffs State A Claim for Intentional Infliction of Emotional Distress

GoldStar unbelievably argues that Plaintiffs have not stated an IIED claim against it. It is hard to imagine conduct more "outrageous" than spending months deceitfully cultivating the friendship a vulnerable, senior couple (the Plaintiffs)—as Bieser did on behalf of GoldStar and the other Defendants—then, once Plaintiffs were lulled into lowering their guard, convincing them to invest the bulk of their retirement, accumulated over decades of employment, into a fraudulent program which ultimately wiped out their live savings.

1

2

**G.   In The Alternative, Plaintiffs Request Leave To The Amend Their Complaint**

3

4

Plaintiffs submit that all of their claims for relief are adequately pled.  If the Court should hold otherwise, Plaintiffs request leave to amend.

5

6

7

8

9

10

11

Senior financial abuse cases like this one generally have the defendants in the possession of the most damaging documents.  *See, e.g.*, *Moore*, 885 F.2d at 540 ("[I]n cases of corporate fraud, plaintiffs will not have personal knowledge of all of the underlying facts."). Because some of the parties exchanged their Initial Disclosures, much more of the financial fraud picture has been laid out.  If an amended pleading is necessary, Plaintiffs could and would strengthen their claims as follows with additional details of GoldStar's involvement.

12

**IV.  CONCLUSION**

13

For the foregoing reasons, GoldStar's MTD should be denied.

14

15

**REIF LAW GROUP, P.C.**

16

17

Dated:  October 29, 2018                    By:   _____

18

19

Brandon S. Reif
Marc S. Ehrlich
Ohia A. Amadi

20

*Attorneys for Plaintiffs*

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANT HAPPY STATE BANK DBA GOLDSTAR TRUST
COMPANY'S MTD TO DISMISS