Brandon S. Reif (SBN 214706)
Marc S. Ehrlich (SBN 198112)
Ohia A. Amadi (SBN 268876)
**REIF LAW GROUP, P.C.**
10250 Constellation Blvd., Suite 100
Los Angeles, CA 90067
Tel: 310.494.6500
Email: Docket@reiflawgroup.com; BReif@reiflawgroup.com;
        MEhrlich@reiflawgroup.com; OAmadi@reiflawgroup.com

Attorneys for Plaintiffs (Co-counsel information on next page)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KOLETTE A. PAGE and CLETUS M. PAGE, individually and on behalf of their individual retirement accounts,<br><br>Plaintiffs,<br><br>v.<br><br>MINNESOTA LIFE INSURANCE COMPANY, a Minnesota corporation; SHURWEST HOLDING COMPANY, INC., an Arizona corporation; SHURWEST, LLC, an Arizona limited liability company; HAPPY STATE BANK & TRUST COMPANY dba GOLDSTAR TRUST COMPANY, a Texas business entity (corporate status unknown); FUTURE INCOME PAYMENTS, LLC, a Delaware limited liability company; CMAM, INC. dba HERITAGE FINANCIAL SERVICES, a California corporation; ALBERT ANDREW MANFRE, an individual; JEANETTE MANFRE, an individual; MATTHEW LEE BIESER, an individual; and DOES 1-10, inclusive,<br><br>Defendants. | Case No. 8:18-cv-01208-AG-KES<br>[Hon. Andrew J. Guilford]<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT HAPPY STATE BANK DBA GOLDSTAR TRUST COMPANY'S MOTION TO DISMISS**<br><br>Action Filed:   July 9, 2018<br>Trial Date:     January 28, 2020<br><br>*(Declarations of Kolette Page, Cletus Page filed concurrently herewith)*<br><br>Action Filed:   July 9, 2018<br>Trial Date:     January 28, 2020<br><br>Hearing Date: December 3, 2018<br>Time: 10:00 a.m.<br>Place: 10D |

Jon C. Furgison (SBN 205761)
**FURGISON LAW GROUP, P.C.**
444 Longfellow Avenue
Hermosa Beach, CA 90254
Tel: 310.356.6890
Email: jon@furgisonlawgroup.com

Attorneys for Plaintiffs

PLAINTIFFS' OPPOSITION TO DEFENDANT HAPPY STATE BANK DBA GOLDSTAR TRUST
COMPANY'S MOTION TO DISMISS

**Table of Contents**

I.    SUMMARY OF ARGUMENT ...............................................................1

II.   STATEMENT OF FACTS...................................................................1

III.  LEGAL ARGUMENT .......................................................................5

      A.    The Court Has Personal Jurisdiction Over GoldStar...................5

            1.    Legal Standard for MTD to Dismiss Based On Lack of
                  Personal Jurisdiction.........................................................5

            2.    GoldStar  Consented to Jurisdiction in California.............6

            3.    Plaintiffs' Claims Arise from GoldStar's Contacts with
                  California and Personal Jurisdiction of GoldStar is
                  Reasonable ......................................................................6

            4.    In the Alternative, The Court Should Allow Plaintiffs to
                  Complete Jurisdictional Discovery..................................10

      B.    GoldStar's Rule 12(b)(3) and Forum Non Conveniens
            Arguments Fail Because it Agreed to a California Federal Court
            Forum and California Choice-of-Law .........................................10

      C.    Plaintiffs Have Adequately Alleged GoldStar's Liability as Co-
            Conspirator and that Bieser Was Its Agent................................13

      D.    Plaintiffs Have Adequately Pled That GoldStar Owes Them
            Fiduciary Duties ......................................................................15

      E.    Plaintiffs Have Alleged Fraud Against GoldStar with Sufficient
            Particularity ............................................................................17

      F.    Plaintiffs Have Stated A Claim for All Causes of Action .........19

            1.    Legal Standard .................................................................19

            2.    Plaintiffs State a Claim for Violations of the Securities
                  Act and California Securities Laws ..................................19

PLAINTIFFS' OPPOSITION TO DEFENDANT HAPPY STATE BANK DBA GOLDSTAR TRUST
COMPANY'S MOTION TO DISMISS

3.   Plaintiffs State a Claim for Breach of Fiduciary Duty and Aiding and Abetting Such Breach, Constructive Fraud, and Negligence ..................................................................20

4.   Plaintiffs State A Claim for Violation of the CLRA, UCL, and Elder Abuse Act........................................................20

5.   Plaintiffs State A Claim for Fraud and Negligent Misrepresentation ...........................................................21

6.   Plaintiffs State A Claim for Intentional Infliction of Emotional Distress............................................................22

G.   In The Alternative, Plaintiffs Request Leave To The Amend Their Complaint ...........................................................23

IV.   CONCLUSION ...................................................................23

PLAINTIFFS' OPPOSITION TO DEFENDANT HAPPY STATE BANK DBA GOLDSTAR TRUST COMPANY'S MOTION TO DISMISS

# Table Of Authorities

## Cases

*Atl. Marine*, 571 U.S. 49, 64 (2013) ......................................................12

*Atlantic Marine Const. Co., Inc. v. U.S.Dist. Court for Western Dist. Of Texas, et al.* ("*Atlantic Marine*"), 571 U.S. 49 (2013) ......................11

*B & O Mfg., Inc. v. Home Depot U.S.A., Inc.*, No. C 07-02864 JSW, 2007 WL 3232276 (N.D. Cal. Nov. 1, 2007) .............................................13

*Brown v. Wells Fargo Bank N.A.*, 168 Cal.App.4th 938 (2008) ...........................25

*Brown v. Wells Fargo Bank, N.A.*, 168 Cal. App. 4th (2008) ................................16

*Burger King Corp.,* 471 U.S. at 478 .....................................................6

*Calder v. Jones*, 465 U.S. 783 (1984) ...................................................7

*CE Distrib., LLC v. New Sensor Corp.*, 380 F.3d 1107 (9th Cir. 2004) ..................9

*Choate v. County of Orange*, 86 Cal.App.4th 312 (2000)..........................14

*Cirulli v. Hyundai Motor Company*, 2009 WL 5788762 (C.D. Cal. 2009) ............20

*Core-Vent Corp. v. Nobel Industries AB*, 11 F.3d 1482 (9th Cir. 1993)...................7

*Craigslist Inc.*, 694 F.Supp. 2d 1039 (N.D. Cal. 2010)........................................10

*Duffy v. Cavalier*, 215 Cal. App. 3d 1517 (1989) ...................................17

*Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122 (9th Cir. 2003) ..........................................................9

*In re National Western Life Ins. Deferred Annuities Litig.*, 467 F. Supp. 2d. 1071 (2006)........................................................18

*In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716 (9th Cir. 2013)........................................................5

*Lazar v. Superior Court*, 12 Cal.4th 631 (1995) .......................................24

*M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972).......................13

