Brandon S. Reif (SBN 214706)
Marc S. Ehrlich (SBN 198112)
Ohia A. Amadi (SBN 268876)
**REIF LAW GROUP, P.C.**
10250 Constellation Blvd., Suite 100
Los Angeles, CA 90067
Tel: 310.494.6500
Email: Docket@reiflawgroup.com; BReif@reiflawgroup.com;
        MEhrlich@reiflawgroup.com; OAmadi@reiflawgroup.com

Attorneys for Plaintiffs (Co-counsel information on next page)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KOLETTE A. PAGE and CLETUS M. PAGE, individually and on behalf of their individual retirement accounts,<br><br>Plaintiffs,<br><br>v.<br><br>MINNESOTA LIFE INSURANCE COMPANY, a Minnesota corporation; SHURWEST HOLDING COMPANY, INC., an Arizona corporation; SHURWEST, LLC, an Arizona limited liability company; HAPPY STATE BANK dba GOLDSTAR TRUST COMPANY, a Texas business entity (corporate status unknown); FUTURE INCOME PAYMENTS, LLC, a Delaware limited liability company; CMAM, INC. dba HERITAGE FINANCIAL SERVICES, a California corporation; ALBERT ANDREW MANFRE, an individual; JEANETTE MANFRE, an individual; MATTHEW LEE BIESER, an individual; and DOES 1-10, inclusive,<br><br>Defendants. | Case No.: 8:18-cv-01208-AG-KES<br><br>**PLAINTIFFS' FIRST AMENDED COMPLAINT**<br><br>**Complaint Filed: July 9, 2018**<br>**Trial Date:        January 28, 2020**<br><br>**DEMAND FOR JURY TRIAL** |

Jon C. Furgison (SBN 205761)
**FURGISON LAW GROUP, P.C.**
444 Longfellow Avenue
Hermosa Beach, CA 90254
Tel: 310.356.6890
Email: jon@furgisonlawgroup.com

Attorneys for Plaintiffs

Plaintiffs Kolette A. Page ("Kolette") and Cletus M. Page ("Cletus") (collectively, "Plaintiffs") allege the following against Defendants Minnesota Life Insurance Company ("Minnesota Life"), Shurwest Holding Company, Inc. and Shurwest, LLC (collectively, "Shurwest"), Happy State Bank dba Goldstar Trust Company ("GoldStar"), Future Income Payments, LLC ("FIP"), CMAM, Inc. dba Heritage Financial Services ("Heritage"), Albert Andrew Manfre ("Albert"), Jeanette Manfre ("Jeanette") and Matthew Lee Bieser ("Bieser") (collectively, "Defendants"):

## I.    SUMMARY OF CLAIMS

1.    Defendants conspired to defraud Plaintiffs, an elderly and vulnerable retired California couple, out of their irreplaceable retirement and life savings exceeding $1,300,000.

2.    Shurwest, through its employee and senior executive Melanie Schulze-Miller, recruited Minnesota Life appointed agents, including Defendants Heritage, Albert, Jeanette and Bieser (collectively, the "Heritage Defendants"), to promote and market to vulnerable California retirees a "Structured Cash Flow" investment program. Shurwest trained and encouraged the appointed agents, including the Heritage Defendants, to sell the Structured Cash Flow program which consisted of investments in FIP and in Minnesota Life insurance policies.  Plaintiffs were victims of this conspiracy.

3.    The Structured Cash Flow program used retirees' individual retirement account ("IRA") assets to purchase fixed income streams from loans issued by FIP to retirees and pensioners secured by, or issued in return for, the sale of the fixed income stream of the retirees and pensioners.

4.    Structured Cash Flow program participants liquidated their IRAs and transferred the proceeds to GoldStar which custodied the accounts and received proceeds from the FIP securities investments and applied them to the IRAs.

5. The FIP offering was an unlicensed, unregistered and non-exempt securities offering by FIP, with its principal place of business in Irvine, California. It is a fraudulent investment peddled by the Defendants including Minnesota Life, Shurwest, GoldStar, Heritage, Albert, Jeanette and Bieser.

6. None of the Defendants possessed the necessary state and/or federal securities licenses from the United States Securities and Exchange Commissions ("SEC") and/or the Financial Industry Regulatory Authority ("FINRA") licenses to make securities recommendations vis-a-vis liquidating the retirees' retirement investments and/or selling them the Structured Cash Flow program consisting of FIP and Minnesota Life insurance to fund each other.

7. The Heritage Defendants, through their employee/appointed agent Bieser, induced Plaintiffs to liquidate their conservatively invested life savings retirement investments estimated at over $1,300,000 and to transfer all the proceeds to GoldStar.  GoldStar, an IRA custodian, played a critical role in the conspiracy by allowing Defendants to access the substantial, tax-deferred assets in Plaintiffs' IRAs without any checks and balances or any supervisory measures in place to protect the seniors against the violations of federal and state laws.

8. GoldStar permitted the Heritage Defendants, Shurwest, Minnesota Life and FIP to induce vulnerable seniors to make taxable and tax-penalty distributions from their IRAs to purchase FIP and the Minnesota Life insurance.  GoldStar knew, having custodied many dozens of Cash Flow Structure programs for these co-conspirators, that senior citizen investors were putting their conservative retirement "nest eggs" at considerable risk.  The securities laws mandate financial institutions to identify, investigate and report suspicious or violative activities, yet GoldStar flouted its responsibilities because it was a co-conspirator in the scheme.

9. After the proceeds were transferred to GoldStar, on the Heritage Defendants' recommendation (through Bieser), GoldStar made taxable distributions to Plaintiffs from their IRAs to purchase large permanent Minnesota Life insurance

policies and used the remaining IRA funds to purchase concentrated positions in FIP securities. GoldStar made subsequent taxable distributions from FIP securities proceeds to Plaintiffs for them to pay premiums on the Minnesota Life insurance policies.

10.    For all of these transactions involving GoldStar, GoldStar was the Plaintiffs' agent, thereby it knowingly and purposefully conducted ongoing business activities in California with California senior citizen residents.

11.    GoldStar also conducted ongoing business activities, in connection with Plaintiffs' action, with the Heritage Defendants and FIP, all of whom were domiciled in Southern California.  GoldStar thereby knowingly and purposely engaged in the business activities at issue in this action in the State of California.

12.    Defendants are liable for these unlawful acts under statutory strict liability as well as intentional torts and negligence. The strict liability claims do not require proof of causation or intent and the statutory remedy is, *inter alia*, rescission of all the transactions.

13.    Each of the Defendants profited from their roles in the conspiracy.

14.    The Heritage Defendants and Shurwest received commissions and other financial remuneration from Minnesota Life on their sales of the Minnesota Life insurance policies.

15.    Minnesota Life received hundreds of thousands of dollars in premium payments from Plaintiffs' insurance policies. Minnesota Life also received interest on loans on the insurance policies that Plaintiffs were forced to take in order to pay unexpected tax liabilities from the recommended IRA distributions.

16.    GoldStar received fees for serving as the custodian of the assets and received other remuneration as the custodian of the assets, i.e. the assets substantially increased their asset base and investment capital as a financial institution.

17.     All of the Defendants conducted ongoing business affairs in California and with California residents – the Plaintiffs, the Heritage Defendants and FIP alike.

## II.     PARTIES

18.     Plaintiffs Kolette and Cletus Page are a married couple residing in the State of California in Covina, California.  At all relevant times, they were retired and living on a fixed income stream.  Cletus is seventy-five (75) years old. Kolette is fifty-nine (59) years old.

19.     Defendant Minnesota Life is a Minnesota insurance corporation headquartered in St. Paul, Minnesota.  It authorized Defendants Albert, Jeanette and Bieser as its duly appointed agents.

20.     Defendants Shurwest Holding Company, Inc. and Shurwest, LLC (Shurwest) are Arizona businesses that conduct regular, ongoing activities in the State of California.  Shurwest serves as a "middle man" between Minnesota Life and insurance agents who market Minnesota Life products, such as the Heritage Defendants. Ronald L. Shurts is the President of Shurwest Holding Company, Inc. and the Manager of Shurwest, LLC.  Shurwest markets and sells life insurance, annuities and securities to consumers and is licensed to do so in California.  The Shurwest businesses are not registered with the State of California as "qualified" to do business in the State but are registered with the California Department of Insurance to sell insurance.  Shurwest unlawfully engaged in business with California residents.

21.     Defendant GoldStar is a "trust branch" and division of Happy State Bank and promotes itself (via website) as "backed by the financial strength and confidence of" Happy State Bank. On information and belief, Happy State Bank is a business entity registered with the Texas Secretary of State.  GoldStar holds itself out to public consumers as a self-directed IRA custodian, trustee and

-4-

1    escrow/payment agent.  It is not "qualified" to do business in the State of

2    California.  It unlawfully engaged in business with California residents.

3         22.     Defendant FIP is a Delaware limited liability company, registered to

4    do business in California, with an office located in Irvine, California. On

5    information and belief, FIP specializes in issuing loans to pensioners in return for

6    their pension payments and then bundles the loans and issues unlicensed, non-

7    exempt securities to investors backed by the pension payments.  FIP is not

8    registered with the SEC, FINRA or the California Department of Business

9    Oversight ("DBO") and is not exempt from securities registration.  It unlawfully

10   engaged in securities transactions with residents of the State of California.