*Marceau v. Blackfeet Hous. Auth.*, 540 F.3d 916 (9th Cir. 2008).........................22

*Menken v. Emm*, 503 F.3d 1050 (9th Cir. 2007) ...................................................6, 7

*Metcalfe v. Renaissance Marine, Inc.* 566 F.3d 324, 336 (3d Cir. 2009) ...............11

*Migliaccio v. Midland Nat'l Life Ins. Co.*, 436 F. Supp. 2d 1095 (2006) ................18

*Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531 (9th Cir. 1989) ...............20, 26

*Mosier v. S. California Physicians Ins. Exch.*, 63 Cal.App.4th 1022 (1998)...........17

*Negrete v. Fid. And Guar. Life Ins. Co.*, 444 F. Supp.2d 998 (2006) ...............17, 18

*Neubauer v. Goldfarb*, 108 Cal. App. 4th 47 (2003)...................................................19

*Panavision Int'l, L.P.*, 141 F.3d 1316 (9th Cir. 1998) .................................................9

*Primary Color Sys. Corp. v. Agfa Corp.*, No. SACV1700761JVSDFMX, 2017 WL 8220729 (C.D. Cal. July 13, 2017) ......................................................13

*Rickley v. Goodfriend*, 212 Cal.App.4th 1136 (2013) ..............................................15

*Sprewell v. Golden State Warriors*, 266 F.3d 979 (9th Cir. 2001)...........................22

*Szetela v. Discover Bank*, 97 Cal.App.4th 1094 (2002) ...........................................14

*Tompkins v. 23and Me*, 2014 WL 2903752 (N.D. Cal. 2014) .................................14

*Troche v. Daley*, 217 Cal.App.3d 406 (1990) ...........................................................22

*Twomey v. Mitchum, Jones & Templeton, Inc.,* 262 Cal.App.2d 690 (1968) ..........17

*Walker v. Dorn*, 240 Cal.App.2d 118 (1966) ............................................................22

*Wetherton v. Growers Farm Labor Assn*. 275 Cal.App.2d 168 (1969) ...................15

*Wyatt v. Union Mortgage Co.,* 24 Cal.3d 773 (1979) ...............................................23

**Statutes**

*Cal. Civ. Code* § 1856....................................................................................................12

*Cal. Code Civ. Proc*. §1281.2........................................................................................12

*Cal. Corp. Code* § 25008.................................................................................................9

*Cal. Corp. Code* § 25008.................................................................................................7

PLAINTIFFS' OPPOSITION TO DEFENDANT HAPPY STATE BANK DBA GOLDSTAR TRUST
COMPANY'S MOTION TO DISMISS

1

*Civ. Code* § 1670.5 ................................................................................................ 12

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANT HAPPY STATE BANK DBA GOLDSTAR TRUST
COMPANY'S MOTION TO DISMISS

## I.   SUMMARY OF ARGUMENT

Defendants Happy State Bank dba Goldstar Trust Company ("GoldStar") directly and through its agents, Matthew Bieser ("Bieser") and Albert and Jeanette Manfre (the "Manfres"), its authorized insurance agents, CMAM, Inc. dba Heritage Financial Services ("Heritage"), its authorized insurance agency, and Shurwest's employees Melanie Schulze-Miller and Bridget Davis, engaged in the unlawful financial elder abuse chicanery set forth in the Complaint.  Plaintiffs have properly alleged claims against GoldStar and GoldStar's Motion to Dismiss should be denied.

## II.   STATEMENT OF FACTS

In 2007, Plaintiffs retained Security Financial Group to prepare a trust for them. Security Financial is a predecessor company to defendant Heritage. *K. Page and C. Page Decls*., ¶ 3. In or about September of 2016, they again contacted Security Financial about making revisions to their trust. *Id*. However, Security Financial was apparently out-of-business so they were connected to Heritage instead. *Id.*

Heritage explained to Plaintiffs that it could to do the trust revisions. *Id.,* ¶ 4. Heritage assigned Bieser to help them with the revisions. *Id.* Plaintiffs had never met Bieser prior to his assignment as their financial advisor. *Id.* He personally came to Plaintiffs' home several times in order to get information for the trust revision. *Id*.

Part of the information Bieser collected from Plaintiffs included the amount of money in their individual retirement account ("IRA"). *Id.,* ¶ 5. At the time, Lincoln Financial Group ("Lincoln") managed their IRAs. Plaintiffs had roughly $1,500,000 in their IRAs invested in what they believed were conservative mutual funds. *Id.*

Bieser began trying to convince them to invest in a program requiring them to liquidate the investments in their Lincoln IRA and transfer the proceeds to an affiliated IRA custodian, Defendant Goldstar Trust Company ("Goldstar"). GoldStar would take custody of their IRAs and purchase securities in FIP. *Id.,* ¶ 6. The proceeds from FIP would be used to fund permanent life insurance policies from MN Life. Bieser told Plaintiffs that he was a licensed agent of MN Life. *Id.,* ¶ 6.

1
2
3
4
5
6
7
8
9

     Plaintiffs were reluctant to buy into the program Bieser recommended because they had no experience with the recommended strategy described as the Structured Settlement program. Bieser visited Plaintiffs at their home to convince them to proceed with the investment strategy in the Structured Settlement program. Bieser made Plaintiffs feel like they were his friends. Sometimes he would bring his pregnant wife with him. And, after his wife gave birth, he came with both his wife and their newborn child. *K. Page Decl.,* ¶ 7.  Bieser even accompanied Mr. Page to the movies on one occasion. *C. Page Decl.,* ¶ 7. Bieser's behavior was deceptively designed to entice an elderly susceptible couple like Plaintiffs.

10
11
12
13
14
15

     Bieser convinced Plaintiffs that investing in the Structured Settlement program would earn them significantly more than their IRAs were earning at the time. *K. Page and C. Page Decls*., ¶ 8. Bieser guaranteed them that it was a risk-free program and that they would earn at least 7% annually on their investment in FIP—which was several percentage points higher than their IRAs were then earning. *Id*. He told them that the program was such a good deal that he and his relatives has invested in it. *Id*.

16
17
18
19

     Bieser also explained to Plaintiffs that if they invested the proceeds from FIP in permanent life insurance policies with MN Life, they would be able to afford a policy with a death benefit of roughly $2 million, and the policy would increase in value over time and eventually become another source of income. *Id.,* ¶ 9.

20
21
22
23

     Bieser told them that he had been introduced to the Structured Settlement program by Shurwest. *Id.,* ¶ 10. He told Plaintiffs that his contact at Shurwest was Melanie Schulze-Miller and that Shurwest recommended the program to him. *Id*. This affiliation was made to build trust and confidence in the recommended program.

24
25
26

     Ms. Schulze-Miller and Shurwest were mostly in the back-office operation but Bieser assured them that Shurwest vetted and endorsed the Structured Settlement program and Shurwest's endorsement guaranteed the program as risk-free. *Id.,* ¶ 11.