11        23.     Defendant CMAM, Inc. dba Heritage Financial Services (Heritage) is

12   a California corporation located in Lake Forest, California. It also does business as

13   HFIS Insurance Services. On information and belief, Defendant Albert Manfre is

14   the President and owner of Heritage.  Heritage's predecessor, which was in the

15   same line of business, located at the same address, and also owned by Albert

16   Manfre, was called Albert Andrew, Inc. and did business as Security Financial

17   Group.  Heritage is licensed to sell Life and Accident Insurance by the California

18   Department of Insurance ("DOI") as CMAM, Inc. dba HFIS Insurance Services

19   with CA Ins. Lic. No. 0G98543.  It is not registered with the SEC, FINRA or the

20   DBO and is not authorized to offer or sell securities.

21        24.     Albert Andrew Manfre (Albert) is an individual residing, on

22   information and belief, in San Juan Capistrano, California, and is the President of

23   Heritage and its now dissolved predecessor Albert Andrew, Inc. He is also an

24   appointed agent of Minnesota Life. Albert is licensed to sell life and accident

25   insurance by the DOI with CA Ins. Lic. No. 0786630. On information and belief, he

26   is married to defendant Jeanette.

27        25.     Defendant Jeanette Manfre (Jeanette) is an individual residing, on

28   information and belief, in San Juan Capistrano, California, and is employed by

1   Heritage. Plaintiffs are informed and believe that she is the CEO of Heritage. She is
2   also an appointed agent of Defendant Minnesota Life.  Jeanette is licensed to sell
3   life and accident insurance by the DOI with CA Ins. Lic. No. 0H24714. Plaintiffs
4   are informed and believe that she is married to Albert.

5   26.    Defendant Bieser is an individual residing in California with a last
6   known address in Costa Mesa, California.  Bieser is licensed to sell life and
7   accident insurance by the DOI with CA Ins. Lic. No. 0680265. Bieser is
8   deceptively identified as an "account representative" on the Plaintiffs' IRAs under
9   the custodianship of GoldStar.  Bieser is also deceptively identified as an "advisor"
10  in annual reports provided to Plaintiffs by Minnesota Life.  Bieser does not now
11  hold, and has never held, securities licenses with the SEC, DBO or FINRA and is
12  not authorized to effectuate or recommend securities transactions for customers.

13  27.    Plaintiffs are unaware of the true names and capacities, whether
14  individual, corporate, agent, representative, or otherwise, of the Defendants named
15  herein as DOES 1 through 10 and therefore sue such Defendants by such fictitious
16  names pursuant to Local Rule 19-1. Plaintiffs are informed and believe, and thereon
17  allege, that each of the Defendant DOES is in some manner responsible for the acts
18  and occurrences alleged herein; and that each DOE Defendant is therefore liable to
19  Plaintiffs as alleged herein. Plaintiffs will seek leave of Court pursuant to Federal
20  Rule of Civil Procedure 15 to amend this complaint to set forth the true names and
21  capacities of these fictitiously named Defendants when they are ascertained.

22  28.    Plaintiffs allege, on information and belief, that, at all material times
23  herein mentioned, each Defendant was the agent, principal, servant, representative,
24  employer, employee, joint venturer, co-conspirator, partner, parent, subsidiary,
25  affiliate and/or alter ego of each and every other Defendant and, in doing the things
26  hereinafter alleged, was acting within the course and/or scope of such authority as
27  the agent, principal, servant, representative, employer, employee, joint venturer, co-
28  conspirator, partner (of any kind), parent, subsidiary, affiliate, and/or alter ego with

the authority and consent of the remaining co-Defendants except where otherwise specifically described.

29.     Plaintiffs are informed and believe, and on that basis, allege that Defendants conspired to and did commit and/or aided and abetted in committing the inequitable, tortious and/or unlawful acts herein alleged in furtherance of their conspiracy to accomplish their unlawful purposes. Defendants, and each of them, caused injury to Plaintiffs.

### III.     JURISDICTION AND VENUE

30.     Jurisdiction and venue are proper in this Court based on federal question jurisdiction pursuant to 28 U.S.C. § 1331.

31.     Venue is appropriate in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred and a substantial part of property that is the subject of the action is situated in this District in that the relationships and conduct at issue in this case were entered into with and affected Plaintiff-residents of this District.

32.     Further, pursuant to, *inter alia*, Cal. Corp. Code § 25550, Defendants are subject to jurisdiction in this venue due to their lack of licensing, registration, and/or certification as alleged in more detail below.

33.     This Court has supplemental jurisdiction over the state law claims for relief under 28 USC §1367.

### IV.     ALLEGATIONS SPECIFIC TO PERSONAL JURISDICTION OVER SHURWEST

34.     The Heritage Defendants are domiciled in California and Shurwest was in regular communications with these California co-Defendants.  Together, Shurwest and the Heritage Defendants conspired with FIP, Minnesota Life and GoldStar to liquidate Plaintiffs' IRA accounts and to sell them FIP and Minnesota Life investments.  Shurwest purposefully directed their conduct to California directly with Plaintiffs and directly with the California co-Defendants.

35.     Bieser told Plaintiffs that he had been introduced to the Structured Cash Flow program by Shurwest. Bieser told Plaintiffs that his contact at Shurwest was Melanie Schulze-Miller and that Shurwest recommended and promoted the Structured Cash Flow program to him for sale to senior citizens with a retirement portfolio. The Shurwest connection was conveyed to build trust and confidence in the recommended program because, according to Bieser, Shurwest had business contracts with Minnesota Life and FIP.

36.     Ms. Schulze-Miller and Shurwest provided, in part, back-office operations to the Heritage Defendants on behalf of Minnesota Life and FIP for processing the insurance and investments.  But the back-office operations were only part of Shurwest's role in this scheme.  The documents produced by Bieser and Minnesota Life show that Ms. Schulze-Miller regularly communicated and interfaced by phone and email with FIP and GoldStar, as well as with Bieser and Heritage about FIP and GoldStar. Ms. Schulze-Miller provided logistical, financial, tax and other advice and support to facilitate the Structured Cash Flow program utilizing Minnesota Life and FIP investments. Shurwest was the intermediary or "middle man" between Heritage and Minnesota Life.  Plaintiffs would not have been harmed but for Shurwest's promotion, facilitation and implementation of the investments at issue.  Shurwest purposely directed its acts to the California co-Defendants and to the California-domiciled Plaintiffs.

37.     Bieser assured Plaintiffs that Shurwest vetted and endorsed the Structured Cash Flow program and Shurwest's endorsement further guaranteed the program as risk-free and safe.

38.     On or about January 17, 2017, Plaintiffs had a conference call with Shurwest's Ms. Schulze-Miller and Bieser. Bieser needed guidance on how to structure the transfer of money from Plaintiffs' GoldStar IRA accounts to Minnesota Life to cover Plaintiffs' policy premiums. Bieser depended on Shurwest's Ms. Schulze-Miller to determine how exactly Plaintiffs were to get

money from their GoldStar IRA to Minnesota Life for payment of their policy premiums. During the call, Bieser was at Plaintiffs' home in California, and interfaced by telephone with Shurwest's Ms. Schulze-Miller. Shurwest knew and understood that Plaintiffs were California residents and the purpose of the call was to facilitate and recommend investment strategies for which Shurwest would receive financial compensation.

39.    Bieser put Ms. Schulze-Miller on speaker and Plaintiffs listened as she explained that she would make arrangements with GoldStar for a transfer from Plaintiffs' GoldStar IRA to their bank in California and then Plaintiffs would need to wire the money to Minnesota Life. Plaintiffs followed Shurwest's investment advice on the call.

40.    Later, in or about April 2018 when Plaintiffs had to pay the tax liabilities created by their GoldStar IRA distributions, Plaintiffs were forced to take loans from Minnesota Life on their insurance policies. Shurwest's Ms. Schulze-Miller stepped in to assist and advise the Heritage Defendants, specifically Bieser and his assistant, about the steps Plaintiffs needed to take to obtain loans, the status of the loans, and when the loan proceeds were likely to be received by Plaintiffs. All of Shurwest's investment/financial advice was knowingly made to Plaintiffs, California senior citizen customers, because Shurwest would receive financial compensation for doing so.

41.    While Plaintiffs primarily interacted with Bieser and Heritage, Bieser and Heritage submitted the documents Plaintiffs returned to them to Shurwest for review and completeness.  Shurwest then transmitted the documents to Minnesota Life.  Shurwest's acts to assist and facilitate Plaintiffs' transactions with Minnesota Life were done for financial compensation.