27
28

Plaintiffs had one conference call with Ms. Schulze-Miller and Bieser. *Id., ¶* 12. Bieser needed guidance on how to transfer money from the GoldStar IRA accounts to MN Life to cover Plaintiffs' policy premiums. *Id., ¶* 12.

Bieser also informed Plaintiffs of another Shurwest employee who was assisting in the processing of their insurance policy applications named Bridget Davis. *Id., ¶* 13. Shurwest was fully aware that Plaintiffs were California residents. *See, e.g.*, *Amadi Decl.*, ¶ 2 and Ex. 1.

Plaintiffs depended on the money in their IRAs to cover their immediate living expenses in retirement. Bieser assured them that FIP was a safe and conservative investment guaranteed to make at least 7% with complete return of their principal within five years. *K. Page and C. Page Decls., ¶* 14. Bieser also promised them that the life insurance and FIP investment would generate thousands of dollars a month and provide a life insurance benefit worth millions of dollars. *Id., ¶* 14.

On or about December 16, 2016, after Plaintiffs learned that MN Life approved them for the policies, Bieser brought paperwork to their home to transfer their IRAs to GoldStar and to purchase FIP securities. *Id., ¶* 18. They had never received or reviewed any of the documents prior to Bieser bringing them to their home. *Id.* Bieser brought multiple agreements, written in technical language. *Id.* Plaintiffs did not have time to review or understand them, but after 4 months of personal visits from Bieser, Plaintiffs trusted him. *Id.* Plaintiffs followed Bieser's instructions and signed the documents. *Id., ¶¶* 18, 19 and Ex. 1 (FIP Purchase Agmt. ("FPA"))

Bieser did not leave a copy of the FPA with them. *Id., ¶* 19. They received a copy from Mr. Manfre in or about April 2018, after FIP announced it was ceasing operations and would no longer make any payments to Plaintiffs or other investors. *Id.* Plaintiffs met with Mr. Manfre at Heritage's office; there, he provided them with a copy of the subscription agreement along with other account documents. *Id., ¶* 19.

Bieser also gave Plaintiffs GoldStar forms to transfer their Lincoln IRAs to GoldStar. *Id., ¶* 20. They had never heard of GoldStar and did not choose GoldStar

1  as their IRA custodian. Bieser told them all FIP investors used GoldStar so they had

2  no choice. *Id.,* ¶ 20.

3      Neither GoldStar, Bieser, Ms. Schulze-Miller, nor any other Defendant told

4  Plaintiffs that FIP was under investigation by state and federal regulators for issuing

5  predatory loans to retirees, veterans and other pensioners, or disclosed the risk to

6  Plaintiffs of investing their IRAs in the Structured Settlement program. *Id.,* ¶ 21.

7      In or about January 2017, when Plaintiffs were required to fund their initial

8  partial premiums for the MN Life insurance policies, the combined payments for

9  Plaintiffs exceeded their combined annual income. *Id.,* ¶ 22. To fund the policy

10  premiums, GoldStar sold some of their FIP securities and distributed money from

11  their IRAs to their bank, which they then to MN Life. Plaintiffs were taxed on the

12  distributions, but Bieser never told them that the distribution from GoldStar to fund

13  the insurance policies would be a taxable event. *Id.,* ¶ 22. Plaintiffs had to take loans

14  on the MN Life policy to pay for the additional taxes from the distribution. *Id.,* ¶ 23.

15      Defendants' Structured Settlement program began unraveling in or about

16  February 2018. *Id.,* ¶ 25. Plaintiffs believed they were not receiving the amount of

17  distributions that they were supposed to from FIP. *Id.,* ¶ 25. Plaintiffs called Bieser

18  about the shortfall and asked Bieser to find out what was delaying their payments.

19  *Id.,* ¶ 26. After two months of increasingly panicked calls, Plaintiffs received a

20  payment in April 2018 for $22,000. *Id.,* ¶ 26. However, Plaintiffs then received a

21  letter from FIP stating that it was ceasing operations due to regulatory actions against

22  it and from GoldStar failing to "keep partner" with FIP. *Id.,* ¶ 26. Since then

23  Plaintiffs have learned from conversations with Bieser and Mr. Manfre, and from

24  documents produced in this case, that Shurwest was the hub connecting GoldStar,

25  Heritage, FIP and Minnesota Life in the Structured Settlement program. *Id.,* ¶ 27.

26      Numerous other retirees residing in California also lost their retirement funds

27  through Defendants' Structured Payment program. *Id.,* ¶ 30. There were at least 12

28  such retirees with Heritage alone. *K. Page Decl.,* ¶ 30 and Ex. 2.

PLAINTIFFS' OPPOSITION TO DEFENDANT HAPPY STATE BANK DBA GOLDSTAR TRUST
COMPANY'S MOTION TO DISMISS

As a direct result of the additional stress from seeing the bulk of Plaintiffs' savings disappear, Mrs. Page has suffered severe physical symptoms, including insomnia, high blood pressure, and high cholesterol, which are treated with medication. *K. Page Decl., ¶ 31; C. Page Decl.*, ¶ 31.

## III.  LEGAL ARGUMENT

### A.   The Court Has Personal Jurisdiction Over GoldStar

Goldstar's Rule 12(b)(6) motion is meritless. FIP agreed to jurisdiction in this forum in written agreements signed by GoldStar and Plaintiffs. Plaintiffs' claims arise directly from GoldStar's contacts with California such that the exercise of personal jurisdiction over GoldStar is consistent with due process. For these reasons, as detailed below, this court should deny GoldStar's MTD based on Rule 12(b)(6).

### 1.   Legal Standard for MTD to Dismiss Based On Lack of Personal Jurisdiction

Specific personal jurisdiction exists over a non-resident defendant where as here, GoldStar purposely directed its activities to and purposefully availed itself of the California forum and Plaintiffs' claims arise from the GoldStar's contacts with the California. *See Menken v. Emm*, 503 F.3d 1050, 1056-57 (9th Cir. 2007). Plaintiffs' allegations must be taken as true and all disputed facts resolved in Plaintiffs' favor. *Menken*, 503 F.3d at 1056 (citations omitted). "[A] single forum state contact can support jurisdiction if Plaintiffs' claims arise from that contact." *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 742 (9th Cir. 2013).

Once Plaintiffs made a prima facie showing of jurisdiction, GoldStar had the burden to "present a *compelling* case" that the such jurisdiction would be unreasonable. *Menken v. Emm*, 503 F.3d 1050, 1056-57 (9th Cir. 2007) (emphasis added). The "compelling case" contemplated by courts is an exacting standard, not easily met. The court's exercise of jurisdiction must "make litigation so gravely difficult and inconvenient that a party unfairly is at a severe disadvantage in

comparison to his opponent." *Burger King Corp.,* 471 U.S. at 478. Even where certain considerations could make exercise of jurisdiction unreasonable, courts should look first to other means to accommodate those considerations "short of finding jurisdiction unconstitutional." *Id.* at 477. The U.S. Supreme Court has held that "*most* such considerations *usually* may be accommodated" without finding jurisdiction unconstitutional. *Id.* (emphasis added). Plaintiffs have met their burden. GoldStar has consented to jurisdiction in this forum, has sufficient forum contacts justifying jurisdiction, and cannot show jurisdiction would be unreasonable.