42.    Shurwest is and was licensed with the California Department of Insurance to perform insurance services.  The Heritage Defendants are authorized

agents of Shurwest, all doing business in the State of California and conducting insurance business with the Plaintiffs.

43.     By telephone and email to Bieser and Heritage in California, Shurwest also advised Bieser and Heritage of the information they needed to obtain from Plaintiffs regarding the Minnesota Life policies and transmitted instructions from Minnesota Life to Bieser and Heritage. Because Shurwest was the intermediary between Heritage and Minnesota Life, Shurwest received and reviewed Plaintiffs' Minnesota Life insurance applications in or about November 2016—which included the address of Plaintiffs' California residence. As such, Shurwest knew from essentially the outset of Plaintiffs' relationship with Heritage that Plaintiffs were California residents.

44.     Shurwest's solicitation of Structured Cash Flow program participants through the California-resident Heritage Defendants was not limited to Plaintiffs. Plaintiffs are informed and believe that there were many other California-resident retirees—at least a dozen others—who Shurwest solicited through the Heritage Defendants to invest in the Structured Cash Flow program and who lost their retirement funds as a result.

45.     Court filings from Ms. Schulze-Miller in *Shurwest, LLC, v. Schulze-Miller, et al.*, Case No. CV2018-004665, initiated in May 2018 in Arizona Superior Court also evidence the extent of Shurwest's complicity in and benefit from the Structured Cash Flow program.

46.     In her June 2018 cross-complaint against Shurwest, Ms. Schulze-Miller stated in a publicly-filed court document that for life insurance products distributed through Shurwest, such as Plaintiffs' Minnesota Life policies, policy premiums were funded by policyholders in a variety of ways, including through cash, brokerage accounts, annuity stream, or via alternative funding. Alternative funding of life insurance premiums typically involves the use of third party service

providers who facilitate the tax-advantaged transfer of monies from the policyholder to the insurer.

47.   One of these alternative funding service providers was FIP. Ms. Schulze-Miller pled in her action that Shurwest accepted the use of FIP as an alternative funding service provider. Shurwest benefited from FIP's facilitating the funding of life insurance policies on which Shurwest received a commission.

48.   Ms. Schulze-Miller also pled that Shurwest was aware that FIP would pay a referral source when a prospective policyholder utilized FIP's services. Prior to April/May 2018, according to Ms. Schulze-Miller, Shurwest never objected to the use of FIP for funding life insurance policies distributed through Shurwest.

49.   Further, Ms. Schulze-Miller had a Shurwest-affiliated business, MSJM Financial, LLC. Ms. Schulze-Miller received payment from FIP when FIP processed investments in FIP securities from potential life insurance policyholders who obtained policies through Shurwest. Ms. Schulze-Miller disbursed payments received from FIP to herself and other Shurwest employees, including Nick Johnson and Michael Seabolt.  Shurwest either knew or should have known that Ms. Schulze-Miller was openly conducting the FIP business during normal business hours and from her Shurwest office space.  Further, Shurwest's Ms. Schulze-Miller conducted these activities at or around the same time that Shurwest openly promoted and trained appointed insurance agents to sell the Structured Cash Flow program.

50.   Despite Shurwest's knowledge of the payments received by Mr. Seabolt from Ms. Schulze-Miller, Ms. Schulze-Miller stated that Shurwest took no disciplinary action against him. Instead, after Ms. Schulze-Miller's termination, she states that Shurwest promoted Mr. Seabolt to Ms. Schulze-Miller's former position as Director of Life Insurance and that Shurwest withheld no wages or commissions from Mr. Seabolt as a result of his dealings with Shurwest's Ms. Schulze-Miller or FIP.

51.    After the Structured Cash Flow program collapsed, both Bieser and Albert made statements to Plaintiffs implicating themselves and the other Defendants in the conspiracy and/or joint venture to defraud Plaintiffs and others like them.  In calls to Plaintiffs on June 1, June 22, and July 2, 2018 (by Albert), and June 25, 2018 (by Bieser), Bieser and Albert told Plaintiffs, among other things, that Shurwest promoted and offered the Structured Cash Flow program.

52.    During a June 1, 2018 call with Plaintiffs, Albert stated that, "Three people to sue are Shurwest, Goldstar and FIP." He further stated that "all qualified money like ours went through Goldstar," and that "even though Goldstar sent a letter saying they are not responsible they are completely responsible."

53.    During those calls Bieser and Albert also told Plaintiffs repeatedly that Plaintiffs' money was safe and that if they had to, they would sue Shurwest because Shurwest recommended the program to them.  At other times, Albert told Plaintiffs that he was in communication with Ron Shurts, Shurwest's CEO, and that Shurwest was going to remunerate the customers who lost money with the Structured Cash Flow program. Albert made these statements to Plaintiffs numerous times, both in person and on weekly telephone calls after FIP's collapse – specifically, that Shurwest is taking responsibility for the situation and will reimburse the harmed customers.

54.    Bieser also acknowledged that he had marketed the Structured Cash Flow program to Plaintiffs as  "completely safe" and that Bieser and the Heritage Defendants knew that Plaintiffs had lost all of their retirement money and that the Heritage Defendants were going to make things right.

55.    The Heritage Defendants, on behalf of themselves and the other Defendants, pressured Plaintiffs and other clients in 1Q18 and 2Q18 to retain their selected lawyer to pursue FIP and Shurwest.  The Heritage Defendants made certain that Plaintiffs received these lawyer solicitation proposals, none of which Plaintiffs signed.  Their acts show ongoing breach of fiduciary duties, misrepresentations and

fraudulent concealment of material facts.  They promised Plaintiffs that their lawyer, if retained, would be able to get back their money from Shurwest and FIP without Plaintiffs having to do anything or paying any of the legal fees.

## V.   ALLEGATIONS SPECIFIC TO PERSONAL JURISDICTION OVER GOLDSTAR

56.    GoldStar was not authorized to transact business in California so it used the other Defendants as its agents to market its custodial services to vulnerable retirees in California.

57.    GoldStar regularly conducted ongoing business with the Heritage Defendants knowing that these co-Defendants were domiciled in the State of California.  GoldStar interfaced with the Heritage Defendants for customer referrals to serve as custodian of their customer assets.

58.    The Heritage Defendants referred Plaintiffs and GoldStar to each other.  Plaintiffs had never heard of GoldStar before, but Bieser told them all "qualified" money such as in Plaintiffs' IRAs had to go through GoldStar to participate in the Structured Cash Flow program. So Plaintiffs didn't have a choice.

59.    Indeed, Bieser on behalf of the Heritage Defendants presented Plaintiffs with the GoldStar documents necessary to open their GoldStar IRAs at the same time that he had them fill out the paperwork for their FIP investment. As was his practice, Bieser personally brought the documents to Plaintiffs' home and did not give Plaintiffs a chance to review the documents before having them complete the documents. Bieser sat with them while they filled out the paperwork and then took all the documents afterwards. Bieser had gained Plaintiffs' trust through numerous in-person visits so Plaintiffs dutifully completed the paperwork as instructed without reviewing the documents with the scrutiny they otherwise would have.

60.    Bieser took the paperwork, including the GoldStar agreements after Plaintiffs completed them and did not leave a copy with Plaintiffs. In keeping with

his role as GoldStar's agent, Bieser transmitted the GoldStar agreements directly to GoldStar. These facts show Bieser's actual authority to solicit customers on GoldStar's behalf as its agent.

61.     At the same time, in GoldStar's "Individual Retirement Custodial Account Agreement" which GoldStar required and which Bieser had Plaintiffs complete as part of the packet of documents, GoldStar stated that it was acting as Plaintiffs' "agent." A representative of GoldStar signed the agreements on GoldStar's behalf. The agreements included Plaintiffs' California address, so GoldStar knowingly contracted with California residents for a business relationship that was to last five years. Further, the agreement was executed by Plaintiffs in California.

62.     GoldStar regularly conducted ongoing business with FIP knowing that its principal place of business was located in Irvine, California. GoldStar's relationship with FIP was so close that in an April 2018 letter to investors, FIP referred to GoldStar as its "partner."

63.     According to emails produced by Bieser, Ms. Schulze-Miller would contact FIP to set up distributions from Plaintiffs' GoldStar IRAs to fund their Minnesota Life insurance policies. For instance, in an email dated January 19, 2018, Ms. Schulze-Miller contacted Michelle Grant at FIP for her to "have GoldStar process the attached two distributions for Kollette page and cletus page [sic]. We have done distributions before so it should be verified, but if it needs to be verified have [GoldStar] contact client."

64.     GoldStar also prepared specific customer agreements for the Structured Cash Flow program. GoldStar required Plaintiffs to complete an "Account Representative and Factoring Company Form (for Structured Cash Flows." This form came pre-filled with FIP as the "factoring company" and email addresses for FIP including "info@structuredcashflows.com".