### 2.   GoldStar Consented to Jurisdiction in California

In the FPA, GoldStar as "Purchaser" agreed that "Purchaser…hereby consent and agree that the state or federal courts located in California shall have non-exclusive jurisdiction to hear and determine any claims or disputes pertaining to this Agreement and/or any related agreement, to any matter arising out of, or related to, this Agreement and/or any related agreements[.]" (*K. Page Decl.*, Ex. 1, FPA, ¶ 10.6). Further, "Purchaser [GoldStar]…waive[d] any objection that it may have based upon lack of personal jurisdiction, improper venue or forum non conveniens and hereby consents to the granting of such legal or equitable relief as is deemed appropriate by such court." *Id.* Thus, GoldStar has consented to the jurisdiction of this Court and waived any right to contest it.

### 3.   Plaintiffs' Claims Arise from GoldStar's Contacts with California and Personal Jurisdiction of GoldStar is Reasonable

GoldStar purposefully directed its conduct to the Plaintiffs, and purposefully availed itself of the California forum.  The "purposeful availment" or "purposeful direction" test for specific jurisdiction is satisfied when (1) an intentional act is (2) both aimed at, and has an effect in, the forum state, and (3) causes harm, "the brunt of which is suffered – and which the defendant knows is likely to be suffered – in the

forum state." *Core-Vent Corp. v. Nobel Industries AB*, 11 F.3d 1482, 1486 (9th Cir. 1993) (citing *Calder v. Jones*, 465 U.S. 783, 783-784 (1984)).

The first prong of the specific jurisdiction analysis "may be satisfied by purposeful availment of the privilege of doing business in the forum; by purposeful direction of activities at the forum; or by some combination thereof." *Menken*, 503 F.3d at 1057. GoldStar committed intentional acts expressly aimed at California-resident Plaintiffs, causing harm that GoldStar knew would be suffered by Plaintiffs and other victims in California. *See Menken,* 503 F.3d at 1050. GoldStar has sufficient California contacts arising from the specific transactions at issue in this case, based on the following conduct:

GoldStar began its illegal scheme with its co-defendants to induce Plaintiffs to transfer their California-based assets into the custody of GoldStar by arranging to "introduce" itself to Plaintiffs through Bieser. Bieser was used by GoldStar and its co-defendants to befriend Plaintiffs and gain their trust and confidence.

GoldStar agreed to protection of the laws of California and the California judicial forum in the FPA. *K. Page and C. Page Decls.*, ¶ 19, Ex. 1

GoldStar sent Plaintiffs IRA distribution checks to Plaintiffs' in California and electronically transferred funds to Plaintiffs' California bank. *Id.*, ¶ 26.

Bieser introduced Plaintiffs to GoldStar by presenting their contracts to the Plaintiffs in California.

GoldStar's purchase of the FIP securities on Plaintiffs' behalf occurred in California. Under California law. "An offer to buy or a purchase of a security is made in [California] when an offer to buy is made in [California], or an offer to sell is accepted in [California][.]" *Cal. Corp. Code* § 25008(a). "An offer…to buy is made in [California] when the offer…is directed by the offeror to [California] and received at the place to which it is directed." *Cal. Corp. Code* § 25008(b). "A security is delivered to the purchaser in [California] when the certificate or other evidence of

the security is directed to the purchaser in [California] and received at the place to which it is directed." *Id*.

GoldStar was not qualified to do business in California (*see* MTD, p. 22:2-3) but did so with Plaintiffs other California-residents. *K. Page Decl*., ¶ 30 and Ex. 2.

GoldStar contracted with Plaintiffs to service their accounts in California for the life of their investment—i.e. for five (5) years – including, among other duties, collecting and accounting for distributions from FIP on a monthly basis, preparing the required annual reports, preparing and distributing annual tax forms, and sending relevant notices to Plaintiffs in California. *K. Page Decl*. and , ¶ 30 and Ex. 2.

GoldStar's contacts with the state of California are plentiful. Thus, GoldStar's characterization of its interactions with Plaintiffs as a "one-time transaction" is not only false, but also rises to the level of a sanctionable misrepresentation.

Moreover, the cases cited by GoldStar to support its opposing position are inapposite and unavailing. For example, in *Morrill v. Scott Fin. Corp,* 873 F.3d 1136 (9th Cir. 2017) (MTD, p. 8), the defendants' only contacts with the forum state were created during the course of representing a client in other litigation and not for any substantive purpose-- plainly not the situation in the within case. Similarly, in *Shisler v. Sanfer Sports Car, Inc.,* 146 Cal. App. 1254 (2006), the defendant's contacts with the forum state were found lacking because the parties engaged in a true one-shot deal (the purchase of a car), and the defendant had no other contacts with the forum other than the sale of the car to the resident—quite unlike the instant case, in which the parties entered into a contractual relationship for a five year period that imposed ongoing activities and obligations upon GoldStar throughout the contractual term.

Further, despite the assertions in its MTD that Plaintiffs "reached out" to GoldStar in Texas and "directed their conduct toward GoldStar," (MTD, p. 6:1.) GoldStar has failed to proffer any evidence to support that contention. GoldStar's only "evidence" is the generalized, factually-bereft declaration of a Senior Vice President, John Johnson, who does not even purport to have any specific connection

1   to, or  even claim to have worked on, Plaintiffs' account. His sole source of

2   knowledge is the fact that he is a GoldStar officer. He does not attest to have any

3   personal knowledge of facts pertinent to this case.

4          A defendant need not accomplish any physical act within California to engage

5   in "forum related activities." Where a defendant's activities will likely cause injury

6   to a plaintiff in California, they are "forum-related activities." *See CE Distrib., LLC*

7   *v. New Sensor Corp.*, 380 F.3d 1107, 1111–12 (9th Cir. 2004); *Harris Rutsky & Co.*

8   *Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122 (9th Cir. 2003).

9          Plaintiffs' claims arise from GoldStar's forum-related activities and confer

10  jurisdiction over GoldStar. *Panavision Int'l, L.P.*, 141 F.3d at 1322; *Craigslist Inc.*,

11  694 F.Supp. 2d 1039, 1053 (N.D. Cal. 2010).  As discussed above, nothing about the

12  parties' interactions in this case suggest that any state but California, has an interest

13  in this case.

14         Further, "[a]n offer…to buy is made in this state when the offer…is directed

15  by the offeror to this state and received at the place to which it is directed." *Cal. Corp.*

16  *Code* § 25008(b). And, "A security is delivered to the purchaser in this state when

17  the certificate or other evidence of the security is directed to the purchaser in this

18  state and received at the place to which it is directed." *Id.*

19         Because GoldStar accepted offers to buy the FIP securities on behalf of

20  Plaintiffs, its purchases were made in California. Further, when Plaintiffs received

21  evidence of securities purchased in their accounts in California, by law, the securities

22  were delivered to them in California.