65.     Despite, or likely because of, the close relationship between GoldStar and FIP, GoldStar failed to disclose regulatory issues facing FIP during Plaintiffs' purchase of FIP securities in late 2016 and other issues alleged above such as the taxable nature of Plaintiffs' IRA distribution. But later GoldStar, on information and belief, actively concealed its discovery of additional regulatory issues which precipitated the collapse of FIP. Specifically, in early 2018, GoldStar failed to disclose to Plaintiffs that it had stopped accepting new investments in FIP due to the regulatory issues FIP faced. During that same time, Plaintiffs had become concerned that they had not received the distributions they were entitled to from FIP. So through Bieser and directly themselves, Plaintiffs sought payment of amounts owed to them as well as an explanation for the delayed payment from GoldStar.

66.     GoldStar also dealt directly with Shurwest regarding Plaintiffs' IRAs. In a March 2018 email to Bieser and his assistant, Ms. Schulze-Miller of Shurwest, detailed her communications with GoldStar regarding GoldStar's rejection of her attempt to process distributions on behalf of Shurwest's "clients," i.e., Plaintiffs— even though GoldStar had allowed her to authorize such distributions on Plaintiffs' behalf in the past.  Her email showed that as early as March 2018, GoldStar had instituted fraud alerts and additional security measures on custodial IRA accounts with investments in FIP. But GoldStar did not advise the Plaintiffs that there was any issue with FIP or Plaintiffs' FIP investment.

67.     GoldStar did not make any statement until the letter dated April 17, 2018 which GoldStar sent only after FIP's letter dated April 10, 2018 in which FIP implicated GoldStar as FIP's "partner" and complicit in the implosion of FIP. For the first time, in GoldStar's April 2018 letter, GoldStar admitted that it had previously stopped accepting additional investments in FIP or its related entities in existing customer accounts and that it was unwilling to act as custodian for new customers wishing to invest in FIP or its related entities.

68.     GoldStar serviced Plaintiffs' IRA accounts domiciled in California as well as approximately a dozen other California customers shared by the Heritage Defendants and GoldStar.

69.     GoldStar served an integral role in Defendants' conspiracy. GoldStar knew or should have known that the Heritage Defendants, FIP, Shurwest and Minnesota Life targeted retirees and senior citizens with substantial retirement assets.

70.     In order to gain access to the seniors' retirement assets, Defendants needed an IRA custodian willing to participate meaningfully in the conspiracy by ignoring securities laws, banking laws, insurance laws and the prohibition against defrauding senior citizens.  GoldStar assumed that role for the Co-Defendants, including the California domiciled Heritage Defendants.  GoldStar turned a blind eye to these illegal and unethical practices.  The ties to California are substantial – the Heritage Defendants promoting GoldStar as the custodian were California domiciled.

71.     And given GoldStar's close relationship with FIP and the fact that GoldStar is a division of a bank subject to requirements to monitor accounts for suspicious activity, it is not credible that GoldStar was unaware of the regulatory issues faced by FIP at the time of Plaintiffs' investment. Yet despite the "Individual Retirement Custodial Account Agreement" in which GoldStar stated that it was acting as Plaintiffs' "agent," GoldStar failed to disclose this information to Plaintiffs.

72.     GoldStar also provided purported legitimacy to insurance agents such as the Heritage Defendants—who were not licensed or registered to provide securities advice or sell securities—by characterizing them as "account representatives" and "broker dealers" authorized to engage in the Structured Cash Flow program transactions when in fact, they were not so authorized. GoldStar's

representations as "account representatives" and "broker-dealers" for the Heritage Defendants were false and misleading descriptions.

73.     GoldStar effectuated taxable distributions to the Structured Cash Flow participants from the proceeds from the FIP investments to fund large premiums on permanent Minnesota Life insurance policies, sold to Structured Cash Flow participants as part of the program.

## VI.    OPERATIVE FACTS

74.     In or about September 2016, Plaintiffs sought to revise trust documents that had previously been prepared for them by Security Financial, a predecessor to Heritage also owned by Albert.

75.     When Plaintiffs contacted Security Financial, they were informed of the name change and told that Heritage would be able to take care of their trust modifications. The employee who previously assisted Plaintiffs was no longer with the company, so Heritage assigned Bieser to assist them.

76.     California *Ins. Code* § 785.4 provides that "[it] shall be unlawful for any insurance agent who is not licensed as an attorney to deliver to a person who is 65 years of age or older, a living trust or other legal document, other than an insurance contract or other insurance product document, if a purpose of the delivery is to sell an insurance product."

77.     Heritage, Albert, Jeanette, Shurwest and Bieser are not licensed attorneys and violated Section 785.4 by preparing and delivering Plaintiffs' trust revisions.   Defendants Minnesota Life knew or should have known of the Section 785.4 violations by its appointed agents and affiliates.

78.     Heritage, Albert, Jeanette, Shurwest, Minnesota Life and Bieser used the trust revisions to gain access to Plaintiffs' securities portfolio exceeding one million dollars in their IRAs managed by Lincoln Financial Group ("Lincoln Financial").   Plaintiffs Kolette and Cletus accrued their savings over decades of service—Kolette, 35 years with Avery Dennison and Cletus, 45 years with the L.A.

Times. These Defendants began a campaign to induce Plaintiffs to take custody of their assets through GoldStar, to induce them to buy large permanent life insurance policies from his principal Minnesota Life, and to invest in the FIP securities offering—in violation of *Ins. Code* § 785.4 and other laws as alleged in this complaint.

79.     From September 2016 to December 2016, Bieser visited Plaintiffs' home several times to review their investment portfolio and to make investment, securities and insurance recommendations on behalf of the Defendants.  Sometimes Bieser visited them alone, and sometimes his pregnant wife or infant child joined him. But each time, Bieser pressured Plaintiffs to buy the insurance policies, to transfer their IRAs with Lincoln Financial to Defendants' management and to purchase FIP.  Bieser took all these steps to create a false sense of trust so he and the other Defendants could deceive and defraud Plaintiffs.

80.     Plaintiffs were vulnerable retirees, who ultimately surrendered to Defendants' aggressive and deceptive sales tactics.

81.     Plaintiffs depended on the money in their IRAs to cover their immediate living expenses in retirement. Bieser assured Plaintiffs that FIP was a safe and conservative investment guaranteed to make money and that Plaintiffs would receive a guaranteed return of at least 7% on their investment with complete return of their principal within five years.

82.     Bieser also promised that between the life insurance and FIP investment, Kolette and Cletus would make thousands of dollars a month and benefit from the life insurance policy worth millions of dollars should one of them die.  Bieser was so convincing in his fraudulent sales tactics that in or about December 2016, Plaintiffs followed the recommendation to invest their entire life savings in their recommended portfolio of Minnesota Life insurance and FIP.

83.     On or about December 16, 2016, Bieser presented Kolette and Cletus with writings to purchase the FIP securities and the Minnesota Life insurance.

Kolette and Cletus dutifully followed the instructions and signed the writings in reliance on the promises of investment returns.

84.     Following Bieser's recommendations, Plaintiffs liquidated their IRAs with Lincoln Financial and rolled over the proceeds to GoldStar, all at Defendants' directive.  Also, at Bieser's directive, Plaintiffs took taxable distributions from their IRAs to pay the premiums on the Minnesota Life permanent life insurance policies. Plaintiffs were not informed and warned by Defendants about the adverse tax and financial consequences.

85.     At the time, Kolette's IRA with Lincoln (Account No. xxxx-6801) ("Lincoln IRA") was worth $516,907.94.  Her retirement savings were invested in low cost, conservative mutual funds.  She liquidated all her investments and rolled over the cash proceeds to GoldStar based on Defendants' unlawful advice.  Kolette opened a Minnesota Life "Omega Builder Indexed Universal Life" insurance policy (policy no. xxx6081W) with a death benefit of $2 million and a premium of $113,539 due annually. GoldStar transferred a distribution of $55,000 from Kolette's GoldStar IRA to Minnesota Life to cover the initial partial premium on her Minnesota Life insurance policy. Shurwest set-up and supervised the transfer of Kolette's GoldStar IRA distribution and the investment purchases recommended by Defendants.  Kolette later learned that she was taxed on this distribution, but Defendants did not explain the risks versus rewards before the tax consequence was incurred.

86.     Bieser and Heritage recommended that Kolette use the remainder of her life savings, roughly $460,000, to purchase FIP securities for Kolette's GoldStar IRA and GoldStar effectuated this transaction for her.

87.     Cletus's Lincoln IRA (Account No. xxxx-5806) was worth $798,000.55 just prior to liquidation. His retirement savings was invested in low cost, conservative mutual funds.  He liquidated all his investments and rolled over the cash proceeds to GoldStar.  Cletus opened a Minnesota Life "Omega Builder

Indexed Universal Life" insurance policy (policy no. xxx9788W) with a death benefit of $1.8 million and a premium of $185,705 due annually. GoldStar transferred a distribution of $96,000 from Cletus's GoldStar IRA to Minnesota Life to cover the initial partial premium on the Minnesota Life insurance policy. Shurwest setup and supervised the transfer of Cletus's GoldStar IRA distribution and the investment purchases recommended by Defendants. Cletus later learned that he was taxed on the distribution to fund the premium.  Defendants did not explain the risks versus rewards before the tax consequence was incurred. Defendants deceived Plaintiffs that the transactions would be tax free.