23         And, but for the unlawful conduct of GoldStar and its co-defendants, the

24  California-residing Plaintiffs would not have suffered the extensive harm resulting

25  from Structured Settlement program. Accordingly, the third and final prong of the

26  test for specific jurisdiction has also been satisfied. *See Menken*, 503 F.3d at 1059.

27

28

**4.  In the Alternative, The Court Should Allow Plaintiffs to Complete Jurisdictional Discovery**

Plaintiffs have made a *prima facie* showing that personal jurisdiction can be established based on the pleadings and declarations filed concurrently with this Opposition. However, if this Court believes that Plaintiffs have not established personal jurisdiction over GoldStar, the Court should permit discovery into personal jurisdiction related issues to allow Plaintiffs the opportunity to assert such personal jurisdiction. *Data Disc, Inc. v. Sys. Tech. Assocs.*, 557 F.2d 1280, 1285 n. 1 (9th Cir. 1977).  Granting jurisdictional discovery is particularly appropriate when a corporate defendant contends that it is not doing business within the forum. *See Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n.*, 107 F.3d 1026, 1042 (3d Cir. 1997); *Metcalfe v. Renaissance Marine, Inc*. 566 F.3d 324, 336 (3d Cir. 2009).

Here, discovery would yield unredacted copies of Plaintiffs' GoldStar Agreements which would show their California address (GoldStar has redacted all Plaintiffs' address information because it would show that Plaintiffs live in California). There are likely records of communications between GoldStar and Bieser, the Manfres, and Heritage—all of whom are located in California. There are also likely records of GoldStar's communications and long-term agreements with other California residents regarding the Structured Settlement program. There may be records of at least other instances involving other customers where GoldStar consented to the California forum. GoldStar should also have records of transmitting funds to Plaintiffs' and other customers' bank accounts in California.

**B.  GoldStar's Rule 12(b)(3) and Forum Non Conveniens Arguments Fail Because it Agreed to a California Federal Court Forum and California Choice-of-Law**

As GoldStar admits in its brief "Where the "parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation."

1   *Atlantic Marine Const. Co., Inc. v. U.S.Dist. Court for Western Dist. Of Texas, et al.*

2   ("*Atlantic Marine*"), 571 U.S. 49, 64 (2013)." (MTD., p. 10).

3       The crux of GoldStar's 12(b)(3) venue argument is the GoldStar Agreements'

4   Forum Clauses. Inexplicably, GoldStar has failed to bring to the Court's attention to

5   the FPA signed by the GoldStar, Plaintiffs, Heritage, and FIP LLC, for the purchase

6   of FIP securities by GoldStar for the benefit of Plaintiffs.  This subsequent agreement

7   contains a robust choice of law and venue provision mandating California choice of

8   law. Further GoldStar as "Purchaser" agreed that "Purchaser…hereby consent and

9   agree that the state or federal courts located in California shall have non-exclusive

10   jurisdiction to hear and determine any claims or disputes pertaining to this Agreement

11   and/or any related agreement, to any matter arising out of, or related to, this

12   Agreement and/or any related agreements[.]" (K. Page Decl., Ex. 1, FPA, ¶ 10.6).

13       Further, "Purchaser [GoldStar]…waive[d] any objection that it may have

14   based upon lack of personal jurisdiction, improper venue or forum non convenience

15   and hereby consents to the granting of such legal or equitable relief as is deemed

16   appropriate by such court." *Id*.  As such, GoldStar "waive[d] the right to challenge

17   the preselected forum as inconvenient or less convenient for themselves or their

18   witnesses, or for their pursuit of the litigation." *Atl. Marine*, 571 U.S. 49, 64 (2013)

19        The FPA contains a merger clause stating it supersedes any prior agreement.

20   Paragraph 10.6 of the FIP Agreement provides: "*Entire Agreement.* This Agreement

21   and the exhibits hereto constitute the entire and final agreement between the parties

22   with respect to the subject matter hereof. No party is entering into this Agreement in

23   reliance on, and this Agreement shall not be contradicted **or** supplemented by, any

24   prior or contemporaneous condition, discussion, promise, statement, understanding,

25   or undertaking, commitment or other agreement or document." (K. Page Decl., Ex.

26   1).  GoldStar entered into the FPA after the GoldStar Agreements were executed.

27   GoldStar's representative executed the FIP Agreement on January 3, 2017, just over

28   a week following its execution of the GoldStar Agreement on December 23, 2016.

1   Paragraph 10.6 is far broader than the mediation/arbitration provision of the GoldStar

2   Agreements given that it encompasses not only issues arising out of the FIP

3   Agreement but also to "any related agreement" and "to any matter arising out of, or

4   related to, this Agreement and/or any related agreement." (Emphasis added.)  The

5   GoldStar Agreement clearly falls within the purview of Paragraph 10.6 because the

6   FIP Securities were purchased by GoldStar for Plaintiffs' IRAs, pursuant to its role

7   as Plaintiffs' agent under the GoldStar Agreements. A similar agreement exists for

8   Mr. Page. (*See C. Page Decl.*, Ex. 1 (FPA Agreement).

9          When the enforcement of different forum selection clauses would result in

10   piecemeal litigation of the plaintiff's claims, courts will not enforce both of them.

11   *Primary Color Sys. Corp. v. Agfa Corp.*, No. SACV1700761JVSDFMX, 2017 WL

12   8220729, at *6 (C.D. Cal. July 13, 2017); *B & O Mfg., Inc. v. Home Depot U.S.A.,*

13   *Inc.*, No. C 07-02864 JSW, 2007 WL 3232276, at *3 (N.D. Cal. Nov. 1, 2007)

14   (*quoting M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972)).

15          Similarly, mediation/arbitration/forum selection clauses like those in the

16   GoldStar Agreements will not be enforced in California if is any possibility of

17   conflicting rulings on a common issue of law or fact. *Cal. Code Civ. Proc.*

18   §1281.2(c).

19          In view of the merger clause and the fact that GoldStar freely signed the FPA

20   after it had entered into GoldStar Agreements, together with the broad scope of the

21   FPA's paragraph 10.6 , GoldStar is now bound by its express consent to jurisdiction

22   in California.  For the same reason, the application of California law is proper in this

23   case. *See also Cal. Civ. Code* § 1856(a).  Accordingly, both GoldStar's 12(b)(2)

24   jurisdictional argument and its 12(b)(3) venue arguments are groundless in view of

25   the FPA.  GoldStar's MTD based on these grounds should therefore be denied.