88.     Bieser and Heritage recommended that Cletus use the remainder of his life savings, roughly $700,000, to purchase FIP securities for Cletus's GoldStar IRA and GoldStar effectuated this transaction for him.

89.     According to the FIP Purchase Agreement, Kolette would receive monthly principal and interest payments of $9,011.01 for five years from January 2017 until her initial principal investment of $460,000 was paid plus 7% interest. Cletus would receive monthly principal and interest payments of $13,712 for five years from January 2017 until his initial principal investment of $700,000 was paid plus 7% interest. However, Plaintiffs only received one check from GoldStar, made out to Plaintiffs jointly, for roughly $22,000 (after tax) in May 2018.

90.     The monthly payments from FIP would be deposited with GoldStar and then transferred to Minnesota Life to help pay the nearly $300,000 in annual premiums for Plaintiffs' Minnesota Life insurance policies.

91.     Shurwest, Minnesota Life, and each of the Heritage Defendants were licensed to sell life insurance, not securities, such as the FIP securities they recommended and induced Plaintiffs to purchase. Defendants' conduct gives rise to statutory strict liability. None of Defendants were registered as required with the SEC, FINRA or the State of California as broker-dealers, brokers, associated persons, investment advisers or registered investment advisory firms.  Yet,

Defendants, including GoldStar, held themselves out to Plaintiffs as being properly registered, skilled and authorized to engage in securities transactions.

92.     Bieser, at Shurwest's direction, on behalf of the Heritage Defendants, and as an actual agent of FIP and GoldStar, marketed and recommended FIP's securities without an offering memorandum prior to Plaintiffs making their investment, and they did not certify Plaintiffs' accreditation status or other necessary steps.

93.     As detailed above, Melanie Schulze-Miller, Shurwest's National Life Director at the time, participated in and supervised the wrongdoing alleged herein on behalf of Shurwest.

94.     Albert, Jeanette and Bieser were Minnesota Life appointed agents and given authority to transact business on its behalf. In account reports distributed by Minnesota Life to Plaintiffs, Minnesota Life referred to Bieser as Plaintiffs' "advisor" which furthered the fraud and deceit that Bieser was a registered investment advisor or other skilled and licensed investment advisor.

95.     Minnesota Life is an insurance company selling permanent life insurance. It is subject to the federal Bank Secrecy Act ("BSA") and its implementing regulations (Anti-Money Laundering ("AML") rules).

96.     Pursuant to AML rules codified at 31 C.F.R. § 1025.320(a)(2)(iii), Minnesota Life has a duty to report any transaction that "is conducted or attempted by, at, or through an insurance company, and involves or aggregates at least $5,000 in funds or other assets, and the insurance company knows, suspects, or has reason to suspect that the transaction (or a pattern of transactions of which the transaction is a part):… Has no business or apparent lawful purpose or is not the sort in which the particular customer would normally be expected to engage, and the insurance company knows of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction[.]"

1       97.   If Minnesota Life had performed its statutorily required duties, it

2   would have uncovered facts showing that the permanent life insurance policies

3   recommended to Plaintiffs were improper.

4       98.   Minnesota Life should have determined that, per 31 C.F.R. §

5   1025.320(a)(2)(iii), the transactions "ha[d] no business or apparent lawful purpose

6   or [were] not the sort in which the particular customer would normally be expected

7   to engage." Plaintiffs were retirees living on a limited fixed income who needed

8   their retirement savings for immediate use. Plaintiffs' initial partial premium

9   payment for the two Minnesota Life policies was approximately $150,000—well in

10   excess of the $5,000 threshold from AML rules and more than 100% of Plaintiffs'

11   2017 fixed income[1].

12       99.   Further, the two Minnesota Life policies called for a combined annual

13   premium of nearly $300,000—more than 200% of Plaintiffs' 2017 fixed income[2].

14   An investigation by Minnesota Life would have uncovered the fact that the only

15   reason Plaintiffs believed they could "afford" the insurance policies was

16   Defendants' fraudulent representation that concentrating the remaining 90% of their

17   life savings[3] in a single, unregistered security (i.e., FIP) would provide them with

18   sufficient distributions to cover the policy premiums. Minnesota Life should have

19   determined that such a concentrated investment was an unacceptable risk for

20   elderly, retirees such as Plaintiffs.

21       100.   As such, either Minnesota Life knew of and approved its agents'

22   actions, or it ratified its agents' actions by negligently, fraudulently or recklessly

23   performing its duties.

---

[1] Plaintiffs' 2017 fixed income excludes taxable distributions from Plaintiffs' GoldStar IRAs used to pay the Minnesota Life initial partial premiums.
[2] See fn. 1.
[3] The other 10% of their life savings went to pay Minnesota Life's initial partial premiums. In May 2018, Plaintiffs transferred roughly $20,000 cash, the remaining cash in their GoldStar IRAs, to separate IRA accounts they opened for that purpose.

101.   On information and belief, GoldStar and Shurwest were not registered to do business in the State of California, although Shurwest is licensed with the California Department of Insurance to do insurance business in California. As such, their business activities with California resident consumers, the Plaintiffs, was unlawful.  These businesses never disclosed or warned Plaintiffs that they were not qualified to transact business with Plaintiffs in California.

102.   Plaintiffs dutifully entered into the transactions recommended by Defendants and through March of 2018, FIP apparently made some payments to Plaintiffs' GoldStar IRAs.

103.   However, according to FIP, after making the March 2018 payment, FIP ceased making any payments to investors, including Plaintiffs.

104.   On or about April 10, 2018, FIP sent some investors and other interested parties, not including Plaintiffs, a letter with re line "FIP Restructure" stating that "Due to [FIP's] business and legal expenses, FIP plans are [sic] to restructure its operation and to drastically cut its overhead."

105.   Around the same time that FIP claimed it was "restructuring" it circulated an undated letter stating that: "There will be NO restructuring or collections by FIP in ANY state**."** (Emphasis removed.) Further, "FIP's final and ONLY remaining task is to provide Buyers the information they need on the assets they purchased."

106.   In its April 10, 2018 letter, FIP also implicated GoldStar as liable for FIP's demise stating that: "FIP has recently endured and continues to endure, intense Regulatory pressure and legal expense. FIP has suffered from events like Goldstar Trust, cutting their services without warning…FIP depends on various service providers (Like our Sellers payment processor and our bank) to hold and transfer money, facilitate the purchase and sale of income streams, *(Like Goldstar Trust)* and otherwise keep *partner* with FIP to implement its business model." (Emphasis added.)

107.   On or about April 17, 2018, GoldStar issued a self-serving and contradictory letter to Plaintiffs asserting that: it has "no business relationship" with FIP despite purchasing and maintaining custody of security interests issued by FIP; it is not a business partner with FIP; and it had not entered into any contracts with FIP.

108.   In its April 17 letter, GoldStar also admitted that it "has not conducted any due diligence regarding the legality or appropriateness of FIP, LLC's business model." So before placing more than $1 million of Plaintiffs' life savings into FIP, GoldStar admitted it performed no due diligence on FIP.  Restated, it did not investigate whether FIP was securities-licensed or exempt from registration or whether it was licensed to do business or whether it was a qualified or nonqualified offering.  Goldstar's malfeasance is actionable.

109.   Around the same time in April 2018, Plaintiffs were panicked that taxes on GoldStar IRA distributions used to pay premiums on Plaintiffs' Minnesota Life policies were due. Plaintiffs rushed to take out a $25,000 loan on Kolette's Minnesota Life insurance policy to pay for 2017 taxes on IRA distributions. Plaintiffs were also forced to take a loan on Cletus's Minnesota Life insurance policy for $33,598 to pay for 2017 taxes on IRA distributions that GoldStar transferred to Minnesota Life.  Plaintiffs were unaware in 2017 that they had incurred nearly $60,000 in taxes because none of the Defendants ever told Plaintiffs that money transferred from their GoldStar IRAs to Minnesota Life would be taxed. Minnesota Life did not investigate, as suspicious or as unsuitable transactions, the fact that their customers took loans within one year of purchasing millions of dollars in insurance.

110.   In January 2018, Plaintiffs were required to take another taxable distribution from their GoldStar IRA to pay $272,000 in Minnesota Life insurance premiums. This distribution will result in a likely tax liability for Plaintiffs of nearly $100,000.

111.   This action is not the first time that Heritage or its agents have been accused of taking advantage of vulnerable, elderly clients. In January 2018, the California Commissioner of Insurance filed an Accusation and Petition to Remove Heritage agent Mark Malatesta, aka Mark Shulzitski for "exploit[ing] elderly consumers, all over the age of 75, for his own financial gain," while he was employed with Heritage from 2010 to 2016. The Commissioner sought to revoke Malatesta's licenses and licensing rights pursuant to Insurance Code section 1748.5(b).