26          GoldStar's forum selection and venue clauses are also unconscionable, which

27   is a defense to the enforcement of contracts. (*Civ. Code* § 1670.5.) Courts have found

28   unconscionability is a defense against agreements to arbitrate. *See, e.g., Szetela v.*

*Discover Bank*, 97 Cal.App.4th 1094, 1099 (2002); *Tompkins v. 23and Me*, 2014 WL 2903752, at *13 (N.D. Cal. 2014).

### C. Plaintiffs Have Adequately Alleged GoldStar's Liability as Co-Conspirator and that Bieser Was Its Agent

GoldStar  wrongly asserts that the Complaint does not adequately allege an agency relationship between GoldStar and its co-defendants. (MTD, pp. 13:1-14:6) GoldStar ignores the doctrine of civil conspiracy, which ties the Defendants' conduct together in this action. Civil conspiracy affixes liability to all persons who have agreed to a common design to commit a wrong. *See, e.g.*, *Choate v. County of Orange*, 86 Cal.App.4th 312, 333 (2000) (internal citation omitted.)

In ruling on the sufficiency of Plaintiffs' allegations, the Court should consider that "[c]onspiracies are typically proved by circumstantial evidence. '[S]ince [the Defendants'] participation, cooperation or unity of action is difficult to prove by direct evidence, it can be inferred from the nature of the act done, the relation of the parties, the interests of the alleged conspirators, and other circumstances.'" *Rickley v. Goodfriend*, 212 Cal.App.4th 1136, 1166 (2013). If a plan for joint action is shown, 'a defendant may be held liable who in fact committed no overt act and gained no benefit therefrom.'" *Wetherton v. Growers Farm Labor Assn*. 275 Cal.App.2d 168, 176 (1969).

Plaintiffs have alleged sufficient facts to support a conspiracy claim between GoldStar and its co-defendants:

Defendants, including GoldStar, used Bieser to "beg[i]n a campaign to induce Plaintiffs to take custody of their assets through GoldStar." (Compl., ¶31);

GoldStar falsely identified Bieser "account representative," when he was not registered, licensed, or certificated as a financial/investment advisor or as a broker. (Compl., ¶151). GoldStar thus cloaked Bieser in authority he did not have.

Bieser visited Plaintiffs home and ingratiated himself to them in an effort "to create a false sense of trust so he and the other defendants [including GoldStar] could deceive and defraud plaintiffs" (Compl., ¶32);

Bieser, on behalf of GoldStar and the other defendants, used fraudulent sales tactics to convince Plaintiffs to liquidate their IRAs with Lincoln Financial and roll over the proceeds to GoldStar (Compl., ¶¶ 35-37);

Defendants, including GoldStar, held themselves out to Plaintiffs as being properly registered, skilled and authorized to engage in securities transactions (¶45);

GoldStar was not registered to do business in California but  "never disclosed or warned Plaintiffs that [it was] not qualified to transact business with Plaintiffs in California" (Compl., ¶ 55).

FIP implicated GoldStar in the conspiracy and as responsible for FIP's demise stating that "FIP has suffered from events like GoldStar Trust, cutting their services without warning…. FIP depends on various service providers … [to]transfer money, facilitate the purchase and sale of income streams (Like GoldStar Trust) and otherwise keep partner with FIP to implement its business model" (Compl., ¶ 60);

GoldStar denied having a "business relationship" with FIP, claiming "it had not entered into any contracts with FIP," (Compl., ¶ 61), a position directly contradicted by the FPA that FIP, GoldStar and Plaintiffs entered into in or about December 2016 (K. Page and C. Page Decls., Ex. 1 (FPA).)

"Shurwest and the Heritage Defendants convinced their victims to transfer their IRAs to GoldStar and invest millions of dollars in FIP . . . GoldStar profited by charging custodial fees on the IRA . . ." (Compl., ¶70);

That, after FIP ceased operations, in June 2018, Defendant Albert implicated GoldStar in Defendants' conspiracy, "stat[ing] that, 'Three people to sue are Shurwest, GoldStar and FIP," and "that 'all qualified money like ours went through GoldStar,' and that 'even though GoldStar sent a letter saying they are not responsible they are completely responsible.'" (¶¶72, 73)

These allegations raise the inference that GoldStar was a participant in the scheme and was working in conjunction with Bieser, FIP, and the other Defendants to commit the wrongful acts alleged in the Complaint. As such, Plaintiffs have adequately pled GoldStar's liability for the other Defendants' misconduct.

### D. Plaintiffs Have Adequately Pled That GoldStar Owes Them Fiduciary Duties

In California, a fiduciary relationship arises where one party reposes a confidence in the integrity of the other, who agrees to assume that confidence, and is in a superior position to exert unique influence over the dependent party. *Brown v. Wells Fargo Bank, N.A.*, 168 Cal. App. 4th 938, 960 (2008). A party is charged with that duty by entering a relationship that imposes that undertaking as a matter of law, including an agent, and a stockbroker. *Id; see also Duffy v. Cavalier*, 215 Cal. App. 3d 1517, 1531 (1989) (quoting *Twomey v. Mitchum, Jones & Templeton, Inc.,* 262 Cal.App.2d 690, 708–709 (1968)).  While no single set of factors gives rise to a fiduciary relationship, it is more likely to arise when one of the parties to that relationship is vulnerable due to advanced age and frail health. *Id*.  As explained herein, the facts alleged show that such a duty arose in this case.  Even if Goldstar did not directly owe Plaintiffs fiduciary duties, it conspired with other defendants to breach the fiduciary duties that those defendants owed to Plaintiffs, and it is also liable for those defendants' breaches of fiduciary duties. *Mosier v. S. California Physicians Ins. Exch.*, 63 Cal.App.4th 1022, 1048 (1998).

Federal courts in California have found that a plaintiff can state a claim for breach of fiduciary duty against a broker by alleging facts showing a scheme to defraud investors into purchasing unsuitable products, where such acts were committed by the broker's sales agents. *See*, *e.g.*, *Negrette* 444 F. Supp. 2d at 999-1000, 1004 (C.D. Cal. 2006) (denying motion to dismiss and finding plaintiff stated a claim for breach of fiduciary duty based on insurance company's unfair, fraudulent and unlawful sales practices where plaintiff alleged facts sufficient to show not

merely an insurer-insured relationship, "but rather one that may entail a breach of fiduciary duty."); *see also Miglaccio v. Midland Nat'l Life Ins. Co.*, 436 F. Supp. 2d 1095, 1006-1008 (2006) (denying motion to dismiss claim for breach of fiduciary by plaintiff against life insurance company in class action alleging, in detail, fraudulent and predatory sales practices inducing senior citizen investors to purchase unsuitable annuities); *In re National Western Life Ins. Deferred Annuities Litig.*, 467 F. Supp. 2d. 1071, 1086-1088 (2006) (denying motion to dismiss breach of fiduciary duty claim and noting that, while insurer does not owe strict fiduciary duty to insured, in California the insurer-insured relationship is fiduciary in nature and carries heightened extra-contractual duties of good faith).