112.   Defendants GoldStar, Shurwest, the Heritage Defendants, and Minnesota Life were Plaintiffs' fiduciaries.  GoldStar purported to be Plaintiffs' agent. Also, Defendant Minnesota Life owed Plaintiffs fiduciary duties as principal to monitor and supervise its agents Albert, Jeanette and Bieser, and they all owed Plaintiffs the same fiduciary duties or at least a duty of reasonable care. Additionally, the insurer, insurance broker, and insurance agent Defendants owed Cletus, as a potential insured over the age of 65, duties of honesty, good faith, and fair dealing pursuant to Cal. *Ins. Code* § 785.

113.   Defendants knew or should have known that investing Plaintiffs' life savings in concentrated, speculative investments violates the law and is actionable. Defendants knew or should have known that FIP was at risk of financial ruin due to ongoing legal and regulatory issues, but none of the Defendants informed and warned the Plaintiffs of these risks.  Many of these legal issues arose prior to or soon after GoldStar, Shurwest, the Heritage Defendants, and Minnesota Life convinced Plaintiffs to make their life altering investment in FIP:

    a.   In March 2016, the Massachusetts Attorney General announced that FIP agreed to provide more than $2 million in debt relief to resolve allegations that it made predatory and illegal loans to Massachusetts consumers. FIP was also barred from making these loans in Massachusetts in the future.

b.  On November 23, 2016, the federal Consumer Financial Protection Bureau served FIP with a Civil Investigative Demand, demanding information related to the company's income stream-advance transactions.

c.  In February 2017, a month after Plaintiffs' FIP investment, the City of Los Angeles filed suit against FIP, alleging that the company charges usurious, hidden interest rates as high as ninety-six percent, prohibits early termination of the loans (thereby ensuring that consumers cannot avoid the high interest rates), and employs abusive collection practices.

d.  And in May 2017, FIP was the subject of investigations by state regulators in New York, California, Massachusetts, Iowa, Washington, and North Carolina.

114.   Defendants fraudulently concealed these facts from Plaintiffs to continue profiting from them. Plaintiffs had no knowledge or suspicion of any of these issues until approximately April 2018 when FIP's President announced FIP had ceased the majority of its operations and would make no further payments to investors as a result of the ongoing regulatory actions and litigation FIP faced.

115.   As alleged herein, Plaintiffs are informed and believe that all the Defendants engaged in a conspiracy and/or joint venture to defraud them and other vulnerable retirees like them. Defendants combined their property, skill, and knowledge to that purpose. Each Defendant had a role to play in the conspiracy and/or joint venture and each Defendant profited from its role.

# VII.   CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### (VIOLATION OF THE FEDERAL SECURITIES ACT BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS AND DOES 1 AND 2)

116.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

117.   Sections 5 and 12 of the federal Securities Act of 1933 provide registration and other requirements relating to the securities offered to Plaintiffs.

118.   On information and belief, the FIP securities that the Heritage Defendants, Shurwest, and FIP offered or sold to Plaintiffs were not registered in compliance with the Securities Act.

119.   Further, the Heritage Defendants and Shurwest were not properly registered, licensed, or certificated to engage in the securities transactions as alleged in this complaint, nor were they exempt.

120.   The Heritage Defendants, Shurwest, and FIP also failed to disclose required information to Plaintiffs as alleged herein, including but not limited to, failing to provide Plaintiffs with a prospectus or operating memorandum for their investments.

121.   Minnesota Life, GoldStar, and the other Defendants are also culpable as co-conspirators who participated in and profited from the alleged misconduct.

122.   This cause of action is a statutory strict liability cause of action which does not require proof of causation or intent.

123.   Plaintiffs are entitled to rescission of all transactions and/or damages and prejudgment interest and attorneys' fees and costs.

## SECOND CLAIM FOR RELIEF

## (RECEIPT OF STOLEN PROPERTY IN VIOLATION OF CAL. PEN. CODE § 496 BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS)

124.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

125.   As alleged above, each Defendant received property, including, but not limited to, fees and commissions, which had been stolen from Plaintiffs or had been obtained from Plaintiffs in a manner that constitutes theft.

126.   As defined in Penal Code § 484, "[e]very person…who shall fraudulently appropriate property which has been entrusted to him or her, or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property…is guilty of theft."

127.   On information and belief, each Defendant knew that the property they received was stolen or obtained in a manner that constituted theft.

128.   As a result of Defendants' actions, Plaintiffs have been damaged in an amount to be proven at trial and are entitled to treble damages, the costs of bringing this suit, and attorneys' fees under § 496(c).

## THIRD CLAIM FOR RELIEF

## (BREACH OF FIDUCIARY DUTY BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS AND DOES 3 TO 5)

129.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

130.   A fiduciary or confidential relationship existed between Plaintiffs and each Defendant.

131.   Defendants Minnesota Life, the Heritage Defendants, Shurwest, and GoldStar owed fiduciary duties by holding themselves out as brokers and financial advisers, investment advisers and skilled financial and licensed professionals with

authority to effect transactions in securities and investments, such as IRA rollovers, the FIP securities and the insurance policies pled in this action.

132.   Further, GoldStar, FIP and Minnesota Life owed Plaintiffs fiduciary duties as a common law agent entrusted with Plaintiffs' life savings.  FIP owed Plaintiffs fiduciary duties based on Plaintiffs granting FIP power of attorney pursuant to the purchase agreement between FIP and Plaintiffs. Defendant GoldStar owed Plaintiffs fiduciary duties as securities custodian of Plaintiffs' life savings and by effecting the FIP securities purchases for the benefit of Plaintiffs pursuant to the purchase agreement between FIP and each Plaintiff.

133.   Plaintiffs were retired, advanced in age, living on a fixed income and had limited financial and investment acumen.  Plaintiffs were vulnerable to Defendants' predation and they relied on Defendants' representations of financial and investment expertise and recommendations. Plaintiffs followed Defendants' recommendation and advice to invest in FIP and purchase Minnesota Life insurance.

134.   Defendants betrayed the trust that Plaintiffs reposed in them and breached their fiduciary duties by: (1) engaging in all acts discussed herein including the registration/licensing violations; (2) putting Defendants' interests ahead of Plaintiffs' interests and taking actions and making recommendations for their own gain at Plaintiffs' expense; (3) concealing material facts from Plaintiffs and by misleading them and deceiving them in all the acts discussed herein.

135.   To the extent that any Defendant does not owe a fiduciary duty to Plaintiffs, such Defendant is still liable for the other Defendants' breaches of fiduciary duty as co-conspirators who participated in and profited from the alleged misconduct.

136.   Defendants' breaches of fiduciary duty proximately caused Plaintiffs' harm.

137.   Defendants engaged in their actions and omissions intentionally with malice, oppression, or fraud pursuant to California Civil Code §3294.  Further, the individual employees of the corporate entity Defendants who committed these wrongful acts and omissions were either officers, directors, or managing agents of such Defendants or such Defendants authorized their employees misconduct or subsequently adopted or approved their wrongful conduct such that such Defendants are liable for punitive damages based on their employees' conduct.

138.   Further, per California Civil Code § 3372, Defendants were persons "engaged in the business of advising others for compensation as to the advisability of purchasing, holding or selling property for investment and who represent[ed]" themselves to be experts but failed to perform with "the due care and skill reasonably to be expected of a person who is such an expert."

## FOURTH CLAIM FOR RELIEF

### (AIDING AND ABETTING BREACH OF FIDUCIARY DUTY BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS AND DOES 6 AND 7)

139.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

140.   If any Defendant was not in a fiduciary or confidential relationship with Plaintiffs, Plaintiffs allege they aided and abetted the breaches of fiduciary duties committed by the other Defendants as alleged in this first amended complaint: they had actual knowledge of the other Defendants' breaches of fiduciary duties and provided substantial assistance or encouragement to their breaches.

141.   Minnesota Life disclosed Bieser as investment "advisor" in annual policy disclosure reviews and Goldstar disclosed Bieser as an "account representative."  Minnesota Life, Goldstar, and the other Defendants reinforced the other Defendants' fraud, deceit, breaches and negligence as set forth in this first amended complaint.

142.   As a proximate result of Defendants' conduct, Plaintiffs have been damaged in an amount to be determined at trial.

143.   Defendants engaged in their actions and omissions intentionally with malice, oppression, or fraud pursuant to California Civil Code §3294 and are liable for punitive damages.

144.   Per California Civil Code § 3372, Defendants were persons "engaged in the business of advising others for compensation as to the advisability of purchasing, holding or selling property for investment and who represent[ed]" themselves to be experts but failed to perform with "the due care and skill reasonably to be expected of a person who is such an expert."