Even in relationships where traditionally no fiduciary relationship exists, courts have found a fiduciary relationship where the relationship between the parties goes beyond the traditional relationship. *See, e.g.*, *Negrete v. Fid. And Guar. Life Ins. Co.*, 444 F. Supp.2d 998, 1004 (2006) ("[P]laintiffs allegations are sufficient to state claim for common law breach of fiduciary duty against defendant, in that the relationship alleged is not simply that of an insurer-insured, but rather one which may entail a fiduciary duty."). In *Negrete* plaintiff sued an insurance company defendant in a situation analogous to this case. Plaintiff alleged a "systematic unfair, fraudulent and unlawful sales practices in connection with [Defendant's] solicitation, offering and sale of deferred annuity products to senior citizens (65 years of age or older) in California." *Id*. at 1000. Plaintiff insured brought claims for, inter alia, elder abuse and breach of fiduciary duty. In a Rule 12(b)(6) motion to dismiss, the defendant insurer based its defense on the argument that "under California law an insurer owes no fiduciary duty to its insureds." *Id*. at 1003. The court disagreed holding sufficient plaintiff's single allegation that the insurer's "purported positions as financial advisors, estate planning specialists, and because of their superior knowledge and ability to manipulate and control senior citizens' finances and legal status, the [managing general agents] and the [national marketing organizations], owned,

operated and/or controlled by defendant who marketed and sold F & G annuities to senior citizens assumed fiduciary duties." *Id*.

Similarly, GoldStar asserts it has no fiduciary obligations because custodians of self-directed IRAs owe no fiduciary duties to IRA owners. (MTD, pp. 18-19). However, as explained herein, GoldStar's role went far beyond that of a traditional self-directed IRA custodian. As in *Negrete*, GoldStar, through its agents and co-conspirators Bieser and the other Defendants, targeted elderly people and retirees. Plaintiffs have adequately alleged that GoldStar, through Bieser, worked to gain Plaintiffs' confidence as being qualified to advise Plaintiffs regarding the purchase of FIP securities, even though this was untrue. *See* Section III.C above.

Further, GoldStar ignores the language of the FPA and GoldStar Agreements conferring fiduciary duties on GoldStar. Under the FPA, GoldStar acted "FBO," i.e., for the benefit of Plaintiffs. *See, e.g.*, *K. Page Decl.*, Ex. 1, p. 1. Further, GoldStar expressly represented that it would act as Plaintiffs' "agent." *See, e.g.*, *Johnson Decl.*, Ex. A, ¶ 8.03 ("By performing services under this agreement we [GoldStar] are acting as your [Plaintiffs'] agent."). However, although GoldStar expressly appointed itself as Plaintiffs' agent, it also disingenuously inserted exculpatory language into the same paragraph to relieve itself of the fiduciary duties it owed to Plaintiffs as their agent. Id. ("You acknowledge and agree that nothing in this agreement will be construed as conferring fiduciary status upon us." California courts disfavor such exculpatory clauses when the party seeking to avoid its fiduciary duties proceeds to act in bad faith. *See*, e.g., *Neubauer v. Goldfarb*, 108 Cal. App. 4th 47, 56-57 (2003). GoldStar's therefore required to act consistent with its fiduciary duties to Plaintiffs.

### E.   Plaintiffs Have Alleged Fraud Against GoldStar with Sufficient Particularity

F.R.C.P. Rule 9(b)'s particularity standard for pleading fraud is relaxed because this is a case of corporate fraud so the relevant facts here are in GoldStar's knowledge. *See Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir.

-17-

1989).  Further, for fraudulent omission, Plaintiffs do not need to plead time and place of the omission. *See also Cirulli v. Hyundai Motor Company*, 2009 WL 5788762, at *4 (C.D. Cal. 2009) (Guilford, J.).

Plaintiffs have sufficiently pled fraud committed by GoldStar and its Co-Conspirator Defendants prior to Plaintiffs' execution of the Structured Payment program agreements in December 2016. Plaintiffs have alleged that the relevant time period was September to December 2016. *See* Compl., ¶¶ 27, 32, 36.

Plaintiffs alleged that GoldStar, fraudulently identified Bieser as an Account Representative, on their IRAs thereby implying he was qualified to advise Plaintiffs in the purchase of securities. (Compl., ¶ 19). This Plaintiff also identified Heritage as a broker dealer in its "Account Representative and Factoring Company Form" ("Rep. Form"), again implying Heritage was qualified to advise on the security transactions at issue. *See*, MTD., *Decl. of John Johnson*, Ex.  C, ("The company or organization under which your designated Account Representative operates will be referred to herein as "broker dealer.") However, GoldStar's representations were false because neither Bieser or Heritage was qualified to market or sell the securities at issue here.

Plaintiffs further alleged that GoldStar held itself out as being qualified to do business in California, but it was not so qualified. (Compl. ¶¶ 55, 128). GoldStar held itself out as being able to do business with California-resident Plaintiffs by actually doing business and entering into agreements with them. (Compl., ¶¶ 37-43 ).

Plaintiffs further alleged that GoldStar, through its agent and co-conspirator Bieser, falsely claimed that Plaintiffs' investment of more than 90% of their IRA assets in FIP was a safe and sound investment. (Compl., ¶¶ 34, 53). This was fraudulent because FIP was subject to many undisclosed regulatory investigations and such a high concentration in a retirement account is unsuitable. (Compl., ¶¶ 53).

For the *fraudulent omissions*, Plaintiffs need only allege the "who", "what", and "how" of the fraudulent omissions. In this case Plaintiffs have pled that Goldstar failed to disclose the following information:

- FIP's regulatory issues Compl., ¶ 142. These issues subsequently led to cessation of FIP's operations;

- The FIP securities lack of proper registration or exemption from registration (Compl., ¶ 142);

- GoldStar was not qualified to sell the FIP securities nor qualified to do business with California-resident Plaintiffs (Compl., ¶ 55); and

- The tax implications of Plaintiffs' transactions.  (Compl., ¶¶ 38, 40.) Plaintiffs were taxed on distributions from their GoldStar IRAs.  *Id*.

As stated in Section III.C above, Plaintiffs have adequately alleged GoldStar's own affirmative misrepresentations and its role in a conspiracy to defraud Plaintiffs with the other Defendants. As such, Plaintiffs have also adequately pled GoldStar's direct liability and liability for the other Defendants' fraudulent conduct.

### F.   Plaintiffs Have Stated A Claim for All Causes of Action

#### 1.   Legal Standard

In deciding a MTD under Federal Rule of Civil Procedure ("FRCP") 12(b)(6), a court accepts as true all allegations of material fact in the complaint and reads the complaint in the light most favorable to the nonmoving party. *Marceau v. Blackfeet Hous. Auth*., 540 F.3d 916, 919 (9th Cir. 2008); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

#### 2.   Plaintiffs State a Claim for Violations of the Securities Act and California Securities Laws

GoldStar rests its entire argument concerning Plaintiffs' federal and state securities fraud claims on the assertion that "an IRA is not a 'security' and GoldStar did not offer a security to Plaintiffs for sale." (MTD, p. 17:11-12).  But Plaintiffs did not allege that an IRA is a security.