## FIFTH CLAIM FOR RELIEF

### (FINANCIAL ELDER ABUSE BY PLAINTIFF CLETUS AGAINST ALL DEFENDANTS AND DOES 1 TO 10)

145.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

146.   Plaintiff Cletus properly asserts his rights under California's financial elder abuse statute because he was a California resident and 65 years or older during all relevant times.

147.   Defendants, and each of them, are liable to Cletus because they violated California's financial elder abuse statute which makes anyone liable who: (i) takes, secretes, appropriates, obtains or retains, any interest in any real or personal property, for a wrongful use, or with intent to defraud or both; or (ii) assists in doing any of the above described acts; or (iii) does any of the above described acts through undue influence.

148.   Each Defendant is also liable as a co-conspirators who participated in and profited from the alleged misconduct.

149.   A conclusive presumption of financial abuse exists under Cal. *Welf. & Inst. Code* § 15610.30(b) because Defendants, and each of them, knew or should

have known that their malfeasance was likely to be harmful to Cletus, a senior citizen.

150.   Cletus was approximately seventy-two (72) to seventy-four (74) years old during the time period relevant to this complaint.  Defendants and their co-conspirators and aiders and abetters exerted duress, fraud, coercion and undue influence over Cletus at the time of these wrongful takings alleged in this complaint.

151.   Cletus seeks attorneys' fees and costs of suit under Cal. *Welf. & Inst. Code* §§ 15657.5(a).  Cletus seeks pain and suffering damages under Cal. *Civ. Code* § 3333.2 and Cal. *Welf. & Inst. Code* §15657.5(b)(1).

152.   Cletus seeks punitive and exemplary damages and trebled damages under Cal. *Civ. Code* §§ 3345 and 3294.

**SIXTH CLAIM FOR RELIEF**

**(VIOLATION OF THE CALIFORNIA CORPORATIONS**

**CODE BY ALL PLAINTIFFS AGAINST**

**ALL DEFENDANTS AND DOES 1 AND 2)**

153.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

154.   California securities laws provide rules and qualifications for effecting any transaction in, or inducing the purchase or sale of, any securities in the State of California.  Plaintiff alleges, on information and belief, that Defendants violated these statutory rules.

155.   Cal. *Corp. Code* §§ 25110 to 25130 provides that "[i]t is unlawful for any person to offer or sell…" securities in the State of California without meeting specific state requirements or having an exemption.

156.   Cal. *Corp. Code* §25210 provides that persons must not effect any transaction in, or induce or attempt to induce the purchase or sale of, any security in

the State of California unless the broker-dealer and agent are licensed and registered.

157.   Cal. *Corp. Code* § 25401 provides that "[i]t is unlawful for any person to offer or sell a security in this state, or to buy or offer to buy a security in this state, by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading."

158.   Cal. *Corp. Code* § 25501 provides in pertinent part that "[a]ny person who violates Section 25401 shall be liable to the person who purchases a security from him or sells a security to him, who may sue either for rescission or for damages (if the plaintiff or the defendant, as the case may be, no longer owns the security)[.]"

159.   Cal. *Corp. Code* § 25501.5 provides that "[a] person who purchases a security from or sells a security to a broker-dealer that is required to be licensed and has not, at the time of the sale or purchase, applied for and secured from the commissioner a certificate under Part 3 (commencing with Section 25200), that is in effect at the time of the sale or purchase authorizing that broker-dealer to act in that capacity, may bring an action for rescission of the sale or purchase or, if the plaintiff or the defendant no longer owns the security, for damages."

160.   Here, none of the Defendants were registered, licensed and certificated brokers with the SEC, FINRA or the State of California or exempt from such registration, licensure, or certification. Nor were they registered, licensed and certificated as investment advisors or exempt from such.

161.   Further, GoldStar and Shurwest were not qualified to conduct business in California because they never registered with the DBO.

162.   Defendants concealed from Plaintiff that they were not registered, licensed and certificated to act in their capacities as brokers and/or investment

advisers or to operate at all within the State of California and each Defendant is also liable as a co-conspirator who participated in and profited from the alleged misconduct.

163.   For these reasons and other statutory registration and licensing issues alleged in this complaint, the agreements and transactions between Defendants and Plaintiffs are void.

164.   This claim for relief is a statutory strict liability claim which does not require proof of causation or intent.

165.   Plaintiffs are entitled to rescission of all transactions plus prejudgment interest, among other remedies set forth in the prayer.

166.   Plaintiffs are also entitled to treble damages under California *Code of Civ. P.* §1029.8 and reasonable attorneys' fees under any statute or law providing such entitlement, including California *Corp. Code* §25501.5(b).

## SEVENTH CLAIM FOR RELIEF

## (VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT ("CLRA") BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS AND DOES 1 TO 10) (*INJUNCTIVE RELIEF ONLY*)

167.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

168.   Cal. *Civ. Code* § 1770(a) states that "the following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer are unlawful: …(2) Misrepresenting the source, sponsorship, approval, or certification of goods or services. (3) Misrepresenting the affiliation, connection, or association with, or certification by, another…(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have….(18)

Misrepresenting the authority of a salesperson, representative, or agent to negotiate the final terms of a transaction with a consumer…. (26) Advertising, offering for sale, or selling a financial product that is illegal under state or federal law, including any cash payment for the assignment to a third party of the consumer's right to receive future pension or veteran's benefits.

169.   Defendants all misrepresented their registration, licensing, and or certification to effect the transactions at issue in this case and/or to provide investment advice to Plaintiffs. Defendants concealed the fact that the FIP securities were not properly registered or exempt from registration. Defendants also concealed from Plaintiffs regulatory actions and litigation against FIP which ultimately led to FIP's demise. As principal, Minnesota Life is responsible for the wrongdoing of its agents Albert, Jeanette, and Bieser.

170.   Shurwest and GoldStar misrepresented their qualification to conduct business in California. Shurwest and GoldStar held themselves out as being authorized by the State of California to conduct business with Plaintiffs, California residents. However, they were not so authorized.

171.   FIP advertised, offered for sale, and sold cash payment for the assignment to a third party of consumers' right to receive future pension or veteran's benefits in violation of the CLRA.

172.   Each Defendant is also liable as a co-conspirator who participated in and profited from the alleged misconduct.

173.   Pursuant to Cal. *Civ. Code* §1780(a) "[a]ny consumer who suffers any damage as a result of the use or employment by any person of a method, act, or practice declared to be unlawful by Section 1770 may bring an action against that person to recover or obtain any of the following: (1) Actual damages, but in no case shall the total award of damages in a class action be less than one thousand dollars ($1,000). (2) An order enjoining the methods, acts, or practices. (3) Restitution of property. (4) Punitive damages. (5) Any other relief that the court deems proper."

174.   Pursuant to Cal. *Civ. Code* § 1780(b)(1) "[a]ny consumer who is a senior citizen or a disabled person, as defined in subdivisions (f) and (g) of Section 1761, as part of an action under subdivision (a), may seek and be awarded, in addition to the remedies specified therein, up to five thousand dollars ($5,000) where the trier of fact does all of the following: (A) Finds that the consumer has suffered substantial physical, emotional, or economic damage resulting from the defendant's conduct. (B) Makes an affirmative finding in regard to one or more of the factors set forth in subdivision (b) of Section 3345. (C) Finds that an additional award is appropriate."

175.   The 30-day period for Defendants to cure their unlawful conduct expired without any Defendant curing such unlawful conduct.  Plaintiffs seeks damages and other remedies including trebled damages, attorneys' fees, prejudgment interest, and costs against all Defendants.

## EIGHTH CLAIM FOR RELIEF

### (UNFAIR BUSINESS PRACTICES IN VIOLATION OF BUS. AND PROF. CODE SECTION 17200 BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS AND DOES 1 TO 10)

176.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

177.   Defendants failed to fulfill their statutory and common law duties as alleged in this complaint. Among other things, Defendants held themselves out as qualified to purchase for Plaintiffs, and advise Plaintiffs on, FIP securities, but failed to register as such prior to purchasing securities for Plaintiffs and advising them on the purchase of securities. Shurwest and GoldStar failed to obtain authorization from the State of California to do business with Plaintiffs. And Defendants misled Plaintiffs on the advisability of purchasing FIP securities and the Minnesota Life insurance policies.

178.   By reason of this and other fraudulent, deceptive, unfair, and wrongful conduct alleged herein, Defendants have violated *California Business and Professions Code* section 17200 et seq.

179.   Each Defendant is also liable as a co-conspirator who participated in and profited from the alleged misconduct.

180.   Pursuant to *Bus. & Prof. Code* section 17200, et seq., Plaintiffs are entitled to restitution of all amounts paid to Defendants and to injunctive relief against Defendants' wrongful conduct alleged in this complaint.

## NINTH CLAIM FOR RELIEF

### (COMMON LAW FRAUD BY ALL PLAINTIFFS
### AGAINST ALL DEFENDANTS AND DOES 1 TO 10)

181.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

182.   As alleged above, Defendants committed fraudulent acts against Plaintiffs both by affirmative misrepresentations and by intentional concealment.