GoldStar is silent as to Plaintiffs' conspiracy, agency, fiduciary duty, and aiding and abetting allegations. This silence is a judicial admission. *See Walker v. Dorn*, 240 Cal.App.2d 118, 120 (1966); *Troche v. Daley*, 217 Cal.App.3d 406, 409

-19-

(1990).  As discussed above, these allegations are sufficiently pled, and therefore GoldStar is as equally culpable for the wrongdoing of its co-defendants, whom, among other things, sold FIP securities to Plaintiff.  Thus, as a co-conspirator and aider and abettor of its co-defendants, GoldStar is equally responsible for violations of sections 5, 11, and 12 of the Federal Securities Act of 1933 and violations of California Corporations Code section 25110 to 25130.

### 3.  Plaintiffs State a Claim for Breach of Fiduciary Duty and Aiding and Abetting Such Breach, Constructive Fraud, and Negligence

GoldStar wrongly asserts that Plaintiffs fail to allege any extra-contractual duties GoldStar owes to Plaintiffs. (MTD, pp. 18-21.) As discussed in Section III.D above, the Complaint alleges a fiduciary relationship between GoldStar and Plaintiffs and thus GoldStar owed them fiduciary duties. GoldStar simply falls back on the argument that it is a self-directed IRA custodian and therefore insulated from liability for the wrongful acts alleged in the Complaint.  (MTD, pp. 18-20).  GoldStar is mistaken.  As discussed in section III.C., since the Complaint alleges that GoldStar's acts went beyond those required of a self-directed IRA custodian, the limitations imposed on an IRA custodian for performing custodial duties are inapplicable. Further, the requisite knowledge and intent can be inferred from Plaintiffs allegations. *Wyatt v. Union Mortgage Co.,* 24 Cal.3d 773, 785 (1979).

### 4.  Plaintiffs State A Claim for Violation of the CLRA, UCL, and Elder Abuse Act

Mr. Page has sufficiently alleged that GoldStar and the other defendants committed financial elder abuse by conspiring to wrongly obtain and actually wrongfully obtaining the funds in his IRA. Further, as alleged above Plaintiffs violated the CLRA and UCL.  *Negrete* is instructive. *Negrete* specifically addressed a defendant insurer's claim that it did not "take, secrete, appropriate or retain" the plaintiff's funds as understood by the Elder Abuse statute. *Negrete*, 444 F. Supp. 2d

at 1002. The court held that plaintiff's allegations where sufficient because he alleged—similar to this case—that defendant insurer resorted to fraudulent and deceptive practices aimed at seniors to increase its sales to seniors for its own financial gain. *Id*. The *Negrete* plaintiff further alleged that the defendant insurer used information it had on its existing senior citizen customers, such as the cash value in their in their already existing insurance policies and annuities to target those with "substantial accumulated cash values." *Id*.

Plaintiffs allege even more egregious conduct by GoldStar and the other defendants, including that they targeted Plaintiffs due to the value of their IRAs (over $1 million), which information Heritage gained by preparing a trust revision for Plaintiffs. (Compl., ¶ 31). Bieser on behalf of defendants then gained Plaintiffs' confidence and used fraud and deceit to convince Plaintiffs to invest in the Structured Settlement program. (Compl., ¶¶ 32-37).

### 5. Plaintiffs State A Claim for Fraud and Negligent Misrepresentation

As discussed above, Plaintiffs have sufficiently alleged their fraud claims against GoldStar, even under the heightened Rule 9(b) standard. However, Plaintiffs' allegations are also to be scrutinized under a more relaxed standard than that of Rule 9(b) because: (1) Plaintiffs have adequately alleged that a fiduciary relationship existed between GoldStar and Plaintiffs; and, (2) many of the specifics of Defendant's fraudulent scheme are within Defendants' knowledge and control, and thus less specificity and particularity is required of Plaintiffs' allegations.

Plaintiffs have made detailed allegations concerning the elements of their fraud-based claims and given GoldStar a clear understanding of the "who, what, where, when, and how" of their fraud claims. Plaintiff's Complaint shows "how, when, where, to whom, and by what means the representations were tendered." *Lazar v. Superior Court*, 12 Cal.4th 631, 645 (1995).  It thus has the particularity required to provide fair notice to the defense and assurance to the court that the

complaint has a prima facie foundation of merit." *Id*. The foregoing allegations are therefore sufficient to apprise GoldStar of the claims against it.

Further, allegations in the Complaint are also adequate to show causation. Plaintiffs have demonstrated cause and effect: Defendants' misrepresentations induced Plaintiffs to transfer their IRA's into GoldStar accounts and purchase the MN Life policies and FIP securities "when [they] otherwise would not have done so," and they suffered "damage by virtue of [among other things] the wrongfully induced decision to buy the [FIP securities]." For pleading purposes this is sufficient.

GoldStar does not contend that the factual allegations are insufficient or that it does not understand the claims against it. Rather, as discussed below GoldStar cloaks itself in the role of "Self-Directed IRA Custodian" to insulate it from liability for its knowing and intentional participation in the illicit scheme perpetrated by all defendants. However, the allegations reflect that GoldStar was no custodian but rather a co-conspirator with the other Defendants, and shares in their liability.

Also, because the Complaint adequately alleges that Plaintiffs were fraudulently induced to enter into the GoldStar Agreements, not only are the agreements unenforceable but the Forum Clauses at the heart of GoldStar's arguments, are also null and void. *Brown v. Wells Fargo Bank N.A.*, 168 Cal.App.4th 938, 958 (2008).

## 6. Plaintiffs State A Claim for Intentional Infliction of Emotional Distress

GoldStar argues that Plaintiffs have not stated an IIED, but it is hard to imagine conduct more "outrageous" than spending months deceitfully cultivating the friendship of the vulnerable, senior citizen Plaintiffs (as Bieser did on behalf of GoldStar and the other Defendants) and then inducing them to invest most of their retirement assets into a fraudulent program that wiped out their life savings.

**G.   In The Alternative, Plaintiffs Request Leave To The Amend Their Complaint**

If the Court is inclined to grant the Motion, in whole or in part, Plaintiffs request leave to amend.  Senior financial abuse cases like this one generally have the defendants in the possession of the most damaging documents.  *See, e.g.*, *Moore*, 885 F.2d at 540.  Because some of the parties exchanged their Initial Disclosures, much more of the financial fraud picture has been laid out.  If an amended pleading is necessary, Plaintiffs could and would strengthen their claims as follows with additional details of GoldStar's involvement.

**IV.  CONCLUSION**

For the foregoing reasons, GoldStar's MTD should be denied.


**REIF LAW GROUP, P.C.**

Dated:  October 30, 2018          By:   *Ohia Amadi*

Brandon S. Reif
Marc S. Ehrlich
Ohia A. Amadi

*Attorneys for Plaintiffs*