183.   Defendants concealed from Plaintiffs their lack of registration, certification and licensure as set forth herein. Minnesota Life, the Heritage Defendants, and Shurwest held themselves out as investment advisers and brokers. However, none of them were registered, licensed, or certificated to act as such and they never disclosed this to Plaintiffs.

184.   Minnesota Life committed affirmative misrepresentations by identifying Bieser as an "advisor" when in fact he was not registered, licensed, or certificated as a financial/investment advisor or as a broker. It is also liable for the fraud of its agents Albert, Jeanette, and Bieser.

185.   GoldStar and Shurwest concealed from Plaintiffs the fact that they were not qualified to transact business with them as California residents.

186.   Defendants concealed the fact that the FIP securities were not properly registered or exempt from registration. Defendants also concealed from Plaintiffs regulatory actions and litigation against FIP which ultimately led to FIP's demise.

187.   Defendants knew or reasonably should have known that their conduct was fraudulent. Defendants also intended to defraud Plaintiffs.

188.   Defendants owed fiduciary or similar duties to Plaintiffs such that Plaintiffs were justified in relying on Defendants' misstatements and concealment. The nature of the relationship between Plaintiffs and Defendants in which Plaintiffs reposed trust and confidence in Defendants, justified their reliance on Defendants.

189.   Defendants' fraudulent concealment and misrepresentation proximately caused Plaintiffs' harm.

190.   Each Defendant is also liable as a co-conspirator who participated in and profited from the alleged misconduct.

191.   As alleged above, Defendants engaged in their actions and omissions intentionally with malice, oppression, or fraud pursuant to California Civil Code §3294.  Further, the individuals who committed these wrongful acts and omissions were either officers, directors, or managing agents of the entity Defendants or the entity Defendants authorized their employees' misconduct or subsequently adopted or approved their wrongful conduct such that the entity Defendants are liable for punitive damages based on their employees'/agents' conduct.

## **TENTH CLAIM FOR RELIEF**

### **(CONSTRUCTIVE FRAUD BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS AND DOES 3 TO 7)**

192.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

193.   Defendants occupied a fiduciary or similar position of trust with respect to Plaintiffs, for, among other things, holding themselves out to be brokers and/or investment advisers.

194.   As alleged above Defendants committed multiple fraudulent acts against Plaintiffs both by affirmative misrepresentations and by intentional concealment.

195.   Defendants concealed from Plaintiffs their lack of registration, certification and licensure as set forth herein. Minnesota Life, GoldStar, the Heritage Defendants, and Shurwest held themselves out as investment advisers and brokers. However, none of them were registered, licensed, or certificated to act as such and they never disclosed this to Plaintiffs.

196.   Minnesota Life and GoldStar committed affirmative misrepresentations by identifying Bieser as an "advisor" and an "account representative," respectively, when in fact he was not registered, licensed, or certificated as a financial/investment advisor or as a broker. Minnesota Life is also liable for the fraud of its agents Albert, Jeanette, and Bieser.

197.   GoldStar and Shurwest concealed from Plaintiffs the fact that they were not qualified to transact business with them as California residents.

198.   Defendants concealed the fact that the FIP securities were not properly registered or exempt from registration. Defendants also concealed from Plaintiffs regulatory actions and litigation against FIP which ultimately led to FIP's demise.

199.   Defendants knew or reasonably should have known that their conduct was fraudulent.

200.   Defendants' fraudulent concealment and misrepresentation proximately caused Plaintiffs' harm.

201.   Each Defendant is also liable as a co-conspirator who participated in and profited from the alleged misconduct.

202.   Defendants engaged in their actions and omissions intentionally with malice, oppression, or fraud pursuant to California Civil Code §3294 and are liable for punitive damages.

## ELEVENTH CLAIM FOR RELIEF

## (NEGLIGENT MISREPRESENTATION BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS AND DOES 1 TO 10)

203.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

204.   As alleged above, Defendants made affirmative misrepresentations to, and intentionally concealed material information from, Plaintiffs.

205.   Defendants concealed from Plaintiffs their lack of registration, certification and licensure as set forth herein. Minnesota Life, GoldStar, the Heritage Defendants, and Shurwest held themselves out as investment advisers and brokers. However, none of them were registered, licensed, or certificated to act as such and they never disclosed this to Plaintiffs.

206.   Minnesota Life committed affirmative misrepresentations by identifying Bieser as an "advisor" when in fact he was not registered, licensed, or certificated as a financial/investment advisor or as a broker. It is also liable for the fraud of its agents Albert, Jeanette, and Bieser.

207.   GoldStar and Shurwest concealed from Plaintiffs the fact that they were not qualified to transact business with them as California residents.

208.   Defendants also concealed the fact that the FIP securities were not properly registered or exempt from registration. Defendants also concealed from Plaintiffs regulatory actions and litigation against FIP which ultimately led to FIP's demise.

209.   Defendants knew or reasonably should have known that their conduct was fraudulent.

210.   Although Defendants may have honestly believed that their representations were true or that they had no duty to disclose information that they failed to disclose to Plaintiffs, Defendants had no reasonable grounds for their belief at the time of their misrepresentation or omission.

211.   Defendants intended for Plaintiffs to rely on their misrepresentations and omissions.

212.   As fiduciaries, Plaintiffs were justified in relying on Defendants' misstatements and concealment.  The nature of the relationship between Plaintiffs and Defendants in which Plaintiffs reposed trust and confidence in Defendants, justified their reliance on Defendants.

213.   Defendants' omissions and misrepresentations proximately caused Plaintiffs' harm.

214.   Each Defendant is also liable as a co-conspirator who participated in and profited from the alleged misconduct.

215.   Defendants engaged in their actions and omissions intentionally with malice, oppression, or fraud pursuant to California Civil Code §3294 and are liable for punitive damages.

## TWELFTH CLAIM FOR RELIEF

### (NEGLIGENCE BY ALL PLAINTIFFS

### AGAINST ALL DEFENDANTS AND DOES 1 TO 10)

216.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

217.   Per California *Civil Code* § 3372, Defendants were persons "engaged in the business of advising others for compensation as to the advisability of purchasing, holding or selling property for investment and who represent[ed]" and as such had a duty to perform with "the due care and skill reasonably to be expected of a person who is such an expert."

218.   Defendants breached these duties as alleged in this complaint.

219.   Defendants' breaches proximately caused Plaintiffs' harm.

220.   As a result of Defendants' negligence, Plaintiffs suffered serious emotional distress.

221.   Each Defendant is also liable as a co-conspirator who participated in and profited from the alleged misconduct.

222.   Defendants' negligence was a substantial factor in causing Plaintiffs' serious emotional distress.

## THIRTEENTH CLAIM FOR RELIEF

## (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS AND DOES 1 TO 10)

223.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

224.   Defendants' conduct as alleged in this complaint was outrageous.

225.   Either Defendants intended to cause Plaintiffs emotional distress or Defendants acted with reckless disregard of the probability that Plaintiffs would suffer emotional distress as a result of Defendants' conduct.

226.   Each Defendant is also liable as a co-conspirator who participated in and profited from the alleged misconduct.

227.   Plaintiffs suffered severe emotional distress.

228.   Defendants' conduct was a substantial factor in causing Plaintiffs' severe emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

1.     Statutory damages, including rescission of Plaintiffs' transactions;

2.     Compensatory damages in an amount according to proof, but not less than $1,300,000;

3.     Special damages in an amount according to proof;

4.     General damages in an amount according to proof;

5.     An accounting of all of Plaintiffs' transactions;

6.     Restitution and unjust enrichment in an amount according to proof;

7.     Treble damages under any statute or law providing such entitlement, including Cal. *Code of Civ. Proc.* § 1029.8 and Cal. *Civ. Code* § 3345;

8.     Attorneys' fees and costs of suit under any agreement, statute, or law providing such entitlement, including Cal. *Corp. Code* § 25501.5(b), Cal. *Wel. & Inst. Code* § 15657.5(a), Cal. *Code of Civ. Proc.* § 1029.8;

9.     For pre-judgment interest on all damages at the maximum legal rate;

10.    For punitive and exemplary damages under Cal. *Civ. Code* §§ 3294 and 3345;

11.    For treble damages pursuant to *Cal. Pen. Code* § 496(c);

12.    For an injunction prohibiting Defendants from continuing to violate Cal. *Bus. & Prof. Code* §§17200, *et seq.* and the CLRA, Cal. *Civ. Code* § 1750 et seq.; and equitable remedies including but not limited to rescission, restitution, civil penalties; and

13.    For such other further relief as the court may deem just and proper.

## JURY DEMAND

Plaintiffs demand trial by jury as to all issues so triable in this action.

**REIF LAW GROUP , P.C.**

Dated:  December 27, 2018     By:     *Ohia Amadi*
_____
Brandon S. Reif
Marc S. Ehrlich
Ohia A. Amadi

Jon C. Furgison
**FURGISON LAW GROUP, P.C.**

*Attorneys for Plaintiffs*